LATHAM & WATKINS LLP
  Peter A. Wald (Bar No. 85705)
  *peter.wald@lw.com*
  505 Montgomery Street, Suite 2000
  San Francisco, CA  94111
  T:  (415) 391-0600/F: (415) 395-8095
  Colleen C. Smith (Bar No. 231216)
  *colleen.smith@lw.com*
  12670 High Bluff Drive
  San Diego, CA  92130
  T:  (858) 523-5400/F: (415) 395-8095
  Megan C. Fitzpatrick (Bar No. 6309005)
  *megan.fitzpatrick@lw.com*
  330 N. Wabash Ave, Suite 2800
  Chicago, IL 60611
  T: (312) 876-7700/F: (312) 993-9767

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
  Jennifer Pasquarella (Bar No. 263241)
  *jpasquarella@aclusocal.org*
  Michael Kaufman (Bar No. 254575)
  *mkaufman@aclusocal.org*
  Sameer Ahmed (Bar No. 319609)
  *sahmed@aclusocal.org*
  1313 West 8th Street
  Los Angeles, CA  90017
  T: (213) 977-5232/F: (213) 977-5297

ACLU FOUNDATION OF NORTHERN CALIFORNIA
  Christine P. Sun (Bar No. 218701)
  *csun@aclunc.org*
  39 Drumm Street
  San Francisco, CA 94111
  T: (415) 621-2493/F: (415) 255-1487

*Attorneys for Plaintiffs*
*Jiahao Kuang and Deron Cooke*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIAHAO KUANG AND DERON COOKE, on behalf of themselves and those similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE and JAMES MATTIS, in his official capacity as Secretary of Defense of the United States Department of Defense<br><br>                    Defendants. | Case No.   18-cv-3698<br><br>**CLASS ACTION COMPLAINT AND PRAYER FOR DECLARATORY, PRELIMINARY AND PERMANENT INJUNCTIVE, AND ADMINISTRATIVE PROCEDURE ACT RELIEF** |

**INTRODUCTION**

1.      Plaintiffs are Lawful Permanent Residents of the United States ("LPRs") who seek the opportunity to serve this country on equal footing with United States citizens. Plaintiffs enlisted in the United States Armed Forces because they want to defend and give back to their adopted country, but they are being prevented from doing so by an unlawful and discriminatory new policy instituted by the United States Department of Defense ("DoD") and Secretary of Defense James Mattis (together, "Defendants").  In a radical departure from long-standing policy, Defendants are forcing LPRs to pass undefined background investigations and requirements before they are permitted to serve in the military, while United States citizens continue to serve unimpeded.  Defendants have failed to explain the purpose behind this discriminatory policy change.

2.      Defendants announced this abrupt shift in a memorandum issued on October 13, 2017.  *See* Office of the Under Secretary of Defense, Military Service Suitability Determinations for Foreign Nationals Who Are Lawful Permanent Residents (October 13, 2017) (the "October 13 Memo"), Exhibit A.  The October 13 Memo states that LPRs cannot ship to basic training, and thus serve in the military, until certain background investigations and related determinations about their purported suitability to serve in the military are completed.  It fails to explain what those background investigations and determinations are, how long they will take, or why they are necessary.  Meanwhile, U.S. citizens continue to ship to basic training after their standard background investigations are initiated, which occurs shortly after they enlist.

3.      Defendants are thus unfairly targeting LPRs, treating them as second-class recruits solely because of their status as LPRs.  Instead of proffering a justification for this treatment, the October 13 Memo merely states that the new policy is to "facilitate process efficiency and the appropriate sharing of information for security risk based suitability and security decisions for the accession of foreign nationals."  *See* Ex. A: October 13 Memo at p. 1. As the discriminatory impact and lack of any justification make plain, there cannot be any legitimate government rationale for this new policy.

4.      For decades, LPRs and U.S. citizens have been treated the same by the

1

DoD.  Pursuant to the DoD's written policies, they shipped to basic training and began their military service as soon as they met certain basic enlistment qualifications and their background investigations were initiated by the DoD.  This was consistent with the U.S. military's long-standing commitment to immigrant soldiers, which reflected the continuing and historical sacrifices that immigrants have made in the Armed Forces – beginning with the American Revolution and continuing in the Civil War, World War I and II, the Vietnam War, and into the present.

5.      Now, LPRs who enlist are discriminated against and left in limbo.  They do not know when or if they will be permitted to ship to basic training.  They do not know if they should quit their jobs or notify employers of their enlistment, arrange for support and care for children and spouses, sell possessions and exit leases.  They are not able to pursue their chosen career path, yet do not know if they should find another.  Desirable officer positions within the military may be foreclosed to them given age restrictions and the likelihood of aging out as they wait to ship.  They are not able to take advantage of the expedited path to naturalization that the military offers to LPRs, but unsure whether they should pursue the slower, civilian path.  Finally, they are stigmatized as second-class recruits, and made to feel inferior by the very country they are trying to serve.

6.      Defendants' unlawful attempts to prevent LPRs from serving in the military are contrary to Congress's intent and the plain language of 10 U.S.C. § 504(b) (the "Enlistment Statute"), which clearly states that "[a] person may be enlisted in any armed force only if the person is . . . [a] national of the United States… [or a]n alien who is lawfully admitted for permanent residence. . . ."

7.      The October 13 Memo and its implementation violate the equal protection and due process rights guaranteed by the Fifth Amendment and the Administrative Procedure Act (the "APA").  Accordingly, on behalf of themselves and a class of all similarly-situated individuals, Plaintiffs seek declaratory, preliminary, and permanent injunctive relief to enjoin Defendants from implementing the policy change promulgated in the October 13 Memo and to permit LPRs to be shipped to basic training on the same terms as U.S. citizen recruits.

2

1
## JURISDICTION

2       8.      This Court has jurisdiction over this action under 28 U.S.C. § 1346

3   (United States as defendant); 28 U.S.C. § 1331 (federal question for violating a federal statute

4   and the United States Constitution); and 5 U.S.C. § 701 et seq. (APA).

5
## VENUE

6       9.      Venue is proper in the Northern District of California under 28 U.S.C. §

7   1391(e), because one of the named Plaintiffs, Jiahao Kuang, resides within this district.  In

8   addition, a substantial part of the events that gave rise to Plaintiffs' claims occurred in the state

9   of California, where a significant number of LPRs reside (including LPRs who enlist in the

10  military).[1]

11
## PARTIES

12      10.     Plaintiff Jiahao Kuang resides in San Leandro, California and is an LPR.

13  Mr. Kuang enlisted in the Navy in July 2017 and was placed in the Navy's Delayed Entry

14  Program ("DEP").[2]  Mr. Kuang's background investigations are currently pending, and, in May

15  2018, he was informed by Navy personnel that he will not be shipped to basic training until the

16  investigations are completed.

17      11.     Plaintiff Deron Cooke resides in Trenton, New Jersey and is an LPR.  Mr.

18  Cooke enlisted in the Air Force in August 2017 and was placed in the Air Force's DEP.  Mr.

19  Cooke's background investigations are currently pending, and, after the October 13 Memo was

20  issued, he was informed by Air Force personnel that he will not be shipped to basic training until

21  the investigations are completed.

