LATHAM & WATKINS LLP
  Peter A. Wald (Bar No. 85705)
    *peter.wald@lw.com*
    505 Montgomery Street, Suite 2000
    San Francisco, CA 94111
    T: (415) 391-0600/F: (415) 395-8095
  Colleen C. Smith (Bar No. 231216)
    *colleen.smith@lw.com*
    12670 High Bluff Drive
    San Diego, CA 92130
    T: (858) 523-5400/F: (415) 395-8095
  Megan C. Fitzpatrick (Bar No. 6309005)
    *megan.fitzpatrick@lw.com*
    330 N. Wabash Ave, Suite 2800
    Chicago, IL 60611
    T: (312) 876-7700/F: (312) 993-9767

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
  Jennifer Pasquarella (Bar No. 263241)
    *jpasquarella@aclusocal.org*
  Michael Kaufman (Bar No. 254575)
    *mkaufman@aclusocal.org*
  Sameer Ahmed (Bar No. 319609)
    *sahmed@aclusocal.org*
    1313 West 8th Street
    Los Angeles, CA 90017
    T: (213) 977-5232/F: (213) 977-5297

ACLU FOUNDATION OF NORTHERN CALIFORNIA
  Christine P. Sun (Bar No. 218701)
    *csun@aclunc.org*
    39 Drumm Street
    San Francisco, CA 94111
    T: (415) 621-2493/F: (415) 255-1487

*Attorneys for Plaintiffs*
*Jiahao Kuang and Deron Cooke*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| JIAHAO KUANG AND DERON COOKE on behalf of themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE, JAMES MATTIS, in his official capacity as Secretary of Defense of the United States Department of Defense,<br><br>Defendants. | CASE NO. 3:18-CV-03698<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: October 25, 2018<br>Time: TBD |

# NOTICE OF MOTION

PLEASE TAKE NOTICE that Plaintiffs Jiahao Kuang and Deron Cooke ("Plaintiffs") respectfully move the Court for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Civil L.R. 7-2 of the Civil Local Rules of the U.S. District Court for the Northern District of California, and for hearing on October 25, 2018.

# RELIEF SOUGHT

For the reasons discussed, Plaintiffs respectfully request the Court grant their Motion for a Preliminary Injunction as follows:

    i.    To preliminarily prohibit Defendants from continuing to implement the October 13 Memo (as defined in the accompanying Memorandum of Points and Authorities);

    ii.    To preliminarily order Defendants to return to the pre-October 13, 2017 practices for the accession of Lawful Permanent Residents into the military; and

    iii.    To preliminarily order Defendants to permit Plaintiffs to ship out to basic training while their background investigations are pending, as U.S. nationals are able to do.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1

# TABLE OF CONTENTS

2

**Page**

3

I.      INTRODUCTION .................................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................................... 4

     A.      Lawful Permanent Residents ..................................................................... 4

     B.      LPR Service in the Military Before the October 13 Memo ...................... 6

     C.      The October 13 Memo ................................................................................ 9

III.    ARGUMENT ....................................................................................................... 10

     A.      Legal Standard ......................................................................................... 10

     B.      Plaintiffs Are Likely to Succeed on the Merits of Their APA
            Claims Under 5 U.S.C. §706(2) .............................................................. 11

          1.      The October 13 Memo Runs Counter to Available
               Evidence ........................................................................................ 12

          2.      Defendants Implemented a New Policy Without Sufficient
               Justification .................................................................................. 15

     C.      Plaintiffs Will Suffer Irreparable Injury If the Court Does Not
            Grant Preliminary Injunctive Relief ........................................................ 17

          1.      Plaintiffs' Careers Have Suffered as a Result of the October
               13 Memo ....................................................................................... 17

          2.      Plaintiffs Have Suffered Economically as a Result of the
               October 13 Memo ......................................................................... 22

          3.      Plaintiffs Have Not Been Able to Naturalize as a Result of
               the October 13 Memo ................................................................... 23

     D.      The Balance of Equities and the Public Interest Weigh in Favor of
            Granting Preliminary Injunctive Relief ................................................... 24

IV.     CONCLUSION .................................................................................................... 25

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ....................................................................2, 11, 24

*Ariz. Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ..................................................................................20

*Bowen v. Mich. Acad. of Family Physicians,*
    476 U.S. 667 (1986) ..................................................................................................11

*Burlington Truck Lines v. United States,*
    371 U.S. 156 (1962) ............................................................................................12, 15

*Doe 1 v. Trump,*
    275 F. Supp. 3d 167 (D.D.C. 2017) ....................................................13, 20, 21, 24

*Elzie v. Aspin,*
    841 F.Supp. 439 (D.D.C. 1993) ...............................................................................21

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) .............................................................................................16

*Garcia v. Google, Inc.,*
    786 F.3d 733 (9th Cir. 2015) ...................................................................................11

*Greater Bos. Television Corp. v. FCC,*
    444 F.2d 841 (D,.C. Cir. 1970) ...............................................................................16

*Inland Empire – Immigrant Youth Collective v. Duke,*
    2017 U.S. Dist. LEXIS 203307 (C.D. Cal. Nov. 20, 2017) .....................................11

*Klein v. San Clemente,*
    584 F.3d 1196 (9th Cir. 2009) .................................................................................24

*Kirwa v. United States Dep't of Def.,*
    285 F. Supp. 3d 21 (D.D.C. 2017) ...............................................17, 20, 24, 25

*Kirwa v. United States Dep't of Def.,*
    285 F. Supp. 3d 257 (D.D.C. 2018) ....................................................11, 12, 16, 17

*League of Wilderness Defs./Blue Mtns. Biodiversity Project v. Connaughton,*
    2014 WL 6977611 (D. Or. Dec. 9, 2014) ................................................................12

*Michigan v. U.S. Envtl. Prot. Agency,*
    135 S. Ct. 2699 (2015) .............................................................................................12

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983) .......................................................................................12, 15, 16

*Natl. Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ..................................................................................................16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) ……………………………………………………12, 16, 17

*Organized Village of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) …………………………………………………………16

*Saravia v. Sessions*,
    280 F. Supp. 3d 1168 (N.D. Cal. 2017) ……………………………………………24

*Stone v. Trump*,
    280 F. Supp. 3d 747 (D. Md. 2017) ..……………………………………13, 21, 24, 25

*Stone v. Trump*,
    2018 WL 2717050 (4th Cir. Feb. 2, 2018) …………………………………………13

*Tiwari v. Mattis*,
    2017 WL 6492682 (W.D. Wash. Dec. 19, 2017) …………………………………12, 21

*Tiwari v. Mattis*,
    2018 WL 1737783 (W.D. Wash. Apr. 11, 2018) …………………………………20, 24

*Wagafe v. Trump*,
    2017 WL 5989162 (W.D. Wash. Nov. 28, 2017) ..…………………………………12

*Winter v. Natl. Res. Defense Council*,
    555 U.S. 7 (2008) ..……………………………………………………………………24

**CONSTITUTIONAL PROVISIONS, STATUTES & REGULATIONS**

5 U.S.C. § 701(a) ..……………………………………………………………………11

5 U.S.C. § 704 ..………………………………………………………………………11

5 U.S.C. § 706(2) ..……………………………………………………………………2, 11

5 U.S.C. § 706(2)(A) ..………………………………………………………………15

8 U.S.C. § 1101(a)(22) ..………………………………………………………………8

8 U.S.C. § 1440 ..………………………………………………………………………23

8 U.S.C. § 1182(a) ..……………………………………………………………………5

8 U.S.C. § 1182(a)(2)(A)(i) ..…………………………………………………………5

8 U.S.C. § 1182(a)(2)(B) ..……………………………………………………………5

8 U.S.C. § 1182(a)(2)(C) ..……………………………………………………………5

8 U.S.C. § 1182(a)(3)(A) ..……………………………………………………………5

8 U.S.C. § 1182(a)(3)(B)(i) ..…………………………………………………………6

10 U.S.C. § 504(b) ..……………………………………………………………………7

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

32 C.F.R. §66.4 ……………………………………………………………………8

32 C.F.R. § 66.6(b)(8) …………………………………………………………8, 9

Fed. R. Civ. P. 65(b)(1)(A) ……………………………………………………10

**OTHER AUTHORITIES**

Anita Hattiangadi, et al., *Non-citizens in Today's Military*, The CNA Corporation (Apr. 2005), https://www.cna.org/CNA_files/PDF/D0011092.A2.pdf …………………………………13

*An Unheralded Contribution: Honoring America's Fallen Foreign-Born Service Members Post 9/11, New American Economy* (Nov. 11, 2015) http://www.newamericaneconomy.org/wp-content/uploads/2015/11/Miltary-Casualties.pdf ……………………………………………7

Christopher Woody, *The Army is trying to bring in more recruits, and it's changing its standards to get them*, Business Insider (Oct. 18, 2017) http://www.businessinsider.com/army-changing-recruiting-standards-to-attract-more-soldiers-2017-10 …………………………………14

*Consular Processing*, U.S. Citizenship and Immigration Services (May 4, 2018), https://www.uscis.gov/greencard/consular-processing …………………………………4