22      12.     Defendant DoD is an executive branch department of the U.S. federal

23  government that is responsible for the implementation and administration of enlistment and

24  accession policy for LPRs.

25
---

26  [1] Nancy Rytina, *Estimates of the Legal Permanent Resident Population in 2012,* at 3 (July 2013) (stating, "California was the leading state of residence with an estimated 3.4 million LPRs in 2012," representing 25.6% of all LPRs living in the United States).

27  [2] Delayed Entry Programs ("DEPs") are programs in which recruits may be enrolled while

28  waiting to be shipped out to basic training.  Recruits in DEPs are not paid and have not been accessed into the military.

3

13. Defendant James Mattis is sued in his official capacity as Secretary of Defense of the DoD. As Secretary of Defense, General Mattis is responsible for the implementation and administration of enlistment and accession policy for LPRs.

## BACKGROUND AND FACTS

### LPRs Are A Valuable Military Resource

14. Immigrants are and always have been a valuable military resource. During the Revolutionary War, the Civil War, World War I, and World War II, a significant portion of the U.S. Armed Forces was comprised of immigrants.[3] In modern times, President George W. Bush issued an executive order after 9/11 to provide expedited naturalization for non-citizens serving in the Armed Forces in order to incentivize non-citizen enlistment.[4] Before the October 13 Memo, approximately 5,000 LPRs enlisted in the U.S. military every year. *See Military Accessions Vital to National Interest (MAVNI) Recruitment Pilot Program Memorandum ("MAVNI Memo"), Exhibit B at p. 3.*

15. Immigrant soldiers have repeatedly gone above and beyond the call of duty to protect the United States. As of 2006, nearly 200 immigrants had won significant awards in combat since 9/11.[5] Some of them have reached the highest ranks in the U.S. military. One of the most prominent contemporary examples is General John Shalikashvili, who served as the Chairman of the Joint Chiefs of Staff from 1993 to 1997, and who immigrated to the United States from Poland shortly after World War II.[6] Other immigrants have proven their value on the

---

[3] Immigrant soldiers includes both non U.S. citizens and foreign born and naturalized U.S. citizens. *See* Jeanne Batalova, *Immigrants in the U.S. Armed Forces*, Migration Policy Institute, May 15, 2008, *available at* https://www.migrationpolicy.org/article/immigrants-us-armed-forces; *See also* Huseyin Yalcinkaya and Melih Can, *The Effect of Executive Order 13269 on Noncitizen Enlisted Accessions in the U.S. Military* (Mar. 2013) (unpublished thesis, Naval Postgraduate School) (on file with Calhoun, Institutional Archive of the Naval Postgraduate School).

[4] Margaret D. Stock, *Special Report Immigrants in the Military Eight Years after 9/11*, November 2009, *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/Immigrants_in_the_Military_-_Stock_110909_0.pdf.

[5] *Contributions of Immigrants to the United States Armed Forces: Hearing Before the Senate Committee on the Armed Services*, Senate Hrg. 109-884 (July 10, 2006) (Statement of Gen. Peter Pace).

[6] *See id.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  battlefield.  Captain Felix Sosa-Camejo earned 12 citations, including 2 Bronze Stars, 3 Silver

2  Stars, and 2 Purple Hearts, in the Vietnam War.[7]

3       16.     Immigrants, including LPRs, contribute valuable skills to the military.

4  Many speak a second language other than English.[8]  Further, numerous studies have found that

5  immigrant recruits generally have better qualifications and lower attrition rates compared to U.S.

6  citizen recruits.  Non-citizens have 36-month attrition rates that are 13.5% lower than those for

7  citizens.[9]  Immigrant recruits with critical foreign language skills tend to have higher Armed

8  Forces Qualification Test ("AFTQ") scores, higher levels of education, and above average

9  performance reviews.[10]

10      17.     The U.S. military has long recognized the importance of immigrants.  On

11  July 10, 2006, the Senate Armed Services Committee held a field hearing devoted entirely to the

12  role of immigrants in the Armed Forces.  At the hearing, Dr. David S. C. Chu, the

13  Undersecretary of Defense for Personnel and Readiness, testified that immigrants are "a vital

14  part of this country's military" and provide "the Services with a richly diverse force in terms of

15  race/ethnicity, language, and culture."[11]

16                **The Applicable Statutory and Regulatory Framework**

17      18.     In January 2006, Congress revised military enlistment laws, repealing the

18  separate statutes that had previously governed enlistment in each of the service branches and

19  replacing them with a single unified statute that applies to all of the armed services.  The

20  amended statute, 10 U.S.C. § 504(b) (the "Enlistment Statute"), provides that entry to the U.S.

21

22  [7] *See Contributions of Immigrants to the United States Armed Forces*: *Hearing Before the Senate Committee on the Armed Services*, Senate Hrg. 109-884 (July 10, 2006) (Statement of Emilio T. Gonzalez, Director, U.S. Citizenship and Immigration Services).

23  [8] Molly McIntosh and Seema Sayala, *Non-citizens in the Enlisted U.S. Military*, The CNA Corporation, Dec. 2011, at 6.

24

25  [9] Anita Hattiangadi, et al., *Non-citizens in Today's Military*, The CNA Corporation, Apr. 2005, at 62.

26  [10] Ani DiFazio, *MAVNI Final Evaluation* (presentation to Jeffrey Mayo, Director, Accession Policy, DoD) (May 21, 2013).

27  [11] *Contributions of Immigrants to the United States Armed Forces*: *Hearing Before the Senate Committee on the Armed Services*, Senate Hrg. 109-884 (July 10, 2006) (Statement of Hon.

28  David S.C. Chu, Under Secretary of Defense for Personnel and Readiness).

military is generally limited to: (1) U.S. nationals;[12] (2) LPRs; and (3) persons from the Federated States of Micronesia, the Republic of Marshall Islands, and Palau.  By revising previous enlistment laws to clarify that LPRs can enlist in any branch of the U.S. military, Congress clearly demonstrated its intent to allow LPRs to serve in the military.

19.    Additionally, the Enlistment Statute confers discretion to the relevant Secretary of each military component to *broaden* the pool of eligible recruits.  It specifically provides that the Secretary "may authorize the enlistment of a person not described" in the statute "[if] such enlistment is vital to the national interest."  10 U.S.C. § 504(b)(2).  But nowhere in the Enlistment Statute does Congress confer any discretion to the secretaries to *restrict* the citizenship and residency categories of eligible recruits.

20.    All recruits, including LPRs, must pass certain background investigations.[13]  Prior to the October 13 Memo, however, the background investigation process was the same for LPRs and U.S. citizens.  Enlistees report to Military Enlistment Processing Stations ("MEPS") for physical and aptitude tests and background questioning about criminal histories, drug use, mental health and other matters.  While at MEPS, enlistees submit fingerprints so that their background investigations can be initiated.[14]

21.    Before the October 13 Memo was issued, DoD practices and written policies subjected all enlistees to the same level of background investigations.[15]  They also permitted all enlistees to ship to basic training and begin their military service once they completed the MEPS process and their background investigation was *initiated*.[16]  This meant recruits could start training, be assigned to their units, get paid, and initiate the expedited

---

[12] U.S. nationals are all citizens of the U.S., as well as all persons who, though not citizens, "owe[] permanent allegiance to the United States."  *See* Immigration and Nationality Act, 8 U.S.C. 1101(a)(22).  This includes persons born in or having ties to outlying possessions of the U.S., such as American Samoa and Swains Island.