*Contributions of Immigrants to the United States Armed Forces: Hearing Before the U.S. Senate Committee on the Armed Services*, 109th Cong., 2d Sess. 109-884 (July 10, 2006), https://www.gpo.gov/fdsys/pkg/CHRG-109shrg35222/html/CHRG-109shrg35222.htm ………6, 7

*Fact Sheet: Immigration Security Checks—How and Why the Process Works*, U.S. Department of Homeland Security (Apr. 25, 2006), https://www.uscis.gov/sites/default/files/files/pressrelease/security_checks_42506.pdf ………4, 5

*Green Card*, U.S. Citizenship and Immigration Services (Feb. 22, 2018), https://www.uscis.gov/greencard …………………………………………………4

*Green Card Eligibility Categories*, U.S. Citizenship and Immigration Services (June 20, 2018), https://www.uscis.gov/greencard/eligibility-categories …………………………………4

Huseyin Yalcinkaya and Melih Can, *The Effect of Executive Order 13269 on Noncitizen Enlisted Accessions in the U.S. Military* (Mar. 2013) (unpublished thesis, Naval Postgraduate School), https://calhoun.nps.edu/bitstream/handle/10945/32921/13Mar_Yalcinkaya_Can.pdf …………6

*I-130, Petition for Alien Relative*, U.S. Citizenship and Immigration Services (Apr. 11, 2018), https://www.uscis.gov/i-130 …………………………………………………4

*I-485, Application to Register Permanent Residence or Adjust Status*, U.S. Citizenship and Immigration Services (Apr. 11, 2018), https://www.uscis.gov/i-485 …………………………4

*I-526, Immigrant Petition by Alien Entrepreneur*, U.S. Citizenship and Immigration Services (Apr. 11, 2018), https://www.uscis.gov/i-526 ……………………………………………4

Jeanne Batalova, *Immigrants in the U.S. Armed Forces*, Migration Policy Institute (May 15, 2008), https://www.migrationpolicy.org/article/immigrants-us-armed-forces …………………………6

*Lawful Permanent Residents (LPR)*, Department of Homeland Security (Apr. 24, 2018), https://www.dhs.gov/immigration-statistics/lawful-permanent-residents …………………………4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vi

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

Margaret D. Stock, *Immigrants in the Military Eight Years after 9/11* (Immigration Policy Center, 2009),
https://www.americanimmigrationcouncil.org/sites/default/files/research/Immigrants_in_the_Military_-_Stock_110909_0.pdf ....………………………………………………………………1, 6, 7

Molly McIntosh and Seema Sayala, *Non-citizens in the Enlisted U.S. Military*, The CNA Corporation (Dec. 2011), https://www.cna.org/cna_files/pdf/D0025768.A2.pdf ………………13

*Revised Federal Investigative Standards Crosswalk Job Aid*, Center for Development of Security Excellence (Mar. 1, 2017), https://www.cdse.edu/documents/cdse/federal-investigative-standards-crosswalk-guide.pdf ………………………………………………………………………9

Thomas Spoehr, *The Looming National Security Crisis: Young Americans Unable to Serve in the Military*, The Heritage Foundation (Feb. 13, 2018), https://www.heritage.org/defense/report/the-looming-national-security-crisis-young-americans-unable-serve-the-military ………………14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vii

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

## I.     INTRODUCTION

Lawful permanent residents ("LPRs") have been serving this country in the Armed Forces side-by-side with U.S. citizens for decades.[1]  Before then, immigrants served in every U.S. war going back to Revolutionary times.[2]  Federal statutes, regulations, and policies acknowledge the contributions made by immigrants to the military and encourage LPRs to serve in our Armed Forces and become citizens.  Approximately 5,000 LPRs volunteer for service in the Armed Forces every year.[3]

Yet, under the new administration, on October 13, 2017, the United States Department of Defense ("DoD") and Secretary of Defense James Mattis (collectively, "Defendants") abruptly and without justification altered the treatment of LPRs enlisting in the military based solely on their alienage, thwarting the federal scheme.  Defendants' new policy of discrimination against LPRs has immediately and negatively impacted Plaintiffs, who have signed military enlistment contracts and are waiting to ship out to basic training and begin their military service.

Previously, LPRs and U.S. citizens seeking to enter the military underwent background investigations and were permitted to ship out to basic training while the required investigations were pending.[4]  However, subject to a memorandum Defendants released on October 13, 2017 (the "October 13 Memo"), LPRs now cannot ship out to basic training until the background investigations are completed, essentially halting LPRs' accession[5] into the military.[6]  Defendants have not provided any information regarding what background investigations are needed, nor any timeline for when these background investigations will be complete, thereby indefinitely

---

[1] Margaret D. Stock, *Immigrants in the Military Eight Years after 9/11* (Immigration Policy Center, 2009), https://www.americanimmigrationcouncil.org/sites/default/files/research/Immigrants_in_the_Military_-_Stock_110909_0.pdf at 5.

[2] *Id.* at 4.

[3] *See* Military Accessions Vital to National Interest (MAVNI) Recruitment Pilot Program Memorandum ("MAVNI Memo"), Ex. 1 at 3.

[4] Declaration of Eric K. Fanning ("Fanning Decl.") ¶¶ 14, 15.

[5]  As used in the October 13 Memo and herein, "accession" refers to recruits' shipment to basic training and the start of their military service.

[6] Office of the Under Secretary of Defense, Military Service Suitability Determinations for Foreign Nationals Who Are Lawful Permanent Residents (Oct. 13, 2017), Ex. 2.

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1  delaying LPRs from beginning their service.  In fact, in a separate case challenging recent

2  changes to the Military Accessions Vital to National Interest ("MAVNI") program (together with

3  similar cases initiated by MAVNI soldiers,[7] the "MAVNI Actions"), Defendants were unable to

4  explain what background investigations would be used for LPRs four months after issuance of

5  the October 13 Memo.[8]

6      To obtain a preliminary injunction, the moving party must establish four factors: (1) it is

7  likely to succeed on the merits of its claims at trial; (2) it is likely to suffer irreparable harm in

8  the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an

9  injunction is in the public interest.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th

10  Cir. 2011).

11      Plaintiffs are likely to succeed on the merits of their Administrative Procedures Act

12  ("APA") claim because the policy change initiated in the October 13 Memo violates the APA's

13  prohibition on agency action that is arbitrary and capricious and contrary to law in at least two

14  distinct ways.[9]  First, the October 13 Memo is arbitrary and capricious because Defendants have

15  not provided a rational connection between any facts and the policy, and the policy instead runs

16  counter to the available evidence.  Second, the October 13 Memo arbitrarily and capriciously

17  implements a departure from the statute governing enlistment in the military and prior agency

18  policy, and the vague purpose articulated in the October 13 Memo – "to facilitate process

19

20  [7] Military service members have filed three actions related to the MAVNI program, under which
   non-citizens with critical language or medical skills were permitted to join the military and

21  naturalize.  *See Kirwa, et al. v. U.S. Dep't of Defense,* No. 17-cv-01793, ECF No. 1 (D.D.C.
   Sept. 1, 2017); *Nio, et al. v. U.S. Dep't of Homeland Sec'y, et al.*, No. 17-0998, ECF No. 1

22  (D.D.C. May 24, 2017); *Tiwari, et al. v. Mattis, et al.,* No. 17-cv-00242-TSZ, ECF No. 1 (W.D.
   Wash. Feb. 16, 2017).  The plaintiffs in the MAVNI Actions are not LPRs and rather are in the

23  U.S. temporarily (such as on student visas or as asylum seekers), but their claims center on
   similar new restrictions on their ability to serve and naturalize as the present action.  Courts in all

24  of the MAVNI Actions have already enjoined the implementation of the policies at issue in those
   cases.  *See Order, Kirwa,* No. 17-cv-01793-ESH-EMM, ECF No. 28 (D.D.C. Oct. 25, 2017);

25  Order at 12, *Tiwari,*  No. 17-cv-00242-TSZ, ECF No. 122 (W.D. Wash. Apr. 11, 2018); Order,
   *Nio,* No. 17-0998, ECF No. 74 (D.D.C. Oct. 27, 2017).

26  [8] *See* Deposition Transcript of Daniel Purtill at 57:6-9, *Tiwari,* No. 2:17-cv-00242-TSZ, ECF No.
   131-4 (W.D. Wash. Jan. 31, 2018), Ex. 3.

27  [9] At this time, Plaintiffs seek a preliminary injunction on the basis of their claim under 5 U.S.C. §
   706(2) of the APA.  Plaintiffs reserve the right to move for a preliminary injunction on the basis

28  of the additional claims enumerated in the Complaint.  *See* Compl., ECF No. 1.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

2

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1   efficiency and the appropriate sharing of information" –  does not provide a sufficiently reasoned

2   explanation for the change.  Ex. 2 at 1.