[13] *See* 32 CFR § 66.6(b)(8).

[14] U.S. Army, *Your Visit to MEPS*, *available at* https://www.goarmy.com/learn/your-visit-to-meps.html.

[15] Department of Defense Manual, Number 5200.02 §7.6(b)2.

[16] Department of Defense Instruction, Number 1304.26 Enclosure 3 §2.h.6(a).

6

naturalization process if they are non-citizens, while waiting for the results of their background investigations.[17]  If the background investigation revealed disqualifying information that was not divulged during MEPS, service members could be discharged for fraudulent entry.[18]

22.     Consistent with this prior practice, the DoD's own regulations and guidelines provide that the DoD should treat applicants to the U.S. military equally and without discrimination.  Specifically, the DoD is required to:

> (a) Use common entrance qualification standards for enlistment, appointment, and induction into the Military Services.
>
> (b) Avoid inconsistencies and inequities based on ethnicity, gender, race, religion, or sexual orientation in the application of these standards by the Military Services.
>
> (c) Judge the suitability of individuals to serve in the Military Services on the basis of their adaptability, potential to perform, and conduct.[19]

**The October 13 Memo Bars LPRs From The Military Indefinitely**

23.     The October 13 Memo abruptly changed the DoD's prior enlistment practice, violating not only the Enlistment Statute, but the DoD's own regulations and guidelines. Defendants failed to provide any legitimate reason to justify this reversal.

24.     The October 13 Memo states "[i]n order to facilitate process efficiency and the appropriate sharing of information for security risk based suitability and security decisions for the accession of foreign nationals . . . effective immediately a Military Service Suitability Determination (MSSD) and National Security Determination (NSD) will be made prior to such foreign national's entry into Active, Reserve, or Guard Service."  *See* Ex. A: October 13 Memo at p. 1.  This means that all LPRs must wait until their required background investigations are completed and favorable "NSDs" and "MSSDs" are rendered before they are

---

[17] 8 U.S.C. §1440 provides an expedited path to citizenship for non-citizen service members by eliminating certain requirements relating to age, length of residency, and payment of fees that apply to civilian applicants for naturalization.  For example, in the past, military service members could initiate their naturalization process after one day of training in boot camp regardless of how long they have resided in the U.S.  *See* supra n.16.  On the other hand, civilian LPRs have to reside in the U.S. for at least five years prior to filing the naturalization application unless they are spouses of U.S. citizens.  In that case, three years of residence is sufficient.

[18] *See, e.g.*, 10 U.S.C. § 883, Art. 83.

[19] 32 CFR § 66.4; Department of Defense Instruction, Number 1304.26.

1  allowed to serve in the military.  Meanwhile, U.S. citizens are still shipped to basic training and

2  permitted to serve as soon as their background investigations are initiated.[20]

3          25.     The DoD must have the results of the background investigations before

4  they can complete the MSSD and NSD adjudications.  However, Defendants have not explained

5  what is required to obtain a favorable NSD or MSSD adjudication, and it is not clear whether

6  these adjudications are applying new, more rigorous standards or requirements to LPRs.

7          26.     Indeed, Daniel Purtill, a DoD official and the Deputy Director of the DoD

8  CAF at the time the October 13 Memo was issued, admitted that he has no idea what the

9  background investigation process is for LPRs.  More than four months after the October 13

10 Memo was issued, he stated, "I don't believe the [D]epartment [of Defense] has finalized that

11 policy yet so I'm not sure what will be included in a check for an LPR."  *See* Deposition

12 Transcript of Daniel Purtill at 57:6-9, Feb. 16, 2017, *Tiwari, et al. v. Mattis, et al.,* No. 2:17-cv-

13 00242-TSZ (W.D. Wash.), Exhibit C.

14         27.     Even if Defendants determine that the background investigations which

15 were previously applied to LPRs and are currently applied to U.S. citizens (the least rigorous

16 background investigations that could be required by the MSSD or NSD) apply to LPRs now, the

17 DoD has represented that they take 350 days to complete on average.

18         28.     This delay is, at least in part, the result of an enormous backlog of

19 background investigations for the federal government.  As of September 2017, the government-

20 wide investigation backlog was 700,000 investigations.[21]  According to the National Background

21 Investigations Bureau ("NBIB"), the backlog increased at an average rate of about 3,600

22 investigations each week from October 2016 through July 2017.[22]

---

[20] A background investigation is initiated when the National Background Investigations Bureau's ("NBIB") processing center receives the investigation request, the corresponding document submissions, and the fingerprint,  *See* "Requesting The Investigation" *available at* https://nbib.opm.gov/hr-security-personnel/requesting-opm-personnel-investigations/requesting-the-investigation/.

[21] U.S. Government Accountability Office, *Personnel Security Clearances: Additional Actions Needed to Ensure Quality, Address Timeliness, and Reduce Investigation Backlog (GAO-18-29)*, Report to Congressional Addressees at 70 (Dec. 2017).

[22] *Id*. at 54.

8

29.     Moreover, the DoD has not explained how they evaluate the results of the background investigation to make the MSSD and NSD adjudications.  Thus, it is unclear when LPRs will be permitted to serve.  In the interim, Plaintiffs have not been permitted to ship to basic training and do not know when they will be permitted to ship.

30.     Upon information and belief, a "lack of U.S. citizenship" is grounds for an unfavorable adjudication of an NSD.  A DoD document produced in a separate litigation indicated that the DoD CAF recommended an unfavorable NSD adjudication based "solely on a lack of U.S. citizenship."  *See* Preliminary Injunction Hearing Transcript, Oct. 18, 2017, *Kirwa v. U.S. Dep't of Defense,* No. 17-cv-01793-ESH-EMM, ECF No. 27, at 81:20-84:15 (D.D.C.), Exhibit D.

**Implementation Of The October 13 Memo**

31.     All branches of the U.S. military, including both active and reserves, have implemented the October 13 Memo and thus banned LPRs from serving in the U.S. military for an indefinite period of time.  Further, in some instances, the DoD has refused to even accept enlistment applications from LPRs.

32.     For example, LPRs were barred from submitting enlistment applications in the Army Reserve for about two months.  On October 24, 2017, the U.S. Army Recruiting Command Public Affairs ("USAREC") issued a press release notifying potential recruits that the Army Reserve stopped enlisting LPRs, purportedly because the Army Reserve did not have a DEP in which LPRs could wait for their background investigations to be completed.  *See* USAREC, DoD Issues New Guidance That Affects Recruiting Green Card Holders (October 24, 2017), Exhibit E.  The Army eventually announced the creation of a DEP for prospective reservists in the week of December 27, 2017, but by then LPRs had already been barred from submitting enlistment applications in the Army Reserve for about two months.[23]

33.     Additionally, upon information and belief, some recruitment centers for

---

[23] Meghann Myers, *Green card holders can join the Army Reserve again — after a wait*, Army Times, Dec. 27, 2017, *available at* https://www.armytimes.com/news/your-army/2017/12/27/green-card-holders-can-join-the-army-reserve-again-after-a-wait/.