3        Plaintiffs Deron Cooke and Jiahao Kuang are suffering and will continue to suffer severe

4   hardship and irreparable harm due to the new significant restrictions on their enlistment and the

5   resulting indefinite delay in their accession.  Plaintiffs Cooke and Kuang have each enlisted—

6   completing the necessary paperwork and signing enlistment contracts obligating them to a term

7   of service in a particular military branch—yet neither has shipped out to basic training and thus

8   begun their military service as a result of the October 13 Memo.  Plaintiffs Cooke and Kuang

9   have already been waiting nearly a year since their enlistment with no indication of when they

10  will ship out, and in the meantime, have placed their professional, educational, and personal lives

11  on hold, including delaying their path to U.S. citizenship and the benefits such citizenship brings.

12       In contrast, there is no harm to Defendants in preserving the *status quo* that existed prior

13  to this unlawful change in policy until a trial on the merits is held, nor is the public interest

14  served by allowing Defendants to change abruptly a policy that has benefited the military and the

15  country for decades.  Defendants would simply be returned to the *status quo ante*, which allowed

16  LPRs to serve in the military on the same basis as U.S. citizens.  Thus, the balance of equities

17  tips decidedly in Plaintiffs' favor.

18       Accordingly, Plaintiffs request preliminary injunctive relief (1) prohibiting Defendants'

19  continued implementation of the October 13 Memo; (2) ordering Defendants to return to the pre-

20  October 13, 2017 practices for the accession of LPRs into the military; and (3) ordering

21  Defendants to permit Plaintiffs to ship out to basic training while their background investigations

22  are pending, as U.S. nationals are able to do.

23

24

25

26

27

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

## II.     STATEMENT OF FACTS

### A.     <u>Lawful Permanent Residents</u>

LPRs, or green card holders, are non-citizens who are lawfully authorized to live permanently within the U.S.[10]  LPRs who meet certain eligibility requirements may also apply to become U.S. citizens.[11]  While there are many potential bases for LPR eligibility,[12] everyone seeking to become an LPR must undergo a rigorous application process.  The initial LPR application varies, depending on the applicant's location and basis of eligibility, but all must file extensive applications with the U.S. government detailing their background and biographical information, including employment history, previous addresses, a medical examination, identification documents, and more.[13]  Applicants generally must also go to a "biometrics appointment" to provide fingerprints, photos, and a signature, and also participate in an in-person interview.[14]  Further, LPR applicants, like other individuals applying for immigration services or benefits, undergo extensive background investigations that address a wide range of risk factors.[15]  The Department of Homeland Security ("DHS") runs the name of every LPR applicant through an interagency background check system, which combines information from multiple agencies and databases to address national security risks, public safety issues, and other law enforcement concerns.[16]  DHS also conducts FBI fingerprint and name checks for many applicants, which will

---

[10] *Lawful Permanent Residents (LPR)*, Department of Homeland Security (Apr. 24, 2018), https://www.dhs.gov/immigration-statistics/lawful-permanent-residents.
[11] *Id.*
[12] *Green Card Eligibility Categories*, U.S. Citizenship and Immigration Services (June 20, 2018), https://www.uscis.gov/greencard/eligibility-categories.
[13] *See I-485, Application to Register Permanent Residence or Adjust Status*, U.S. Citizenship and Immigration Services (Apr. 11, 2018), https://www.uscis.gov/i-485; *Consular Processing*, U.S. Citizenship and Immigration Services (May 4, 2018), https://www.uscis.gov/greencard/consular-processing; *see, e.g.*, *I-130, Petition for Alien Relative*, U.S. Citizenship and Immigration Services (Apr. 11, 2018), https://www.uscis.gov/i-130; *I-526, Immigrant Petition by Alien Entrepreneur*, U.S. Citizenship and Immigration Services (Apr. 11, 2018), https://www.uscis.gov/i-526.
[14] *Green Card*, U.S. Citizenship and Immigration Services (Feb. 22, 2018), https://www.uscis.gov/greencard.
[15] *Fact Sheet: Immigration Security Checks—How and Why the Process Works*, U.S. Department of Homeland Security (Apr. 25, 2006), https://www.uscis.gov/sites/default/files/files/pressrelease/security_checks_42506.pdf at 1-2.
[16] *Id.* at 2.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

reveal criminal history within and outside the U.S.[17]  These security checks and investigations identify LPR applicants who have been involved in violent crimes, sex crimes, drug trafficking, and who have links to terrorism.[18]

While LPR applicants are supposed to be given the opportunity to explain any derogatory information in their application and, in certain circumstances, may seek a waiver for past misconduct, in general those who do not meet strict background requirements are ineligible for LPR status.[19]  The Immigration and Nationality Act ("INA"), codified under Title 8 of the U.S. Code, provides a lengthy list of those who would be ineligible for admission to the U.S. (and thus ineligible for LPR status), including for example:

- "[A]ny alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of— (I) a crime involving moral turpitude . . . or (II) a violation of (or a conspiracy or attempt to violate) any law  . . . relating to a controlled substance . . ."[20]

- "Any alien convicted of 2 or more offenses . . . regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement were 5 years or more . . ."[21]

- "Any alien who the consular officer or the Attorney General knows or has reason to believe— (i) is or has been an illicit trafficker in any controlled substance or in any listed chemical . . ."[22]

- "Any alien who . . . seeks to enter the United States to engage solely, principally, or incidentally in— (i) any activity (I) . . . relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information, (ii) any other unlawful activity, or (iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means . . ."[23]

- "Any alien who— (I) has engaged in a terrorist activity (II) . . . is engaged in or is likely to engage after entry in any terrorist activity . . . (III) has,

---

[17] *Id.*
[18] *Id.* at 1.
[19] Inadmissible Aliens, 8 U.S.C. § 1182(a) (2016).
[20] *Id.* at § 1182(a)(2)(A)(i).
[21] *Id.* at § 1182(a)(2)(B).
[22] *Id.* at § 1182(a)(2)(C).
[23] *Id.* at § 1182(a)(3)(A).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity …"[24]

The combination of thorough background checks and ineligibility categories serves to prevent individuals who could pose a risk to the U.S. from obtaining LPR status in the first place.

## B.    LPR Service in the Military Before the October 13 Memo

### 1.    Immigrants Have Served in the Military with Distinction

As of 2009, 114,601 immigrants were serving in the U.S. military, representing approximately 8% of the 1.4 million military personnel on active duty.[25]  Before the October 13 Memo, approximately 5,000 LPRs enlisted in the military every year.[26]  Since the Revolutionary War, immigrants have composed a significant portion of the military.[27]  More recent government actions have also encouraged immigrant service in the military.  For example, President George W. Bush issued an executive order after 9/11 providing expedited naturalization for non-citizens serving in the military, in order to incent this group to enlist.[28]

Immigrant soldiers have proven to be invaluable and exemplary members of the military.  One notable immigrant, Captain Felix Sosa-Camejo, earned 12 citations, including 2 Bronze Stars, 3 Silver Stars, and 2 Purple Hearts, in the Vietnam War.[29]  In the first five years following 9/11, the military awarded nearly 200 commendations to immigrants for their service in combat.[30]  As a result of this exemplary service, immigrants have reached the highest ranks of the military.  One of the most prominent contemporary examples is General John Shalikashvili,

---

[24] *Id.* at § 1182(a)(3)(B)(i).
[25] *Supra* note 1, at 3.
[26] *See* MAVNI Memo, Ex. 1 at 3.
[27] Immigrant soldiers includes both non U.S. citizens and foreign born and naturalized U.S. citizens.  *See* Jeanne Batalova, *Immigrants in the U.S. Armed Forces*, Migration Policy Institute (May 15, 2008), https://www.migrationpolicy.org/article/immigrants-us-armed-forces; *see also* Huseyin Yalcinkaya and Melih Can, *The Effect of Executive Order 13269 on Noncitizen Enlisted Accessions in the U.S. Military* (Mar. 2013) (unpublished thesis, Naval Postgraduate School), https://calhoun.nps.edu/bitstream/handle/10945/32921/13Mar_Yalcinkaya_Can.pdf at 5.
[28] *See supra* note 1.
[29] *See Contributions of Immigrants to the United States Armed Forces*: *Hearing Before the U.S. Senate Committee on the Armed Services*, 109th Cong., 2d Sess. 109-884 (July 10, 2006) (Statement of Emilio T. Gonzalez, Director, U.S. Citizenship and Immigration Services), https://www.gpo.gov/fdsys/pkg/CHRG-109shrg35222/html/CHRG-109shrg35222.htm.
[30] *Id.* (Statement of Gen. Peter Pace, USMC, Chairman, Joint Chiefs of Staff).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

who served as Chairman of the Joint Chiefs of Staff from 1993 to 1997, and who immigrated to the U.S. from Poland shortly after World War II.[31]  Hundreds of immigrant troops have also lost their lives in combat since 9/11.[32]  Between 2001 and 2008, over a hundred immigrant soldiers lost in battle were granted posthumous citizenship.[33]

The military has long recognized the importance of immigrants both in terms of the quality of their service and the attributes they bring to the military.  On July 10, 2006, the Senate Armed Services Committee held a field hearing devoted entirely to the role of immigrants in the military.  At the hearing, Dr. David S. C. Chu, the Undersecretary of Defense for Personnel and Readiness, testified that immigrants are "a vital part of our country's military" and provide "the Services with a richly diverse force in terms of race/ethnicity, language, and culture."[34]