9

the Marine Corps have also banned LPRs from enlisting pursuant to the October 13 Memo.
Others have permitted them to submit enlistment applications, but have prohibited them from
shipping to basic training.

34.     The National Guard has mandated that all LPRs seeking to enlist in the
National Guard must first enlist in a newly created Recruit Force Pool ("RFP"), akin to a DEP,
while waiting for their background investigations to be completed.  *See* National Guard Bureau,
Army National Guard Recruit Force Pool (RFP) Enlistment Option with Lawful Permanent
Resident (LPR-09M) Guidance (as amended January 4, 2018), Exhibit F.  In the past, LPRs in
the National Guard, like U.S. citizens, would be paid for attending a monthly drill.  However,
LPRs are no longer paid while in the RFP.  *Id.* at p. 2.

35.     Finally, upon information and belief, the Navy and the Air Force have also
implemented the October 13 Memo.  LPRs seeking to enlist after October 13, 2017 have been
placed in the DEP, while waiting for their background investigations to be completed and MSSD
and NSD to be favorably adjudicated.

**Plaintiffs Have Been Barred From Serving In The Military**

36.     In 2007, Plaintiff Jiahao Kuang immigrated to the U.S. from China with
his father when he was eight years old.  Since immigrating to the U.S., Mr. Kuang has embraced
American traditions and is eager to become a citizen.

37.     In the summer of 2017, following his junior year of high school, Mr.
Kuang began making plans for his life after graduation.  Proud of the country he has lived in
since his childhood, Mr. Kuang decided to enlist in the U.S. Navy.

38.     Mr. Kuang was sworn in and signed his enlistment contract with the Navy
as a Personnel Specialist on July 18, 2017.  As required for all high school recruits, Mr. Kuang
enlisted into the Navy's DEP pending his high school graduation.  His ship date was set for about
a year later, on July 5, 2018, so that he could ship out shortly after graduation in June.

39.     Mr. Kuang attended DEP meetings every month after he enlisted.  He first
learned about the policy change in the October 13 Memo at a DEP meeting in early 2018.
However, Navy personnel told him they were optimistic that his ship date would not be delayed,

10

1  as there was a year between his enlistment and ship date during which his background

2  investigation could be completed.

3          40.     At a DEP meeting in May 2018, a recruiter informed Mr. Kuang that his

4  ship date had been delayed to January 17, 2019.  Mr. Kuang asked his recruiter whether there

5  was anything he could do to ship out earlier.  The recruiter told him that there was nothing he

6  could do – he would simply have to wait until his background investigation cleared.  However,

7  he was also told that it was possible his background investigation would not be completed at that

8  time and, if that was the case, then he would not be allowed to ship out.

9          41.     Mr. Kuang graduated from high school on June 7, 2018 and now lives in a

10  state of limbo.  He can't go to college in the fall because he didn't apply to do so.  If he had

11  known that he would not ship out to basic training, he would have applied to and attended a

12  University of California school if he were accepted.

13          42.     Further, Mr. Kuang budgeted his money and planned his long-term

14  finances under the assumption that he would ship out and begin to receive his salary on July 5,

15  2018, and that he would subsequently be eligible for financial assistance for college from the

16  military.  Now, his savings are beginning to run out, his unknown ship date makes finding a job

17  difficult, and his concerns about being able to pay for college are growing.

18          43.     Mr. Kuang feels he cannot make any long-term commitments due to the

19  uncertainty created by his unknown ship date.  Though he is scheduled to ship out in January

20  2019, Mr. Kuang could be ordered to ship at any time.  He is therefore hesitant to sign up for

21  community college courses and concerned about how to explain his situation to potential

22  employers.  He worries that he will ship out unexpectedly, and the company will have wasted

23  training resources on him, damaging his reputation.  If he is upfront about his uncertain status, he

24  will be an unattractive employment candidate.

25          44.     The policy change has also significantly delayed Mr. Kuang's pursuit of

26  U.S. citizenship.  When Mr. Kuang enlisted, he was told that he could get citizenship through his

27  military service after three days of active duty service and he would not need to pay the

28  application fee.  As a result, he decided to renew his green card rather than apply for citizenship

11

through the civilian process. Now, Mr. Kuang does not know when, or if, he will be able to obtain citizenship through the military.

45.    Mr. Kuang wants to serve the United States and has demonstrated that he would be a valuable asset to the military.  He is smart, hardworking, and self-motivated.  Mr. Kuang scored exceptionally well on his Armed Services Vocational Aptitude Battery ("ASVAB") test, leading recruiters to suggest he pursue a job in nuclear engineering.  He is a highly skilled, self-taught computer coder.  He has pursued his interest in computers throughout high school, founding his high school's first coding club, helping organize a coding event for all high schools in the Bay Area, and frequently volunteering to create educational software programs for his teachers.  He graduated high school with a 3.8 GPA and speaks Mandarin and Cantonese.  Instead of encouraging Mr. Kuang to join the military, the DoD has delayed and blocked his service at every turn and treated him as a second-class, inferior recruit.

46.    Mr. Kuang feels strongly that the October 13 Memo is unjust.  He is frustrated because immigrants like himself contribute to the U.S. just as citizens do, yet policies such as the October 13 Memo make their path to success more difficult.  Mr. Kuang is also concerned that he will be ostracized by his colleagues once he ships out given that the DoD's official policies single out and discriminate against LPRs.  More than anything, the DoD policy makes him feel unwelcome in the U.S. and in the U.S. military.

47.    Plaintiff Deron Cooke immigrated to the U.S. from Jamaica in July 2015 when he was twenty-two years old.  He was looking for a better life, and he found it in the U.S. Grateful for his new life and inspired by his family's history of public service, Mr. Cooke decided to enlist to give back to his adopted country.  Mr. Cooke's father was a police officer, and his uncle was an U.S. Air Force pilot.

48.    In September 2017, Mr. Cooke was sworn in and signed a contract to work as an auto mechanic in the Air Force.  His recruiter told him that he would ship out on November 15, 2017, while his background investigations were in progress.

49.    At the time he enlisted, Mr. Cooke had a temporary position as a lensing technician for a laser technology company.  Mr. Cooke was working as a temporary employee

because his employer understood that he would be shipping out to basic training soon. In anticipation of his ship date, Mr. Cooke submitted his two-weeks' notice to his employer. But just two weeks before his ship date, Mr. Cooke was told that his ship date and auto-mechanic job contract had been cancelled.

50.    Mr. Cooke was forced to rescind his resignation and continue his job as a temporary technician. His recruiter told him that there was a nine-month backlog in processing the background investigations, but that he could not provide Mr. Cooke with a guaranteed timeline, and there was nothing Mr. Cooke could do to ship out sooner. Nor could he guarantee that Mr. Cooke would be able to serve as an auto mechanic, his desired position, since his contract for that position had been cancelled.

51.    In February 2018, Mr. Cooke still had not received a new ship date, so he switched to a permanent employee position. Since then, Mr. Cooke's employer has encouraged him to apply for a promotion, but Mr. Cooke is hesitant because he does not know when he will ship out. He also has not taken advantage of his company's educational benefits because he hopes to ship out soon and begin his military career.