2.  **The Enlistment Statute and Process Before the October 13 Memo**

The October 13 Memo represents an unprecedented and unexplained departure from Defendants' prior enlistment policy for LPRs.  The DoD's new policy marks a change from the preexisting policy which allow[ed] for LPR recruits to ship to initial military training as long as their background investigation had been *initiated*, and they had cleared all other entry screening requirements.[35]

Before 2006, each military branch had separate statutes and/or policies governing enlistment, but all permitted LPRs to enlist.[36]  In January 2006, Congress combined them into a single unified statute that applies to all of the armed services.  *See* Persons Not Qualified, 10 U.S.C. § 504(b) (2010) (the "Enlistment Statute").  The Enlistment Statute provides for entry

---

[31] *See id.* (Statement of Emilio T. Gonzalez).
[32] *An Unheralded Contribution: Honoring America's Fallen Foreign-Born Service Members Post 9/11, New American Economy* (Nov. 11, 2015) http://www.newamericaneconomy.org/wp-content/uploads/2015/11/Miltary-Casualties.pdf at 2-3.
[33] *See id.* at 6.
[34] *See supra* note 29 (Statement of Hon. David S.C. Chu, Under Secretary of Defense for Personnel and Readiness).
[35] Fanning Decl. ¶¶ 14, 15.
[36] *See supra* note 1 at 5 (noting that prior to September 11, 2001, immigrants, the vast majority of whom were LPRs, were serving in all branches of the U.S. military).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

into the U.S. military by (1) U.S. nationals;[37] (2) LPRs; and (3) persons from the Federated States of Micronesia, the Republic of Marshall Islands, and Palau.  Pursuant to this statute and its implementing regulations, the DoD subjects all applicants—LPRs and U.S. citizens alike—to the same enlistment requirements.[38]  DoD regulations and guidelines also explicitly direct the DoD to treat all applicants equally in the enlistment process:

> (a) Use common entrance qualification standards for enlistment, appointment, and induction into the Military Services.
>
> (b) Avoid inconsistencies and inequities based on ethnicity, gender, race, religion, or sexual orientation in the application of these standards by the Military Services.
>
> (c) Judge the suitability of individuals to serve in the Military Services on the basis of their adaptability, potential to perform, and conduct.[39]

Enlistment in the military begins when a recruit speaks with a local recruiter and makes a commitment to serve by signing an enlistment contract.[40]  After working with the recruiter to determine which branch of the military to join and any specialized career path to pursue, the recruit completes a series of steps, including a physical examination, aptitude tests, and other administrative tasks at their Military Enlistment Processing Stations ("MEPS").[41]  Recruits also submit fingerprints for use in their background investigations.[42]

Before the October 13 Memo, the background investigation process was the same for LPRs and U.S. citizens.  Both groups were subject to the National Agency Checks with Law and Credit ("NACLC") and, since 2016, its successor—a "Tier 3" investigation.[43]  Prior policy made

---

[37] U.S. nationals are all citizens of the U.S., as well as all persons who, though not citizens, "owe[] permanent allegiance to the United States."  *See* Definitions, 8 U.S.C. 1101(a)(22) (2011).  This includes persons born in or having ties to outlying possessions of the U.S., such as American Samoa and Swains Island.

[38] *See* Enlistment, Appointment, and Induction Criteria, 32 C.F.R. § 66.6(b)(8) (2016); DoD Instruction 1304.26, Qualification Standards for Enlistment, Appointment and Inductions, at 11-12 (Apr. 11, 2017), Ex. 4.

[39] *See* Qualification Standards For Enlistment, Appointment, And Induction, 32 C.F.R. §66.4 (2016); *see also* DoD Instruction 1304.26 at § 3, Ex. 4.

[40] Fanning Decl. ¶¶ 11, 12.

[41] *Id.*

[42] *Id.* at ¶ 12.

[43] *See* 32 C.F.R. § 66.6(b)(8) and Memorandum 5200.02 from the Department of Defense on Procedures for the DoD Personnel Security Program at §7.6 b (2) (Apr. 3, 2017) ("All military members will undergo the NACLC or successor Tier 3 investigation at a minimum."), Ex. 5;

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1   no distinction between the background investigation process applicable to LPRs and other

2   recruits before accession.  *See* 32 CFR § 66.6(b)(8) ("An ***applicant*** may be accessed (including

3   shipping him or her to training or a first duty assignment) provided that a NACLC or higher-

4   level investigation was submitted and accepted …") (emphasis added).  As soon as the Tier 3

5   investigation was initiated, U.S. citizens and LPRs were permitted to ship to basic training and

6   begin their military service.[44]  Thus, recruits could start training, be assigned to their units, get

7   paid, and begin the naturalization process if they wished.[45]

8       **C.**   **The October 13 Memo**

9       On October 13, 2017, the DoD circulated a memorandum to the different military

10  branches that drastically changed the enlistment process for LPRs.  *See* Ex. 2.  Defendants did

11  not circulate the new policy for public review and comment before issuing it.

12      The October 13 Memo provides that, "effective immediately a Military Service

13  Suitability Determination (MSSD) and National Security Determination (NSD), will be made

14  ***prior to*** such foreign national's entry into Active, Reserve or Guard Service."  *Id*. at 1 (emphasis

15  added).  The memo indicates that these two determinations cannot be made until after

16  "***completion*** of the appropriate background investigation" – meaning that LPRs cannot ship out

17  until their background investigations and the MSSD and NSD determinations are complete.  *Id*.

18  (emphasis added).  The October 13 Memo includes only a single, bare justification for this

19  departure from decades of past practice and policy – to facilitate "process efficiency and the

20  appropriate sharing of information for security risk based suitability and security decisions for

21  the accession of foreign nationals" into the military.  *Id*.

22

23  ─────────────────

24  Federal Investigations Notice No. 16-02, "Federal Investigative Standards for Tier 3 and Tier 3 Reinvestigation" (Oct. 6, 2015), Ex. 6.  Tier 3 investigations are the third tier of the five-tier background investigation system implemented by the United States Office of Personnel

25  Management ("OPM") with Tier 5 representing the most stringent vetting standard.  The tier system dictates the types of personal information and background investigations required for

26  each applicant.  *See Revised Federal Investigative Standards Crosswalk Job Aid*, Center for Development of Security Excellence (Mar. 1, 2017),

27  https://www.cdse.edu/documents/cdse/federal-investigative-standards-crosswalk-guide.pdf.
[44] Fanning Decl. ¶¶ 14, 15.

28  [45] Fanning Decl. ¶ 14.

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1    Defendants have not explained what is required to obtain a favorable NSD or MSSD

2    adjudication, nor whether new, more rigorous standards or requirements are being applied to

3    LPRs.  Instead, the October 13 Memo states only that the "appropriate" background

4    investigations must be completed.  *Id*.  Indeed, well into 2018, the Deputy Director of the DoD

5    Consolidated Adjudications Facility ("DoD CAF"), the entity responsible for these adjudications,

6    testified in one of the MAVNI Actions that the DoD did not know what background

7    investigations were required by the October 13 Memo and that he did not believe the background

8    investigation policies had even been finalized.[46]  Meanwhile, LPRs have been prevented from

9    shipping out since October 2017.  Plaintiff Cooke's background investigation has ostensibly

10   been pending since he signed his enlistment contract in August 2017 and Plaintiff Kuang's has

11   likewise ostensibly been pending since he signed his enlistment contract in July 2017.[47]  The

12   DoD has not issued any other information about how long these investigations will take to

13   complete.

14   At the same time, a document produced in one of the MAVNI Actions indicates that the

15   DoD CAF recommended an unfavorable National Security Determination based "solely on a

16   lack of U.S. citizenship."  *See* Preliminary Injunction Hearing Transcript at 81:20-84:15, *Kirwa,*

17   No. 17-cv-01793-ESH-EMM, ECF No. 27, (D.D.C. 2018), Ex. 7.  Even if the DoD allows LPRs

18   to obtain waivers permitting them to serve in the military despite the unfavorable NSD, as the

19   October 13 Memo suggests might be possible, at a minimum this still adds an additional step to

20   the adjudication process and substantial uncertainty as to the outcome – burdens to which only

21   LPRs are subject, and solely because of their noncitizen status.

22   **III.    ARGUMENT**

23   **A.    Legal Standard**

24   Courts may grant preliminary injunctive relief to prevent immediate and irreparable

25   injury.  *See* Injunctions and Restraining Orders, Fed. R. Civ. P. 65(b)(1)(A) (1948).  To obtain a

26

27   [46] *See* Deposition Transcript of Daniel Purtill at 57:6-9, *Tiwari,* No. 17-cv-00242-TSZ, ECF No. 131-4  (W.D. Wash. Jan 31, 2018), Ex. 3.