52.    Mr. Cooke has big plans for his military career. His recruiter told him that after two years of service as an auto mechanic, he could pursue his education and earn credits to add to his associate's degree, so that he eventually would receive a bachelor's or master's degree and could work as an engineer within the military. But he hasn't been permitted to pursue these plans, and he is concerned that his military career options will become more limited as he gets older.

53.    Mr. Cooke also wants to become a citizen so that he can bring his mother, who is ill, to the U.S. for better medical treatment. Mr. Cooke's mother suffers from a serious back injury, and is partially disabled. However, because he cannot start the naturalization process until he begins his military service, his citizenship has been indefinitely delayed, and he has not been able to sponsor his mother's immigration to the U.S.

54.    To date, Mr. Cooke has still not received a new ship date. He feels the military has unfairly singled out him and other LPRs and that the military does not want LPRs

1    fighting alongside citizens.  He worries that the military thinks LPRs are all terrorists.  He has

2    been forced to put his life on hold, including his own honeymoon, in anticipation of being sent to

3    basic training at a moment's notice.

4              **Defendants Have No Legitimate Justification For The October 13 Memo**

5              55.    The October 13 Memo fails to articulate any legitimate justification for its

6    departure from this country's long tradition of enlisting LPRs and U.S. citizens on equal terms.

7    The October 13 Memo simply states that the change is "to facilitate process efficiency and the

8    appropriate sharing of information for security risk based suitability and security decisions for

9    the accession of foreign nationals."  *See* Ex. A: October 13 Memo.  This vague and conclusory

10   statement is not a legitimate justification for this dramatic and unprecedented new policy.

11             56.    In fact, the new policy actually harms U.S. military interests and

12   compromises national security.  Currently approximately 71% of young Americans are ineligible

13   to serve in the U.S. military because they do not meet physical fitness and educational

14   requirements.[24]  Military leaders anticipate that the military will have tremendous difficulties

15   meeting its recruitment goals and have declared the manpower shortage a "looming crisis" that

16   "directly compromises national security."[25]

17             57.    Meanwhile LPRs represent approximately 4.1% of the population that are

18   between the recruitable ages of 18 to 24 year old, equivalent to about 1.5 million people.  Their

19   proportional share in the recruitable population is expected to grow over time since much of the

20   growth in the U.S. youth population over the next two decades will come from immigration.[26]

21   Moreover, they are highly qualified and less inclined to leave the military compared to U.S.

22

23

24   ────────────────

25   [24] Thomas Spoehr, *The Looming National Security Crisis: Young Americans Unable to Serve in
     the Military*, The Heritage Foundation, Feb. 13, 2018, *available at*
26   https://www.heritage.org/defense/report/the-looming-national-security-crisis-young-americans-
     unable-serve-the-military.
27   [25] *Id.*

28   [26] Anita Hattiangadi, et al., *Non-citizens in Today's Military*, The CNA Corporation, Apr. 2005,
     at 6-7.

                                                14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

citizen recruits.[27]

58.    The indefinite ban of LPRs deepens the manpower crisis by both delaying the service of LPRs who have enlisted and deterring others from enlisting at all.

59.    Indeed, the DoD itself has admitted that the new policy may have an impact on their ability to meet their recruiting goals in 2018.  In fact, on April 20, 2018, the Secretary of the Army announced that the Army would fall short of its recruiting goal in 2018.[28]

60.    Previously, the Army has accepted recruits with lower qualifications in order to meet its recruiting goals, and it appears this is likely to occur again.  For example, in 2017, the Army had to accept three times the number of recruits scoring below the 30th percentile on standard military exams than it did in 2016.[29]  The Army has also been granting more waivers to recruits who have admitted past drug use or have been diagnosed with mental health conditions.[30]  In fact, from October 2016 to October 2017, the Army issued waivers to more than 1,000 recruits who had been diagnosed with mental health conditions that could affect their ability to serve in the military's estimation.[31]

61.    Additionally, if Defendants contend that the October 13 Memo was motivated by some national security concern, they have provided no evidence to support this

---

[27] *See supra* at ¶ 16; *see also Population Representation in the Military Services: Fiscal Year 2016 Summary Report*, Office of the Under Secretary of Defense, Personnel and Readiness, 2016, at 41 ("In terms of the their quality, the majority of non-citizen [non-prior-service] accessions are high-quality recruits, with Tier 1 education credentials and an AFQT score in the top 50 percentiles.").

[28] Richard Sisk, *Goal of 80,000 Recruits Won't Be Met, Army Secretary Says*, Military.com, April 21, 2018, *available at* https://www.military.com/daily-news/2018/04/21/goal-80000-recruits-year-wont-be-met-army-secretary-says.html.

[29] Christopher Woody, *The Army is trying to bring in more recruits, and it's changing its standards to get them*, Business Insider, Oct. 18, 2017, *available at* http://www.businessinsider.com/army-changing-recruiting-standards-to-attract-more-soldiers-2017-10.

[30] Barnini Chakraborty, *Army eases mental health restrictions to meet recruiting goals*, New York Post, Nov. 13, 2017, *available at* https://nypost.com/2017/11/13/army-eases-mental-health-restrictions-to-meet-recruiting-goals/.

[31] Tom Vanden Brook, *Army issues waivers to more than 1,000 recruits for bipolar, depression, self-mutilation*, USA Today, April 26, 2018, *available at* https://www.usatoday.com/story/news/politics/2018/04/26/army-issues-waivers-1-000-recruits-history-bipolar-depression-self-mutilation/554917002/.

1    justification.

2    　　　62.　　　A study commissioned by the DoD found that threats to U.S. national

3    security in the military do not come from new recruits, regardless of their immigration status.[32]

4    Therefore, new LPR recruits do not pose heightened national security risks that warrant the

5    drastic change to the existing policy.  Nor are immigrants more prone to crime generally than

6    U.S. citizens.  In fact, "immigrants are less likely to be incarcerated than natives."[33]

7    　　　63.　　　Further, from a national security perspective, all LPRs enlisting in the

8    military have already undergone extensive background investigations—either through the

9    Department of State (if they are processed for an immigrant visa overseas) or the Department of

10   Homeland Security, or both agencies— in order to obtain their LPR status.  Both the State

11   Department and U.S. Citizenship and Immigration Services ("USCIS") conduct background

12   investigations that address a wide range of risk factors, similar to those assessed in military

13   background investigations.[34]  They both run the names of every LPR applicant through an

14   interagency background check system, which combines information from multiple agencies and

15   databases to address national security risks, public safety issues, and other law enforcement

16   concerns.[35]  The agencies also conduct FBI fingerprint checks and FBI name checks for almost

17   all LPR applicants, which will reveal any criminal history within the U.S. and which often reveal

18   criminal history outside the U.S. as well.[36]  These security checks and investigations identify

19   LPR applicants who have been involved in violent crimes, sex crimes, drug trafficking or with

20

21   [32] Kelly R. Buck et. al., *Screening for Potential Terrorists in the Enlisted Military Accessions Process*, Defense Personnel Security Research Center, Apr. 2005, *available at*
22   https://fas.org/irp/eprint/screening.pdf

23   [33] Michelangelo Landgrave and Alex Nowrasteh, *Criminal Immigrants: Their Numbers, Demographics, and Countries of Origin*, Cato Institute, March 15, 2017, at 6.