28   [47] Cooke Decl. ¶ 7; Kuang Decl. ¶ 9.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

preliminary injunction, the moving party must establish four factors: (1) it is likely to succeed on the merits of its claims at trial; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *See Alliance*, 632 F.3d at 1131. In addition, the Ninth Circuit follows the "sliding scale" approach for preliminary injunctions: "a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *Id.* (internal quotation marks and citations omitted). Plaintiffs easily satisfy this standard.

### B. Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims Under 5 U.S.C. §706(2)

Likelihood of success on the merits is the "most important" factor for injunctive relief, but it is not an absolute requirement. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

Here, Plaintiffs are likely to succeed on the merits of their claim that Defendants have violated 5 U.S.C. § 706(2) of the APA. Courts may "hold unlawful and set aside agency action[48] . . . found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ." *See* Scope of Review, 5 U.S.C. § 706(2) (2013).[49] The policy change reflected in the October 13 Memo violates 5 U.S.C. § 706(2) in at least two ways: first, the October 13

---

[48] The agency action must be a "final agency action for which there is no other adequate remedy" to be reviewable. Actions Reviewable, 5 U.S.C. § 704 (2011). Here, the October 13 Memo is formal policy guidance, effective immediately, which establishes heightened requirements for LPRs seeking to enlist in the military and provides LPRs with no mechanism for relief. *See* October 13 Memo, Ex. 2. In one of the MAVNI Actions, the DoD did not contest that the new policies are a final agency action under the APA. *See Kirwa II*, 285 F. Supp. 3d at 269.

[49] The APA permits judicial review of agency action unless the governing statutory scheme precludes judicial review or the agency action is committed to agency discretion by law. *See* Application; Definitions, 5 U.S.C. § 701(a) (2011). There is a strong presumption that agency action is reviewable. *See Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). The October 13 Memo does not preclude judicial review, nor is it committed to Defendants' discretion – as the Enlistment Statute, its implementing regulations, and DoD's prior memoranda and practices provide standards against which the Court can review to determine if the Memo is arbitrary and capricious. *See, e.g., Kirwa II*, 285 F. Supp. 3d at 268 (reviewing DoD action under the APA and finding that "[t]he October 13th guidance [] represents a dramatic departure from past practice"); *Inland Empire – Immigrant Youth Collective v. Duke*, 2017 U.S. Dist. LEXIS 203307, at *8-*9 (C.D. Cal. Nov. 20, 2017) (holding that government regulations and policy directives provide courts with standards needed to review Deferred Action for Childhood Arrivals revocations).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1    Memo is arbitrary and capricious because Defendants have not provided a rational connection

2    between any facts and the policy, which instead runs counter to the evidence before Defendants,

3    and; second, the October 13 Memo arbitrarily and capriciously implements a departure from the

4    Enlistment Statute and prior agency policy without providing sufficient justification.

5            1.    **The October 13 Memo Runs Counter to Available Evidence**

6            Agency action is arbitrary and capricious if the agency "'relied on factors which

7    Congress has not intended it to consider, entirely failed to consider an important aspect of the

8    problem, offered an explanation for its decision that runs counter to the evidence before the

9    agency . . .'" *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir.

10   2007) (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43

11   (1983)). The agency must "examine the relevant data and articulate a satisfactory explanation

12   for its action, including a rational connection between the facts found and the choice made."

13   *State Farm*, 463 U.S. at 43. In reviewing agency action, the court must ensure that the process

14   by which the agency reached its result was logical and rational. *See Michigan v. U.S. Envtl.*

15   *Prot. Agency*, 135 S. Ct. 2699, 2706 (2015); *see also League of Wilderness Defs./Blue Mtns.*

16   *Biodiversity Project v. Connaughton*, 2014 WL 6977611, at *25 (D. Or. Dec. 9, 2014) ("The

17   Court cannot determine that the [agency's] conclusion was 'reasonable' because the record

18   simply does not provide a rationale behind the decision.").

19           Here, Defendants have not identified a single fact that necessitated the policy change laid

20   out in the October 13 Memo, much less a "rational connection" between any such facts and the

21   new policy. *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371

22   U.S. 156, 168 (1962)); *Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 257, 269 (D.D.C.

23   2018) ("*Kirwa II*") (quoting *State Farm*, 463 U.S. at 43); *Wagafe v. Trump*, 2017 WL 5989162,

24   slip op. at *1 (W.D. Wash. Nov. 28, 2017).[50] Instead, the October 13 Memo runs counter to

25   ────────────

26   [50] Courts have also addressed similar actions in the constitutional context and found that the
     government was unable to articulate sufficient justification for its disparate treatment of certain
     groups. For example, the government's failure to ship foreign-born recruits was also at issue in

27   *Tiwari I*, 2017 WL 6492682, slip op. at *2. In *Tiwari I*, the court upheld the standing of MAVNI
     recruits to seek injunctive relief because they alleged that the government continued its

28

1    myriad evidence that LPRs provide a valuable pool of recruits and soldiers, and that their

2    inclusion in the Armed Forces benefits not only the military but also the country at large.  In fact,

3    the policy change laid out in the October 13 Memo actually *harms* the military and Defendants

4    by restricting the pool of qualified recruits and sowing mistrust between LPRs and the military.

5            Immigrants, including LPRs, are invaluable, high-quality recruits for the U.S. military.

6    LPRs represent 4.1% of the population that are between the recruitable ages of 18 to 24 years

7    old, equivalent to approximately 1.5 million people, and they volunteer to enlist at higher rates

8    than their proportion of the population and at a higher rate than U.S. citizens.[51]  LPRs contribute

9    valuable skills and cultural diversity to the military, such as the ability to speak other

10   languages.[52]  Furthermore, studies have found that immigrant recruits have lower attrition rates

11   than U.S. citizens.[53]  Immigrant recruits with critical foreign language skills also tend to have

12   higher Armed Forces Qualification Test scores, higher levels of education, and above average

13   performance reviews.[54]  These qualified LPRs will be dissuaded from enlisting in the military

14

15   discriminatory policy of *not sending them to basic training,* among other things.  *Id*. at *6.  The
     court refused to dismiss the action because the government had "*not articulated any*

16   *relationship*" between the disparate treatment of MAVNIs and a "governmental interest
     sufficient to render Plaintiffs' claims implausible."  *Id*. at *8 (emphasis added).  The court

17   reached that conclusion after considering DoD memoranda seeking to justify the disparate
     treatment of MAVNI recruits.  *See* Defendant's Notice of Supplemental Authorities, Exhibits 1-

18   3, *Tiwari,* No. 2:17-cv-00242-TSZ, ECF No. 76 (W.D. Wash. Oct. 25, 2017).  Another court

19   similarly found that this administration's abrupt reversal of transgender military service policies
     lacked *any* justification and was "unlikely to survive a rational review."  *Stone v. Trump,* 280 F.

20   Supp. 3d 747, 768 (D. Md. 2017), *appeal dismissed,* 2018 WL 2717050 (4th Cir. Feb. 2, 2018).
     The presidential ban on transgender enlistment even purported to reinstitute past practice and

21   was allegedly justified pending further study to confirm that transgender service "'would not

22   hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources.'"  *Id*.
     at 754 (citing Plaintiff's Motion for Preliminary Injunction, Exhibit 18, *Stone*, No. 17-cv-02459-

23   MJG (D. Md. 2017), ECF No. 40-21).  But the policy reversal lacked the hallmarks of reasoned
     policymaking and was not entitled to deference on a "bare invocation of 'national defense.'"  *Id*.

24   at 769 (citing *Doe 1 v. Trump,* 275 F. Supp. 3d 167, 205 (D.D.C. 2017)).

25   [51] Anita Hattiangadi, et al., *Non-citizens in Today's Military*, The CNA Corporation (Apr. 2005),
     https://www.cna.org/CNA_files/PDF/D0011092.A2.pdf.

26   [52] Declaration of Mark Berkman (the "Berkman Decl.") ¶ 41.
     [53] *Id.*

27   [54] Molly McIntosh and Seema Sayala, *Non-citizens in the Enlisted U.S. Military*, The CNA
     Corporation (Dec. 2011), https://www.cna.org/cna_files/pdf/D0025768.A2.pdf.