24   [34] U.S. Citizenship and Immigration Services, *Fact Sheet: Immigration Security Checks*, U.S. Department of Homeland Security, Apr. 25, 2006, *available at*
25   https://www.uscis.gov/sites/default/files/files/pressrelease/security_checks_42506.pdf; *see also* USCIS Policy Manual, Volume 12, Part B, Chapter 2-Background and Security Checks,
26   *available at* https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume12-PartB-Chapter2.html.

27   [35] *Id.*

28   [36] *Id.*

16

1    known links to terrorism.[37]  Additionally, the Department of Homeland Security verifies the LPR

2    status of all LPRs who attempt to enlist through the SAVE (Systematic Alien Verification of

3    Entitlements) system, just prior to enlistment.  As a result, LPR recruits have been thoroughly

4    vetted prior to enlisting, unlike U.S. citizens.

5                              **The October 13 Memo Discriminates Against LPRs**

6                    64.    The October 13 Memo distinguishes between U.S. citizens and LPRs and

7    creates additional burdens and requirements for LPRs solely because of their status as LPRs.

8    Thus, on its face, it discriminates against LPRs.

9                    65.    Moreover, given the absence of any evidence of a legitimate government

10   rationale, it is difficult to conceive of any motivation, other than animus, for the DoD making it

11   more difficult for qualified immigrants to join the military.

12                   66.    In fact, on the same day the October 13 Memo was issued, Defendants

13   issued another policy change that also unjustifiably targeted LPRs.  *See* Office of the Under

14   Secretary of Defense, Certification of Honorable Service for Members of the Selected Reserve of

15   the Ready Reserve and Members of the Active Components of the Military or Naval Forces for

16   Purposes of Naturalization (October 13, 2017), Exhibit G.  It declared that it would not certify

17   (and would revoke those already certified) Form N-426s, a form non-citizen soldiers must submit

18   to USCIS to be eligible for expedited naturalization, until LPRs met additional requirements.

19                   67.    In the past, the DoD certified Form N-426s within one or two days of the

20   applicants' submission, meaning non-citizen recruits could start the naturalization process during

21   basic training.[38]  Indeed, a federal statute entitles them to an expedited path to U.S. citizenship

22   after as little as one day of military service.[39]  Now Defendants will no longer certify the forms

23   until more onerous requirements are met, including completing at least 180 days of active duty

24

25   [37] U.S. Citizenship and Immigration Services, *Fact Sheet: Immigration Security Checks*, U.S.
     Department of Homeland Security, Apr. 25, 2006, *available at*
26   https://www.uscis.gov/sites/default/files/files/pressrelease/security_checks_42506.pdf

27   [38] *See Kirwa v. U.S. Dep't of Defense,* No. 17-cv-01793-ESH-EMM, 2017 U.S. Dist. LEXIS
     176826 at *8-9 (D.D.C. Oct. 25, 2017).

28   [39] 8 U.S.C. § 1440

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

1   service or a full year of reserve service.  As a result, USCIS has closed naturalization centers at

2   basic training sites and non-citizen recruits, including LPRs, have to wait indefinitely before they

3   can initiate the naturalization process.[40]

4          68.    Defendants' unprecedented and unjustified departure from historical

5   practices targets LPR recruits.  Defendants' dramatic policy reversal comes at a time when

6   President Donald Trump's administration has enacted and promoted a flurry of policies against

7   immigrants with lawful status.  The current administration has radically curtailed the Temporary

8   Protected Status program, which allows people from countries ravaged by war and natural

9   disasters to remain in the U.S., and severely limited the admission of refugees to the country,

10  including by lowering the annual cap on refugees.  Under President Trump's leadership, the

11  administration has also sought to end the long-standing practice of family immigration to the

12  U.S.[41]

13         69.    Moreover, both during his campaign and after taking office, President

14  Trump, the Commander-in-Chief of the U.S. Armed Forces, has made statements against

15  immigrants with lawful status.  He repeatedly told the old fable of a "vicious snake" killing its

16  savior after she had nursed it back to health and asked his supporters to "think of [the story] in

17  terms of immigration."  At a Conservative Political Action Conference on February 23, 2018,

18  President Trump compared immigrants to snakes again and warned "[w]e're letting people in.

19  And it is going to be a lot of trouble. It is only getting worse."[42]

20         70.    In a campaign speech on September 1, 2016, President Trump told the

21  American public that "we have no idea who these people [immigrants] are, where they come

22

23  _____

24  [40] Tara Copp, *US closes naturalization offices at military basic training sites*, Military Times,
    Mar. 6, 2018, *available at* https://www.militarytimes.com/news/your-military/2018/03/06/us-
    closes-naturalization-offices-at-military-basic-training-sites/.

25  [41] Alan Gomez, *All the ways President Trump is cutting legal immigration*, USA Today, June 12,
26  2016, available at https://www.usatoday.com/story/news/world/2018/06/12/donald-trump-
    cutting-legal-immigration/692447002/

27  [42] Rachael Wolfe, *Transcript of Trump's CPAC speech*, Vox, Feb. 23, 2018, *available at*
28  https://www.vox.com/policy-and-politics/2018/2/23/17044760/transcript-trump-cpac-speech-
    snake-mccain.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

from. I always say Trojan Horse."[43]

71.    Meanwhile, Defendants have offered no evidence of any legitimate government purpose for the October 13 Memo.

**Defendants' Unlawful Conduct Has Caused, and**
**Will Continue to Cause, Substantial and Irreparable Harm to Plaintiffs**

72.    Plaintiffs are suffering and will continue to suffer substantial and irreparable harm as a result of this unjustified and unlawful policy change.

73.    Plaintiffs want to serve their adopted country in the military.  They want to protect American interests and people at home and abroad.  They want to provide for their families and earn their U.S. citizenship by risking their lives for this country.  But Defendants are refusing to allow them to do so.  Instead, Defendants are treating LPRs as second-class recruits, discriminating against them for no reason other than their immigration status.  In doing so, Defendants are effectively telling the world that LPRs are inferior to U.S. citizens.  Defendants are also violating Plaintiffs' legal and constitutional rights.

74.    Defendants' new policy has also caused significant harm to Plaintiffs' professional and personal lives.  Not knowing when, or if, they will be permitted to serve, LPRs are unable to move forward with their personal and professional lives.  They cannot pursue long term plans or goals, including choosing a career path, having a child, or deciding where to live. In anticipation of serving, many LPRs quit jobs or notified employers of their plans to enlist.

75.    Lastly, since immigrants in the military have historically been guaranteed an expedited path to citizenship, the October 13 Memo has also denied LPRs the rights and benefits that are conferred with U.S. citizenship, including the right to vote, protection from deportation, the ability to become a commissioned officer, jobs that require security clearances, and the opportunity to sponsor their family members to immigrate to the U.S.

## CLASS ACTION ALLEGATIONS

76.    The named Plaintiffs bring this action pursuant to Rule 23 of the Federal

---

[43] *Transcript of Donald Trump's Immigration Speech*, New York Times, Sept. 1, 2016, *available at* https://www.nytimes.com/2016/09/02/us/politics/transcript-trump-immigration-speech.html.

Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.  The named Plaintiffs seek to represent the below-described class (the "Proposed Class").

77.    The Proposed Class is all individuals who: (i) are LPRs; (ii) have signed an enlistment contract with the U.S. military; and (iii) pursuant to Defendants' October 13 Memo, have not been permitted to enter into Active, Reserve or Guard Service pending the completion of their MSSD and NSD.

78.    The members of the Proposed Class warrant class action treatment because they fulfill the certifying requirements of Rule 23(a) of the Federal Rules of Civil Procedure.

79.    The Proposed Class meets the numerosity requirement of Rule 23(a)(1) because the members of the class are so numerous that joinder of all members is impractical. While the exact number of class members is unknown to Plaintiffs at this time, the DoD states that about 5,000 LPRs enlist in the military each year.  *See* MAVNI Memo, Ex. B at p. 3.  As it has been approximately eight months since the announcement of the October 13 Memo, the Proposed Class would consist of approximately 3,000 members, and Plaintiffs expect the Proposed Class to grow during the pendency of this litigation as more LPRs apply to enlist.

80.    The Proposed Class meets the commonality requirement of Rule 23(a)(2) because there are questions of law and fact common to the class, including, for example, whether it is unlawful for Defendants to subject LPRs to different enlistment application procedures than U.S. citizen applicants.

81.    The Proposed Class meets the typicality requirement of Rule 23(a)(3) because the claims of the named Plaintiffs are typical of the claims of each of the class members. Class members and Plaintiffs are similarly affected by Defendants' wrongful conduct in violation of their constitutional rights and in excess of Defendants' statutory and agency authority under the APA.

82.    The named Plaintiffs will fairly and adequately protect the interests of the Proposed Class as required by Rule 23(a)(4) because their interests are identical to those of the other members of the class.  In addition, the named Plaintiffs are represented by competent legal

20

1   counsel who are capable of fair and adequate representation of the Proposed Class, as they are

2   experienced in federal litigation (including class actions), are undertaking representation on a pro

3   bono basis, and have adequate resources and commitment to represent the class as a whole.

4          83.    As of the filing of this Complaint, Plaintiffs already have demonstrated

5   their ability to serve as class representatives by assisting counsel with developing and

6   investigating the facts set forth in this Complaint, including by participating in phone and in

7   person interviews with counsel.

8          84.    Plaintiffs are committed to continuing to represent the class until their

9   claims for permanent injunctive and declaratory relief are fully and finally adjudicated and until

10  all class members are treated fairly and equally with all other enlistment applicants.

11         85.    This Proposed Class qualifies for certification under Rule 23(b)(1)

12  because prosecuting separate actions would create a risk of inconsistent adjudications across

13  class members.  If the individual members of the class were to bring separate suits to challenge

14  Defendants' policies and practices, Defendants may address the claims of these individuals while

15  ignoring the concerns of the remaining class members and, thereby exacerbating Defendants'

16  unlawful conduct in providing disparate treatment.

17         86.    Resolving this matter as a class action also would serve the Court's

18  interest in judicial economy by avoiding overburdening the courts with individual lawsuits

19  brought by each LPR who has been harmed by Defendants' unlawful conduct.

20         87.    Alternatively, the Proposed Class qualifies for class action treatment under

21  Rule 23(b)(2) because Plaintiffs seek final injunctive and declaratory relief.  This relief is

22  appropriate for the whole class as Defendants' unlawful conduct applies generally to the class as

23  a whole.

24                          **CLAIMS FOR RELIEF**

25             **Count I: Violation Of Equal Protection (Fifth Amendment)**

26         88.    The foregoing allegations are realleged and incorporated by reference

27  herein.

28         89.    The Due Process Clause of the Fifth Amendment prohibits the Federal

21

1  Government, its agencies, and its officials and employees from denying to any person the equal

2  protection of the laws, including on the basis of alienage.

3          90.    The October 13 Memo directs that "a Military Service Suitability

4  Determination (MSSD) and National Security Determination (NSD), will be made prior to [an

5  LPR's] entry into Active, Reserve or Guard Service." Ex. A: October 13 Memo at p. 1.

6  However, Defendants impose no such requirement on U.S. citizens prior to their entry into

7  military service.

8          91.    The October 13 Memo facially discriminates against LPRs based on their

9  alienage and violates Plaintiffs' right to equal protection under the Fifth Amendment.

10         92.    There is no legitimate justification for such discriminatory treatment

11  required under the Fifth Amendment.

12         93.    As a result of the October 13 Memo, Plaintiffs have suffered, or

13  imminently will suffer harm, including stigma, humiliation and/or emotional distress, loss of

14  liberty, loss of salary and benefits upon which they and their dependents rely, obstruction of their

15  path to military service (including loss of career opportunities), disruption of their path to

16  naturalization, and violations of their constitutional right to equal protection.

17         94.    Plaintiffs seek declaratory and injunctive relief to prevent the ongoing

18  harm inflicted by Defendants' violation of the Equal Protection guarantees of the Fifth

19  Amendment.

20

21         **Count II: Violation Of Substantive Due Process (Fifth Amendment)**

22         95.    The foregoing allegations are realleged and incorporated by reference

23  herein.

24         96.    The Due Process Clause of the Fifth Amendment prohibits the Federal

25  Government, its agencies, and its officials and employees from depriving any person of life,

26  liberty or property without due process of law, including the right to pursue a chosen profession.

27         97.    Defendants' conduct, including their issuance and enforcement of the

28  October 13 Memo, violates Plaintiffs' rights under the Fifth Amendment's Due Process Clause.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

98.    Where the government impermissibly burdens a due process right protected by the Fifth Amendment, such government action may be sustained only upon showing that it furthers a legitimate government interest.

99.    Here, the October 13 Memo, without any justification, impermissibly burdens LPRs' constitutional right to pursue their chosen profession by preventing them from serving in the military.  There is no legitimate justification for Defendants' refusal to allow LPRs to serve in the military.  In fact, the October 13 Memo is overbroad and facially discriminatory, barring the military service of all LPRs, without any individualized determination of the national security risk that each enlistee might pose.  *See* Ex. A: October 13 Memo at p. 1.  Defendants' conduct epitomizes the very kind of arbitrary and capricious government action that the Due Process Clause forbids.

100.    As a result of the October 13 Memo, LPRs, including Plaintiffs, have suffered, and will continue to suffer harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they and their dependents rely, obstruction of their path to military service (including loss of career opportunities), disruption of their path to naturalization, and violations of their constitutional right to substantive due process. Defendants' conduct has denied Plaintiffs' the opportunity to serve in the military and continues to violate Plaintiffs' substantive due process rights on a daily basis.

101.    Plaintiffs seek declaratory and injunctive relief to prevent future injury caused by Defendants' violation of their Fifth Amendment rights to substantive due process.

**Count III: Violation Of The Administrative Procedure Act (5 U.S.C. § 706(1))**

102.    The foregoing allegations are realleged and incorporated by reference herein.

103.    5 U.S.C. § 706(1) authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed."  Reviewable agency action includes an agency's failure to act.  Defendants unlawfully have withheld and/or unreasonably delayed Plaintiffs' shipment to basic training, and thus their military service, contrary to the requirements of applicable law

23

1    including the Enlistment Statute, 10 U.S.C. § 504(b)(1)(B).