28

due to their inability to ship out and begin service.[55]  Furthermore, the discriminatory nature of

the October 13 Memo telegraphs to LPRs that they are unwelcome in the military, further

discouraging LPRs from enlisting.[56]

At the same time, the National Defense Authorization Bills of 2017 and 2018 each

*increased* the minimum number of active duty personnel in the military.[57]  For example, the

Army is seeking to add 76,500 recruits in 2018.[58]  Reaching these recruiting goals can be costly,

as branches of the military have offered bonuses to encourage enlistment.[59]  Meanwhile,

approximately 71% of young Americans currently are ineligible to serve in the military "due to

obesity and other health issues, felony convictions, inability to pass the Armed Forces

Qualification Test, or inappropriate tattoos."[60]  Military leaders have declared the manpower

shortage a "looming crisis" that "directly compromises national security."[61]  To address this

shortfall, the Army has already been required to accept an increasing number of recruits with

lower qualifications.[62]  For example, in 2017, the Army accepted more than three times the

percentage of recruits who scored below the 30th percentile on standard military exams than it

accepted in 2016.[63]  Additionally, the Army has been granting more waivers to recruits who have

admitted past drug use or have been diagnosed with mental health conditions.[64]  By contrast, as

discussed in Section II(A) above, LPRs have already undergone extensive background

investigations in order to obtain their status, and immigration laws prohibit individuals who pose

certain kinds of threats from even becoming LPRs.  The indefinite delay in permitting LPRs to

---

[55] Fanning Decl. ¶ 22.
[56] *Id.* at ¶¶ 22, 23.
[57] Berkman Decl. ¶ 36.
[58] *Id.*
[59] *Id.*
[60] *Id.* at ¶ 38.
[61] Thomas Spoehr, *The Looming National Security Crisis: Young Americans Unable to Serve in the Military*, The Heritage Foundation (Feb. 13, 2018), https://www.heritage.org/defense/report/the-looming-national-security-crisis-young-americans-unable-serve-the-military.
[62] Berkman Decl. ¶¶ 37 – 38.
[63] Christopher Woody, *The Army is trying to bring in more recruits, and it's changing its standards to get them*, Business Insider (Oct. 18, 2017) http://www.businessinsider.com/army-changing-recruiting-standards-to-attract-more-soldiers-2017-10.
[64] Berkman Decl. ¶¶ 37 – 38.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1   serve will only intensify the military's recruiting crisis as it both precludes the service of LPRs

2   who have enlisted and deters others from enlisting at all.[65]

3          The October 13 Memo harms the military beyond its recruitment efforts.  As discussed

4   by former Secretary of the Army Eric K. Fanning, the military has long prided itself on being a

5   meritocracy that recognizes and promotes service members on the basis of their honorable

6   service, not their classification in any particular group.  Fanning Decl. ¶¶ 20-21.  By treating one

7   group of soldiers as "other" and subjecting them to different enlistment processes, the military

8   signals to LPRs who are seeking to serve and those already serving, as well as to the rest of the

9   military, that LPRs are "second class."  Not only does this undermine the military's reputation as

10   a meritocracy, but it also weakens the trust between LPR soldiers and their peers and

11   supervisors, thereby threatening the unit cohesion among soldiers that is critical to the military's

12   success and functioning.  *Id.*  Finally, the military benefits from the inclusion of individuals from

13   all demographics, including LPRs.  Diversity in the military's ranks ensures that it will be able to

14   draw on different perspectives and experiences when facing the many challenges that soldiers

15   daily encounter around the world.  *Id.* at ¶ 24.

16          In sum, Defendants have failed to articulate *any* facts justifying the October 13 Memo,

17   and thus have failed to "examine the relevant data and articulate a satisfactory explanation for its

18   action including a 'rational connection between the facts found and the choice made.'"  *State*

19   *Farm*, 463 U.S. at 43 (citing *Burlington*, 371 U.S. at 168).  The October 13 Memo also "runs

20   counter to the evidence before the agency" and, as such, is arbitrary and capricious in violation

21   of the APA.  *Id.*

22          2.     **Defendants Implemented a New Policy Without Sufficient**
                   **Justification**

23

24          Independent from the reasoning above, Defendants' complete lack of justification for the

25   *change* from the prior policy of permitting LPR recruits to begin their service while their

26   background investigations were pending is, standing alone, a violation of the APA's prohibition

27   on arbitrary and capricious agency action.  *See* Scope of Review, 5 U.S.C. § 706(2)(A) (2013).

28   _____
     [65] Fanning Decl. ¶ 22; Berkman Decl. ¶¶ 38 – 39.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

15

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1   "[A]n 'unexplained inconsistency' in agency policy is 'a reason for holding an interpretation to

2   be an arbitrary and capricious change from agency practice.'"  *Encino Motorcars, LLC v.*

3   *Navarro*, 136 S. Ct. 2117, 2126 (2016) (citing *Natl. Cable & Telecomms. Ass'n v. Brand X*

4   *Internet Servs.*, 545 U.S. 967 (2005)); *see also Organized Village of Kake v. U.S. Dep't of Agric.*,

5   795 F.3d 956, 966 (9th Cir. 2015).  Although "[a]n agency is entitled to change its course when

6   its view of what is in the public's interest changes," the agency "must supply a reasoned analysis

7   indicating that prior policies and standards are being deliberately changed, not casually ignored."

8   *Nw. Envtl. Def. Ctr.*, 477 F.3d at 687 (citing *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841

9   (D,.C. Cir. 1970)).  "'[I]f an agency glosses over or swerves from prior precedents without

10  discussion it may cross the line from the tolerably terse to the intolerably mute.'"  *Id.* at 687-88

11  (citing *Greater Bos.*, 444 F.2d at 852), 690 (setting aside agency's action where "[Defendant]

12  departed from its two-decade-old precedent without supplying a reasoned analysis for its change

13  of course.").

14       As discussed in detail in Section II(B)(2) above, the Enlistment Statute specifically states

15  that LPRs are permitted to enlist in the military, indicating Congress's intent to allow LPRs to

16  serve.  In line with this statute and Congress's intent, the regulations, policies, and practices

17  implementing the Enlistment Statute have long fostered LPR service in the military and treated

18  LPRs and U.S. nationals identically for enlistment purposes.  The October 13 Memo abruptly

19  ended this policy by forcing LPRs to wait indefinitely to begin serving.  The only explanation

20  offered for this sweeping and discriminatory change is a vague statement regarding "efficiency"

21  and "sharing of information."  *See* Ex. 2.  Yet the October 13 Memo does not articulate any

22  explanation of how the new policy will further these stated goals or why the existing policy

23  needed to be changed.  Instead, Defendants are contravening a federal statute and decades of

24  developed policy without anything approaching the "satisfactory explanation" or "reasoned

25  analysis" required under the APA.  *See State Farm*, 463 U.S. at 43; *Nw. Envtl. Def. Ctr.*, 477

26  F.3d at 687.

27       The court in one of the MAVNI Actions, *Kirwa*, considered a similar APA claim in

28

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

addressing plaintiffs' request for a preliminary injunction.  There, non-citizen enlistees initiated an APA challenge to the DoD's policy change, which suspended their naturalization applications pending completion of the DoD's enhanced "screening and suitability requirements," including the rendering of a favorable MSSD.  *Kirwa II*, 285 F. Supp. 3d at 264.  The court in *Kirwa* sided with plaintiffs and issued the preliminary injunction (which is still in place), finding that "[t]he October 13th guidance [ ] represents a dramatic departure from past practice."  *Id.* at 268.  A prior decision in the same action had found "no reasoned explanation for this change, thereby suggesting that DoD's decision was an arbitrary and capricious one."  *Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 21, 38 (D.D.C. 2017) ("*Kirwa I*").  Here, as in *Kirwa*, Defendants have failed to provide any reasoned explanation for their unprecedented departure from the Enlistment Statute and longstanding military policies, thereby violating the APA's prohibition on arbitrary and capricious agency action.

C.     **Plaintiffs Will Suffer Irreparable Injury If the Court Does Not Grant Preliminary Injunctive Relief**

1.     **Plaintiffs' Careers Have Suffered as a Result of the October 13 Memo**

Defendants' wholesale abandonment, without explanation or justification, of their decades-long policy and practice of allowing LPRs to begin military service while their background investigations are pending has caused and will continue to cause Plaintiffs irreparable harm unless remedied by an injunction.

As a result of the October 13 Memo, Plaintiffs have been indefinitely delayed in beginning their military careers and have suffered significant harms as a result.  In the summer of 2017, following his junior year of high school, Plaintiff Jiahao Kuang began making plans for his life after graduation.  Declaration of Jiahao Kuang ("Kuang Decl."), ¶ 6.  Proud of the country in which he has lived since childhood, Mr. Kuang decided to enlist in the U.S. Navy.  *Id.* at ¶ 9. Mr. Kuang was sworn in and signed his enlistment contract as a Personnel Specialist ("PS") on July 18, 2017.  *Id.*  Mr. Kuang's ship date was set for a year later, on July 5, 2018, so that he could graduate high school and ship out shortly thereafter.  *Id.*  Mr. Kuang attended Delayed Entry Program ("DEP") meetings every month after he enlisted.  *Id.* at ¶ 10.  He first learned

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1    about the October 13 Memo at a DEP meeting in early 2018.  *Id.* at ¶ 13.  However, Navy

2    personnel told him that his ship date likely would not be delayed, as there was a year between his

3    enlistment and ship date during which his background investigation could be completed.  *Id.*  At

4    a DEP meeting in May 2018, however, a recruiter informed Mr. Kuang that his ship date had

5    been delayed by six months to January 17, 2019.  *Id.* at ¶ 14.  Mr. Kuang has repeatedly asked

6    his recruiter when his background investigation would be done, but his recruiter has said that he

7    has "no clue" when that might occur or when Mr. Kuang might ship out.  *Id.*

8        Mr. Kuang graduated from high school on June 7, 2018 and now lives in a state of limbo.

9    He cannot go to college in the fall because he did not apply to do so, in reliance on his enlistment

10   contract and the Defendants' decades-long policy and practice of allowing LPRs to begin their

11   service without waiting for the completion of background investigations.  *Id.* at ¶ 18.  Further,

12   Mr. Kuang budgeted his money and planned his long-term finances under the assumption that he

13   would ship out and begin to receive a salary (as well as room and board) beginning on July 5,

14   2018, and that he subsequently would be eligible for college financial assistance from the

15   military.  *Id.* at ¶ 20.  Because he does not know when he will actually ship out, he has continued

16   to live with his father instead of beginning his life as an independent adult.  *Id.* at ¶ 23.