2         104.    The Enlistment Statute states, "A person may be enlisted in any armed

3    force . . . if the person is one of the following: . . . [a]n alien who is lawfully admitted for

4    permanent residence."

5         105.    LPRs thus have a clear right to enlist and serve in the military.

6    Defendants have interfered with this right by refusing to ship LPRs to basic training for an

7    unknown period of time, thereby effectively banning them from military service indefinitely.

8         106.    LPRs have the further right to reasonably timely shipment to basic

9    training.  Plaintiffs have been waiting to ship to basic training for many months and still do not

10   know when they will be permitted to ship.  Based on representations from the DoD regarding the

11   backlog of background investigations, it could be many more months.

12        107.    As a result of the October 13 Memo, LPRs, including Plaintiffs, have

13   suffered, and will continue to suffer harm, including stigma, humiliation and/or emotional

14   distress, loss of liberty, loss of salary and benefits on which they and their dependents rely,

15   obstruction of their path to military service (including loss of career opportunities), the disruption

16   of their path to naturalization, and their statutory right to enlist in the U.S. military.

17        108.    Plaintiffs seek declaratory and injunctive relief to prevent future injury

18   caused by Defendants' violation of 5 U.S.C. § 706(1).

19   **Count IV: Violation Of The Administrative Procedure Act (5 U.S.C. § 706(2))**

20        109.    The foregoing allegations are realleged and incorporated by reference

21   herein.

22        110.    5 U.S.C. § 706(2) authorizes a court to "hold unlawful and set aside

23   agency action… found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in

24   accordance with the law. . . [or] in excess of statutory jurisdiction, authority, or limitations or

25   short of statutory right."

26        111.    The October 13 Memo represents an unprecedented and unjustified

27   departure from Defendants' longstanding policy and regulation of treating LPRs the same as

28   U.S. citizens, including using the same enlistment qualification process and permitting LPRs to

1  ship to basic training while their background investigations and adjudications are pending.

2  Despite the abrupt shift, Defendants have failed to provide any legitimate explanation for the

3  new policy, subjecting only LPRs to new access restrictions and requirement solely on the basis

4  of their status as LPRs.

5         112.    The October 13 Memo is also arbitrary and capricious because it contains

6  vague and unworkable requirements.  It does not explain what background investigation

7  requirements and standards LPRs must satisfy, fails to provide any guidance regarding the

8  background investigation process, and arbitrarily discriminates against LPRs.

9         113.    Nor did Defendants circulate the October 13 Memo for public review and

10  comment prior to issuing the Memo.  Defendants' failure to permit public comment prevents

11  judicial review on a complete administrative record.  Absent a complete administrative record, it

12  is unknown whether Defendants meaningfully considered reasonable alternatives to the policies

13  contained in the October 13 Memo.

14         114.    Defendants are also impermissibly applying the October 13 Memo

15  retroactively.  Mr. Kuang and Mr. Cooke, and other proposed class members, enlisted prior to

16  October 13, 2017.  Nonetheless, Defendants are imposing the requirements of the October 13

17  Memo on Plaintiffs.

18         115.    The October 13 Memo is not in accordance with the law and in excess of

19  applicable statutory jurisdiction, authority, and limitations because it exceeds the authority

20  granted to the DoD by the Enlistment Statute, which mandates that LPRs be permitted to enlist

21  and serve in the military.

22         116.    In contravention of the statutory and regulatory scheme, the October 13

23  Memo has indefinitely barred LPRs, including Plaintiffs, from serving in the military by

24  prohibiting them from doing so until their MSSD and NSD adjudications are complete.  Thus,

25  Defendants have violated Congress's clear intent and the plain language of the Enlistment

26  Statute to allow LPRs to enlist along with U.S. citizens.

27         117.    For these and other reasons, the October 13 Memo is arbitrary, capricious,

28  an abuse of discretion, not in accordance with the law, and in excess of statutory jurisdiction and

authority in violation of 5 U.S.C. § 706(2).

118.     As a result of the October 13 Memo, LPRs, including Plaintiffs, have suffered, and will continue to suffer harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they and their dependents rely, obstruction of their path to military service (including loss of career opportunities), and disruption of their path to naturalization.

119.     Plaintiffs seek declaratory and injunctive relief to prevent future injury caused by Defendants' violation of 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

120.     Issue a judgment, pursuant to 28 U.S.C. §§ 2201-02, declaring the October 13 Memo unconstitutional and illegal on its face and as applied to Plaintiffs.

121.     Issue a preliminary and permanent injunction enjoining Defendants from enforcing and implementing the October 13 Memo, including ordering that:

a.     Defendants shall not cancel the enlistment contracts and ship dates of Plaintiffs and members of the class and shall not require LPRs to pass a MSSD and NSD prior to shipping to basic training and beginning their military service; and

b.     Defendants shall revert to the status quo with regard to enlistment and accession of LPRs that existed before issuance of the October 13 Memo.

122.     Award Plaintiffs costs, expenses, and reasonable attorneys' fees, including under the Equal Access to Justice Act; and

123.     Grant any further injunctive, equitable, or other relief that this Court deems just and proper.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

1    Dated:  June 21, 2018

2                                         LATHAM & WATKINS LLP

3

4                                         By /s/ Peter A. Wald
                                          Peter A. Wald (Bar No. 85705)
5                                            peter.wald@lw.com
                                          505 Montgomery Street, Suite 2000
6                                         San Francisco, CA  94111-6538
                                          Telephone:  (415) 391-0600
7                                         Fax: (415) 395-8095

8                                         Colleen C. Smith (Bar No. 231216)
                                            colleen.smith@lw.com
9                                         12670 High Bluff Drive
                                          San Diego, CA  92130-3086
10                                        Telephone:  (858) 523-5400
                                          Fax: (858) 523-5450

11

12                                        Megan C. Fitzpatrick (Bar No. 6309005)
                                            megan.fitzpatrick@lw.com
                                          330 N. Wabash Ave, Suite 2800
13                                        Chicago, IL 60611
                                          Telephone: (312) 876-7700
14                                        Fax: (312) 993-9767

15                                        ACLU FOUNDATION OF SOUTHERN
                                          CALIFORNIA
16                                        Jennifer Pasquarella (Bar No. 263241)
                                            jpasquarella@aclusocal.org
17                                        Michael Kaufman (Bar No. 254575)
                                            mkaufman@aclusocal.org
18                                        Sameer Ahmed (Bar No. 319609)
                                            sahmed@aclusocal.org
19                                        1313 West 8th Street
                                          Los Angeles, CA  90017
20                                        Telephone: (213) 977-5232
                                          Fax: (213) 977-5297

21                                        ACLU FOUNDATION OF NORTHERN
                                          CALIFORNIA
22                                        Christine P. Sun (Bar No. 218701)
                                            csun@aclunc.org
23                                        39 Drumm Street
                                          San Francisco, CA 94111
24                                        Telephone: (415) 621-2493
                                          Fax: (415) 255-1487
25

26                                        *Attorneys for Plaintiffs*
                                          *Jiahao Kuang and Deron Cooke*

27

28

                                      27