17       At a July 2018 DEP meeting, Mr. Kuang learned that his position had been changed from

18   PS to Surface/Seaman Professional Apprenticeship Career Track ("SN/PACT").  *Id.* at ¶ 15.  Mr.

19   Kuang did not request this change in position, and is now concerned that his chosen position as a

20   PS might not be available when he becomes eligible to ship out, which may cause him further

21   delay and prejudice.  *Id.* at ¶¶ 15-16.

22       Mr. Kuang feels he cannot make any long-term commitments due to the uncertainty

23   created by his unknown ship date.  Though he is scheduled to ship out in January 2019, Mr.

24   Kuang's background checks could potentially clear at any time, making him eligible to ship out.

25   *Id.* at ¶ 22.  He is therefore hesitant to sign up for community college courses and risk wasting

26   time and money if he is able to ship out mid-semester.  *Id.* at ¶ 19.  He is also concerned about

27   how to explain his situation to potential employers.  *Id.* at ¶ 22.  He worries that he will ship out

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1   unexpectedly, and the company will have wasted training resources on him, damaging his

2   reputation. *Id.* If he is upfront about his uncertain status, he will be an unattractive employment

3   candidate. For example, Mr. Kuang turned down internship opportunities at companies that had

4   recruited him based on his experience writing software, and now cannot begin an internship due

5   to the uncertainty of when he might ship out. *Id.* at ¶ 21.

6        The October 13 Memo has similarly harmed Plaintiff Deron Cooke's employment and

7   educational prospects. Mr. Cooke immigrated to the U.S. from Jamaica in July 2015 when he

8   was twenty-two years old. Declaration of Deron Cooke ("Cooke Decl."), ¶ 2. Grateful for his

9   new life and inspired by his family's history of public service, Mr. Cooke decided to enlist and

10  give back to his adopted country. *Id.* at ¶ 9. In August 2017, Mr. Cooke was sworn in and

11  signed a contract to work as an auto mechanic in the Air Force. *Id.* at ¶¶ 7-8. Mr. Cooke also

12  began to participate in drills at a nearby Air Force training center, for which he was not paid. *Id.*

13  at ¶ 11. Mr. Cooke's recruiter told him that he would ship out on November 15, 2017, while his

14  background investigations were in progress. *Id.* at ¶ 8. His recruiter told him that after two years

15  of service as an auto mechanic, he could pursue his education and earn credits to add to his

16  associate's degree, so that he eventually would receive a bachelor's or master's degree and could

17  work as an engineer within the military. *Id.*

18       On October 27, 2017, Mr. Cooke gave his employer notice that he would be leaving. *Id.*

19  at ¶ 12. On November 1, 2017, two weeks before his scheduled ship date, Mr. Cooke was told

20  he would no longer ship out until his background investigations cleared. *Id.* at ¶ 13. Mr. Cooke

21  had no choice but to withdraw his resignation from his old job. *Id.* at ¶ 16. Because of the

22  uncertainty as to when he will ship out, Mr. Cooke has not been able to pursue educational

23  courses offered by his employer or apply for a promotion. *Id.* at ¶ 17.

24       The delay Mr. Cooke confronts has also negatively impacted his ability to access a career

25  in the military specialty he desires. While Mr. Cooke's recruiter indicated that he would be able

26  to pursue an auto mechanic specialty, without a ship date Mr. Cooke's recruiter has now

27  informed him that his anticipated position may not be available if and when Mr. Cooke is

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1    permitted to begin his service.  *Id.* at ¶ 18.  Mr. Cooke is also concerned that his options in the

2    military will become increasingly limited as he gets older.  *Id*.

3          Mr. Cooke has suffered personally as a result of the indefinite delay in shipping out.  He

4    and his wife have had to put their lives as newlyweds on hold, as they do not know if or when he

5    will ship out.  For example, Mr. Cooke and his wife have not been able to sign a lease for an

6    apartment of their own due to the uncertainty, and have continued living with Mr. Cooke's

7    mother-in-law.  *Id.* at ¶ 19.

8          The delay Plaintiffs Kuang and Cooke have experienced as a result of the new policy is

9    causing them substantial harm and warrants an injunction.  Courts have recognized that tangible

10    irreparable harm results when qualified military recruits are even *threatened* with accession and

11    advancement bars.  *See Doe 1*, 275 F. Supp. 3d at 205 (enjoining, pre-enforcement, presidential

12    directive that would indefinitely prohibit transgender individuals from joining military).  Such

13    obstacles irreparably harm recruits by preventing them from entering their profession of choice

14    and experiencing their highest career trajectory.  *See Tiwari v. Mattis*, No. C17-242 TSZ, 2018

15    WL 1737783, slip op. at *7 (W.D. Wash. Apr. 11, 2018) ("*Tiwari II*") (citing *Ariz. Dream Act*

16    *Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("'Setbacks early in their careers are likely

17    to haunt Plaintiffs for the rest of their lives.'")); *Doe 1*, 275 F. Supp. 3d at 216 (threatened ban on

18    recruits "stunts the growth of their careers, and threatens to derail their chosen calling . . .").  The

19    immediate and practical harms to Plaintiffs' lives and careers are also irreparable.  *See Tiwari II*,

20    2018 WL 1737783, slip op. at *7 (withholding MAVNI security clearances "spoiled the currency

21    of their qualifications and training, and reduced the amount of pay they are eligible to receive.");

22    *Kirwa I*, 285 F. Supp. 3d at 42-43 (internal citations omitted) (granting preliminary injunction

23    and stating that, "Defendants argue that plaintiffs are not harmed because they can still file for

24    naturalization after they receive their N-426s.  This argument is nothing short of illogical.  The

25    government represented to plaintiffs that, in exchange for 8 years of military service, they would

26    be able to pursue an expedited path to citizenship shortly after enlistment.  Now that time has

27    been extended by two or three years."); *Doe 1*, 275 F. Supp. 3d at 216 (accession ban threatened

28

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1    "unique educational opportunities" of transgender recruits in military academies).  This prejudice

2    is equally applicable here; even if Plaintiffs are eventually permitted to ship out, they have

3    already suffered and will continue to suffer irreparable harm as a result of Defendants' conduct.[66]

4         Mr. Kuang and Mr. Cooke are also concerned that they will be ostracized by their

5    colleagues and may not be able to advance in the military as they otherwise would have, given

6    that the DoD's official policies single out and discriminate against LPRs.  Kuang Decl. ¶ 27;

7    Cooke Decl. ¶¶ 21-22.  More than anything, the DoD policy makes them feel unwelcome in the

8    U.S. and in the military.[67]  Kuang Decl. ¶ 28; Cooke Decl. ¶¶ 21-22.  This type of disparate

9    treatment of recruits based on their alienage results in stigma that cannot be remedied by money

10   damages.  *See Elzie v. Aspin*, 841 F.Supp. 439, 443 (D.D.C. 1993) (finding irreparable injury in

11   being "labeled as unfit for service solely on the basis of his sexual orientation, a criterion which

12   has no bearing on his ability to perform his job"); *Tiwari v. Mattis*, No. C17-242 TSZ, 2017 WL

13   6492682, slip op at *6 (W.D. Wash. Dec. 19, 2017) ("*Tiwari I*") (recognizing an Article III

14   injury in the government's treatment of MAVNI soldiers as "second class citizen[s].");  *Doe 1*,

15   275 F. Supp. 3d at 216 (even a threatened ban of transgender service members caused irreparable

16   harm because it stigmatizes them "as less capable of serving in the military, reduc[ing] their

17   stature among their peers and officers"); *Stone,* 280 F. Supp. 3d at 757 (finding current harm

18   from pending transgender service ban in "stigma of being set apart as inherently unfit.").

19

20

21

22

23

24

---

25   [66] Fanning Decl. ¶ 18 ("The October 13 Memo serves to substantially limit the advancement and
     promotion opportunities of LPRs in the military.  Compared to U.S. citizens, LPR soldiers are

26   delayed indefinitely from accessing into the military, as they are placed in the DEP to wait for
     their background checks to be completed . . . This delay prevents LPRs from beginning their
     military journey and taking steps toward opportunities for advancement.")

27   [67] *Id.* at ¶ 23 ("[T]he October 13 Memo deteriorates the relationship between immigrants in the
     United States and the Armed Forces by singling out LPRs as inherently suspicious and burdening

28   LPRs with a more difficult path to service in the military.")

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

2.  **Plaintiffs Have Suffered Economically as a Result of the October 13 Memo**

An analysis by Mark Berkman of The Brattle Group supports the harms that Plaintiffs Cooke and Kuang have suffered and will continue to suffer by virtue of the delay in beginning their military careers imposed by Defendants.

Berkman concludes that LPRs like Plaintiffs who suffer a delay in accessing into the military "can be expected to see promotions and pay increases later than they would have otherwise," which will lead to "lower pay in a given year, as rank is a direct determinant of Basic Pay." Berkman Decl. ¶ 17. Berkman also reviewed literature looking at the earnings veterans experience after serving, which finds that service members with at least four years of experience have long-run earnings premiums relative to non-veterans, and that this earnings premium increases with the number of years served. *Id.* at ¶ 33. Delays in the commencement of service also delay the military and on-the-job training that LPRs receive, which translates into increased post-service wages. *Id.* at ¶ 22. Even an additional one month of training in the military can increase a service member's civilian pay. *Id.* Furthermore, to the extent LPRs like Plaintiffs naturalize through their service in the military, that naturalization can also result in increased earnings. *Id.* at ¶ 24. Plaintiffs Cooke and Kuang, who each enlisted nearly a year ago, are currently experiencing this loss in increased earning potential because they have not been permitted to begin their service.

The economic benefits of serving in the military are not confined to salary, as service members are entitled to additional valuable benefits. While they serve, members are entitled to a housing stipend, subsidized health care for themselves and their families, subsidized groceries at commissaries, and use of subsidized dependent care. *Id.* at ¶ 15. Berkman cites to a Congressional Budget Office estimate that these non-cash benefits comprise 21% of a service member's total compensation, or approximately $18,000, for service members with children and 8%, or $5,600, for service members without children. *Id.* These are tangible, valuable benefits that Plaintiffs Cooke and Kuang are being denied while they wait indefinitely to serve.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1    Once their service is complete, veterans are also entitled to educational benefits and

2  preferential loans.  *Id.* at ¶¶ 28-29.  These benefits are substantial.  For example, veterans are

3  entitled to receive reimbursement for college tuition and fees, which can total up to $94,684 over

4  four years.  *Id.* at ¶ 28.  Similarly, service members are eligible for preferential home loans,

5  which can result in savings of $13,794 for an average-priced new home over the course of the

6  loan.  *Id.* at ¶ 29.  Plaintiffs are currently unable to access these benefits because they have not

7  yet begun their service.

8                3.    **Plaintiffs Have Not Been Able to Naturalize as a Result of the October**
                       **13 Memo**
9

10    Plaintiffs are not only stalled in their careers and life plans, but they also have been

11  delayed in becoming U.S. citizens.[68]  Plaintiffs Cooke and Kuang have committed themselves to

12  many years of military service and are prepared to endure the sacrifices that enlistment entails.

13  Yet, despite their willingness to serve and sacrifice for this country, they have been indefinitely

14  stalled in pursuing citizenship.  Mr. Cooke intended to take advantage of the expedited path to

15  citizenship by joining the military, as it would allow him to become a citizen of the country he

16  considers his home and to bring his mother to the U.S. for important medical treatment that she

17  cannot receive in Jamaica.  Cooke Decl. ¶ 10.  However, Mr. Cooke cannot start the

18  naturalization process until he successfully enters the military.  *See* 8 U.S.C. § 1440.  The policy

19  change has also significantly delayed Mr. Kuang's pursuit of U.S. citizenship.  When Mr. Kuang

20  enlisted, he was told that he could secure citizenship through his military service during basic

21  training and would not need to pay the application fee.  Kuang Decl. ¶ 8.  As a result, he decided

22  to renew his green card in 2018 rather than apply for citizenship.  *Id.*  As a result of the October

23  13 Memo, both Plaintiffs are being denied the rights and freedoms attendant to being a

24  naturalized citizen:  the right to vote and to stand for office, the ability to become a

25  commissioned officer, access to jobs that require security clearances, and the ability to

26  participate in the civic life of the adopted homeland they have sworn to protect.

27  [68] *See* Naturalization Through Active-Duty Service in the Armed Forces During World War I,
    World War II, Korean Hostilities, Vietnam Hostilities, or Other Periods of Military Hostilities, 8
28  U.S.C. § 1440 (2004).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

1   Because Plaintiffs have suffered irreparable injury and continue to do so each passing

2   day, this Court should issue a preliminary injunction restraining implementation of the October

3   13 Memo.

4   **D.    The Balance of Equities and the Public Interest Weigh in Favor of Granting**
        **Preliminary Injunctive Relief**

5

6   The balance of the equities and public interest weigh overwhelmingly in favor of granting

7   Plaintiffs preliminary injunctive relief.  "When the government is a party, the balance of the

    equities and public interest analysis generally merge." *Saravia v. Sessions*, 280 F. Supp. 3d
8
    1168, 1200 (N.D. Cal. 2017).  In balancing equities, courts "must balance the competing claims
9
    of injury and must consider the effect on each party of the granting or withholding of the
10
    requested relief." *Klein v. San Clemente*, 584 F.3d 1196, 1199–1200 (9th Cir. 2009) (citing
11
    *Winter v. Natl. Res. Defense Council*, 555 U.S. 7, 24 (2008)).  Courts also pay "particular regard"
12
    to "the public consequences" in issuing an injunction. *Alliance*, 632 F.3d at 1132.
13
    Here, the balance of equities tips sharply in Plaintiffs' favor, because, as discussed above,
14
    Plaintiffs have suffered and will continue to suffer serious hardships as a result of Defendants'
15
    policy changes and have no other recourse against the government.
16
    In contrast, Defendants would suffer a minor administrative inconvenience, at most, in
17
    reinstating the pre-existing procedures – which are consistent with the Enlistment Statute and
18
    had been in place for decades. *See Tiwari II*, 2018 WL 1737783, slip op. at *7 ("Defendant will
19
    be little harmed, if at all, in requiring its personnel to recognize and adopt the revocation and
20
    consider interim security clearances from MAVNI soldier[s] on the same terms and conditions as
21
    all other soldiers.").  Defendants will still be able to run background investigations on LPR
22
    enlistees, as they have done for years and as they continue to do for U.S. citizens. *Doe 1 v.*
23
    *Trump*, No. 17-5267, 2017 WL 6553389, at *2 (D.C. Cir. Dec. 22, 2017) (enjoining transgender
24
    ban would not irreparably harm the government because "transgender people are <u>already</u> serving
25
    openly in the military") (emphasis in original).  To the contrary, "depriv[ing] the military of
26
    skilled and talented troops . . . would be counter to the public interest." *Id*. at *3. *See also Stone*,
27
    280 F. Supp. 3d at 769 (evidence indicated military would be impaired by banning transgender
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

service, not permitting it).  In addition, as discussed above, Defendants have not articulated any

legitimate justification for the new policy reflected in its October 13 Memo – strongly suggesting

that it was not born from legitimate concerns.  *See, e.g.*, *Stone*, 280 F. Supp. 3d at 768; *Kirwa I*,

285 F. Supp. 3d at 44.

Because the immense hardships Plaintiffs will suffer absent injunctive relief tip the

balance of the equities and public interest decisively in Plaintiffs' favor, the Court should grant

Plaintiffs' request for a preliminary injunction.

## IV.      CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their application for a

preliminary injunction.

Dated:  July 19, 2018

LATHAM & WATKINS LLP


By: */s/ Peter A. Wald*
    Peter A. Wald (Bar No. 85705)
    *peter.wald@lw.com*
    505 Montgomery Street, Suite 2000
    San Francisco, CA  94111
    Telephone:  (415) 391-0600
    Fax: (415) 395-8095
    Colleen C. Smith (Bar No. 231216)
    *colleen.smith@lw.com*
    12670 High Bluff Drive
    San Diego, CA  92130
    Telephone:  (858) 523-5400
    Fax: (415) 395-8095
    Megan C. Fitzpatrick (Bar No. 6309005)
    *megan.fitzpatrick@lw.com*
    330 N. Wabash Ave, Suite 2800
    Chicago, IL 60611
    Telephone: (312) 876-7700
    Fax: (312) 993-9767

    ACLU FOUNDATION OF SOUTHERN
    CALIFORNIA
    Jennifer Pasquarella (Bar No. 263241)
    *jpasquarella@aclusocal.org*
    Michael Kaufman (Bar No. 254575)
    *mkaufman@aclusocal.org*
    Sameer Ahmed (Bar No. 319609)
    *sahmed@aclusocal.org*
    1313 West 8th Street

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698

25

1

2

Los Angeles, CA  90017
Telephone: (213) 977-5232
Fax: (213) 977-5297

3

4

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
  Christine P. Sun (Bar No. 218701)
    *csun@aclunc.org*
  39 Drumm Street
  San Francisco, CA 94111
  Telephone: (415) 621-2493
  Fax: (415) 255-1487

5

6

7

8

*Attorneys for Plaintiffs*
*Jiahao Kuang and Deron Cooke*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26

PLAINTIFFS' NOTICE OF MOTION AND MOTION
FOR PRELIM. INJUNCTION
CASE NO. 3:18-CV-03698