UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIAHAO KUANG, et al., | Case No. 18-cv-03698-JST |
| Plaintiffs, | |
| v. | **ORDER GRANTING CLASS CERTIFICATION, DENYING MOTION TO DISMISS, AND GRANTING PRELIMINARY INJUNCTION** |
| UNITED STATES DEPARTMENT OF DEFENSE, et al., | |
| Defendants. | Re: ECF Nos. 21, 31, 42, 44 |

Before the Court are (1) Plaintiffs Jiahao Kuang and Deron Cooke's unopposed motion for class certification, ECF No. 31; (2) Plaintiffs' motion for a preliminary injunction, ECF No. 21; and (3) Defendants U.S. Department of Defense ("DoD") and Secretary of Defense James Mattis's motion to dismiss, ECF No. 42. The Court will grant the motion for class certification, deny the motion to dismiss, and grant the motion for preliminary injunction.

## I. BACKGROUND

### A. Factual Background[1]

In October 2007, an eight-year-old Jiahao Kuang moved with his father from China to the United States. ECF No. 24 ¶ 2. Kuang entered the United States on a CR2 visa, which is issued to children of a foreign spouse who is married or soon to be married to a U.S. citizen. *Id.* A month later, Kuang obtained his green card pursuant to his father's marriage. *Id.* ¶ 3. Since then, Kuang has resided with his family in San Leandro, California, as a lawful permanent resident ("LPR") of the United States. *Id.* ¶¶ 3-4.

---

[1] Given the cross-motions for preliminary injunction and to dismiss, as well as the production of the administrative record, the Court sets forth the facts and background of this litigation using record evidence. But in deciding the motion to dismiss, the Court relies only on the Complaint and other materials properly considered in that context.

On July 18, 2017, during the summer before his senior year of high school, Kuang enlisted in the U.S. Navy for a four-year term of active service, followed by a four-year term of reserve duty. ECF No. 24-1 at 2. Kuang enlisted in the military because of desire to serve his country. ECF No. 24 ¶ 11. In addition, Kuang was motivated by the promise of financial assistance with his future college education and the understanding that he would be eligible to naturalize (i.e. become a U.S. citizen) once he entered basic training. *Id.* ¶¶ 8, 12.[2] Relying on these representations, Kuang renewed his green card rather than applying to become a citizen through the much lengthier civilian process. *Id.* ¶ 8.

Kuang's enlistment contract provided that he would be eligible to "ship out," or enter active service, on July 5, 2018. ECF No. 24 ¶ 9; ECF No. 24-1 at 5. Kuang was placed in a Delayed Entry Program ("DEP") in the interim and attended monthly DEP meetings. ECF No. 24 ¶ 10.

At the age of twenty-two, Deron Cooke successfully applied for a green card based on his father's U.S. citizenship. ECF No. 25 ¶ 2. In July 2015, Cooke emigrated from Jamaica to the United States; he has maintained LPR status since then. *Id.* Cooke lives with his wife, who is a U.S. citizen, in Trenton, New Jersey. *Id.* ¶ 4.

On August 3, 2017, Cooke enlisted in the U.S. Air Force for a four-year term of active service, followed by a four-year term of reserve duty. ECF No. 25 ¶ 7; ECF No. 25-1 at 2. Cooke enlisted in order to give back to the United States, develop his career skills, and carry on his family's tradition of service in the military and law enforcement. ECF No. 25 ¶ 9. Upon enlisting, Cooke was also informed that he would be eligible for an expedited naturalization process through the military. *Id.* ¶ 10.

Two weeks later, Cooke entered into an employment contract with the Air Force for an auto mechanic position, with a scheduled ship-out date of November 15, 2017. ECF No. 25 ¶ 8;

---

[2] 8 U.S.C. § 1439(a) provides that "[a] person who has served honorably at any time in the armed forces of the United States for a period or periods aggregating one year . . . may be naturalized" without meeting certain conditions. During designated periods of hostilities, there is no length-of-service requirement. *See id.* § 1440(a). The United States has been in a designated period of hostilities since the September 11, 2001 attacks. *See* ECF No. 57 at 149.

1    ECF No. 25-2.  Cooke was also placed in a DEP and began attending biweekly drills.  ECF No. 25

2    ¶ 11.

3        **B.      Lawful Permanent Residents**

4        In order to become LPRs, Kuang and Cooke had to undergo an application and screening

5    process.  As part of this process, LPR applicants must provide detailed information regarding their

6    background (such as employment history and prior addresses), provide fingerprints, photos, and a

7    signature, as well as participate in an in-person interview.  *See, e.g., I-485, Application to Register*

8    *Permanent Residence or Adjust Status*, U.S. Citizenship and Immigration Servs. (Apr. 11, 2018),

9    https://www.uscis.gov/i-485; *Green Card*, U.S. Citizenship and Immigration Servs. (Feb. 22,

10   2018), https://www.uscis.gov/greencard; *Fact Sheet: Immigration Security Checks—How and Why*

11   *the Process Works*, U.S. Dep't of Homeland Security (Apr. 25, 2006),

12   https://www.uscis.gov/sites/default/files/files/pressrelease/security_checks_42506.pdf at 1-2

13   [hereinafter "*Fact Sheet*"].[3]  The Department of Homeland Security ("DHS") conducts an

14   interagency background check for every applicants, as well as FBI fingerprint and name checks

15   for many of those applicants, which reveal foreign criminal history.  *See Fact Sheet* at 2.

16       LPR applicants may be denied for a multitude of reasons, including criminal history and

17   security risk grounds.  *See* 8 U.S.C. § 1182(a)(2), (3).

18       **C.      Military Enlistment and Accession Process**

19       Kuang and Cooke are far from the only LPRs to enlist in the U.S. military.  Approximately

20   5,000 LPRs do so every year.  ECF No. 22-1 at 4.  The process by which LPRs are enlisted and

21   shipped into active military service ("accession") is governed by various statutory, regulatory, and

22   DoD policy requirements.  Because these requirements are at the heart of this dispute, the Court

23   reviews them in some detail here.

24       First, Congress has enacted certain statutory requirements governing who may enlist in the

25   military.  *See* 10 U.S.C. § 504.  "No person who is insane, intoxicated, or a deserter from an armed

26

27   _____

     [3] The Court takes judicial notice of these publicly available government documents, whose
28   authenticity or accuracy is not disputed.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998
     (9th Cir. 2010).

force, or who has been convicted of a felony, may be enlisted in any armed force," except that the relevant Secretary may authorize a meritorious exception for a deserter or convicted felon. *Id.* § 504(a).

Second, and most relevant here, Congress has established citizenship or residency requirements for military service. In general, "[a] person may be enlisted in any armed force only if the person is one of the following:" (1) "[a] national of the United States"; (2) "[a]n alien who is lawfully admitted for permanent residence"; or (3) "[a] person described in [the Department of Defense State Partnership Program, 10 U.S.C. § 341]" of compacts between the United States and the Federated States of Micronesia, the Republic of the Marshall Islands, and Palau. *Id.* § 504(b)(1).[4]

Congress also provided for individualized exceptions to these citizenship requirements. Section 504(b)(2) permits the relevant Secretary to authorize the enlistment of someone who does not fall into any of the categories of section 504(b)(1), if the Secretary determines that the "person possesses a critical skill or expertise – (A) that is vital to the national interest; and (B) that the

---

[4] Section 504(b)(1) provides in full:

> (b) Citizenship or residency. – (1) A person may be enlisted in any armed force only if the person is one of the following:
>
> (A) A national of the United States, as defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).
>
> (B) An alien who is lawfully admitted for permanent residence, as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)).
>
> (C) A person described in section 341 of one of the following compacts:
>
>> (i) The Compact of Free Association between the Federated States of Micronesia and the United States (section 201(a) of Public Law 108-188 (117 Stat. 2784; 48 U.S.C. 1921 note)).
>> (ii) The Compact of Free Association between the Republic of the Marshall Islands and the United States (section 201(b) of Public Law 108-188 (117 Stat. 2823; 48 U.S.C. 1921 note)).
>> (iii) The Compact of Free Association between Palau and the United States (section 201 of Public Law 99-658 (100 Stat. 3678; 48 U.S.C. 1931 note)).

4

person will use in the primary daily duties of that person as a member of the armed forces."

Recruits enlisted under section 504(b)(2) are subject to additional procedures prior to entering

active service, however. A person enlisted under section 504(b)(2) may not "report to initial

training until after the Secretary concerned has completed all required background investigations

and security and suitability screening as determined by the Secretary of Defense regarding that

person." 10 U.S.C. § 504(b)(3)(A).[5] These applications were processed pursuant to the Military

Accessions Vital to the National Interest ("MAVNI") pilot program. *See generally*, *Kirwa v. U.S.*

*Dep't of Def.*, 285 F. Supp. 3d 257, 263 (D.D.C. 2018); ECF No. 57 at 146-48.

DoD has promulgated additional regulations governing the accessions process, including

"standards for age, aptitude, citizenship, dependents, education, medical, character/conduct,

physical fitness, and other disqualifying conditions, which are cause for non-qualification for

military service." 32 C.F.R. § 66.1(b). Per DoD's regulations, its policy is to "[u]se common

---

[5] Sections 504(b)(2) and (b)(3) provide in full:

(2) Notwithstanding paragraph (1), and subject to paragraph (3), the Secretary concerned may authorize the enlistment of a person not described in paragraph (1) if the Secretary determines that such person possesses a critical skill or expertise–

(A) that is vital to the national interest; and

(B) that the person will use in the primary daily duties of that person as a member of the armed forces.

(3)(A) No person who enlists under paragraph (2) may report to initial training until after the Secretary concerned has completed all required background investigations and security and suitability screening as determined by the Secretary of Defense regarding that person.

(B) A Secretary concerned may not authorize more than 1,000 enlistments under paragraph (2) per military department in a calendar year until after—

(i) the Secretary of Defense submits to Congress written notice of the intent of that Secretary concerned to authorize more than 1,000 such enlistments in a calendar year; and
(ii) a period of 30 days has elapsed after the date on which Congress receives the notice.

entrance qualification standards for enlistment, appointment, and induction into the Military Services," "[a]void inconsistencies and inequities based on ethnicity, gender, race, religion, or sexual orientation in the application of these standards by the Military Services," and "[j]udge the suitability of individuals to serve in the Military Services on the basis of their adaptability, potential to perform, and conduct." *Id.* § 66.4.

Concerning citizenship, DoD regulations incorporate the requirements of § 504(b). *See* § 66.6(b)(2)(i). DoD additionally requires that a service member be a U.S. citizen "[t]o be eligible for appointment as a commissioned officer," although the requirement may be waived on an individual basis, "but only for an original appointment in a grade below the grade of major or lieutenant commander." *Id.* § 66.6(b)(2)(ii).

DoD regulations also seek "to minimize entrance of persons who are likely to become disciplinary cases, security risks, or who are likely to disrupt good order, morale, and discipline." *Id.* § 66.6(b)(8). Consistent with this goal, the regulations disqualify applicants with certain criminal records, prior dishonorable conduct in military service, or who have "exhibited antisocial behavior or other traits of character that may render the applicant unfit for service." *Id.* § 66.6(b)(i)-(v).

Moreover, DoD generally deems ineligible an applicant who "[r]eceives an unfavorable final determination by the DoD Consolidated Adjudication Facility on a completed National Agency Check with Law and Credit (NACLC) or higher-level investigation, which is adjudicated to the National Security Standards in accordance with Executive Order 12968, during the accession process." *Id.* § 66.6(b)(vi). Notwithstanding this background investigation requirement, DoD permits – but does not require – that:

> An applicant may be accessed (including shipping him or her to training or a first duty assignment) provided that a NACLC or higher-level investigation was submitted and accepted by the investigative service provider (Office of Personnel Management (OPM)) and an advanced fingerprint was conducted, and OPM did not identify any disqualifying background information.

*Id.* § 66.6(b)(vi)(A).

In addition to these regulations, DoD has issued further guidance regarding investigations

for accessing service members. DoD Manual 5200.02, *Procedures for the DoD Personnel Security Program*, explains that "[t]he appointment, enlistment, and induction of each member of [the military] will be based on a favorably adjudicated PSI ['personnel security investigation']." ECF No. 57 at 74 § 4.2(a). In turn, the manual provides that "[t]he NACLC, or its equivalent, is the minimum investigation required for entry into the Military Departments." ECF No. 57 at 74. Currently, the government employs a "Tier 3" investigation (out of a five-tier scale of intensity) as the equivalent of the NACLC. *See* ECF No. 22-5 at 1-2; ECF No. 57 at 95 § 7.6(b)(2).

Based on the results of this investigation, DoD renders a Military Service Suitability Determination ("MSSD") and National Security Determination ("NSD"). ECF No. 42 at 22-23; ECF No. 57 at 1-2. To determine the applicant's "national security eligibility," DoD uses uniform adjudicative guidelines issued by the Director of National Intelligence ("DNI"). ECF No. 57 at 94 § 7.4. A favorable NSD does not authorize the applicant for access to classified information.[6] The current DNI Guidelines articulate thirteen categories of criteria that must be considered in determining the security risk posed by an individual. *Id.* at 33. Among those are information relevant to the individual's allegiance to the United States, susceptibility to foreign influence, and preference for foreign nations over the United States. *Id.* at 35-38. (For convenience, the Court refers to the entire process of the Tier 3 investigation and resulting MSSD and NSD as the "background investigation" throughout the remainder of this Order.)

At the time Kuang and Cooke enlisted, DoD's policy "allow[ed] for LPR recruits to ship to initial military training as long as their background investigation had been initiated, and they had cleared all other entry screening requirements." *DoD Announces Policy Changes to Lawful Permanent Residents and the Military Accessions Vital to the National Interest (MAVNI) Pilot Program*, U.S. Dep't of Def. (Oct. 13, 2017), https://dod.defense.gov/News/News-Releases/News-Release-View/Article/1342317/dod-announces-policy-changes-to-lawful-permanent-residents-and-the-military-acc/. U.S. citizens were likewise able to begin basic training while their

---

[6] "National security eligibility determinations are a function distinct from granting access to classified national security information." ECF No. 57 at 93 § 7.1(a)(1). Indeed, "[o]nly U.S. citizens are eligible for access to classified information," unless approved through a separate, limited program. *Id.* at 89 § 6.1.

background investigations were in progress. ECF No. 23 ¶¶ 14-15.

On October 13, 2017, DoD Under Secretary of Defense for Personnel and Readiness A.M. Kurta issued a memo implementing a new policy for background investigations for LPRs ("October 13 Memo"). ECF No. 57 at 5-6. The October 13 Memo explained that "[i]n order to facilitate process efficiency and the appropriate sharing of information for security risk based suitability and security decisions for [LPRs]," DoD would require a completed background investigation before an LPR could enter "Active, Reserve or Guard Service." ECF No. 57 at 5.

**D.     Subsequent Events**

The October 13 Memo's policy change prevented Kuang and Cooke from entering active service on their projected ship-out dates. ECF No. 24 ¶ 14; ECF No. 25 ¶ 13.

In May 2018, a recruiter informed Kuang that his ship-out date had been delayed until January 17, 2019. ECF No. 24 ¶ 14. In the interim, Kuang was informed that his career track designation had been switched from personnel specialist to one that does not receive a "designated position or career path and [is] usually assigned manual labor responsibilities," *id.* ¶ 15, despite Kuang's experience with computers, *id.* ¶ 5. In anticipation of entering active service, Kuang did not apply to college, and continues to be hampered in his pursuit of interim employment and education due to uncertainty regarding when he will be permitted to enter the military. *Id.* ¶¶ 18-22.

Unaware of the October 13 Memo, Cooke resigned from his job on October 27, 2017, in preparation for his November 15 ship-out date. ECF No. 25 ¶ 12. Although he was able to reclaim that job when informed of DoD's new policy, his ability to further his civilian career or take advantage of his employer's education benefits is hampered by his looming military service. *Id.* ¶ 16. A recruiter has also informed Cooke that the auto mechanic position for which he originally enlisted may no longer be available when he is ultimately able to enter active service. *Id.* ¶ 18.

To date, neither Kuang nor Cooke has received notification from DoD of a completed background investigation.

**E.     Procedural History**

On June 21, 2018, Kuang and Cooke ("Plaintiffs") filed this putative class action lawsuit on behalf of all similarly situated LPRs. *See* ECF No. 1 ("Compl."). Plaintiffs raised four claims. First, Plaintiffs alleged that the October 13 Memo violated their equal protection rights by unjustifiably discriminating against LPRs. *Id.* ¶¶ 88-94. Second, Plaintiffs alleged that the memo violated their substantive due process rights to pursue their chosen profession of military service. *Id.* ¶¶ 95-101. Third, Plaintiffs asserted that DoD had unlawfully withheld or unreasonably delayed their entrance into military service, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1). Compl. ¶¶ 102-108. Finally, Plaintiffs raised another APA claim under 5 U.S.C. § 706(2), contending that the October 13 Memo exceeded DoD's lawful authority and was otherwise arbitrary and capricious. Compl. ¶¶ 109-119. Plaintiffs requested declaratory and injunctive relief on these claims. *Id.* ¶¶ 120-121.

On July 19, 2018, Plaintiffs filed a motion for a preliminary injunction, solely on the basis of their 5 U.S.C. § 706(2) claim. ECF No. 21 at 9 n.9. Plaintiffs subsequently filed a motion to certify a class of similarly situated LPRs. ECF No. 31. When DoD expressed its intent to file a motion to dismiss, the Court approved a consolidated briefing schedule on the motion to dismiss and the preliminary injunction. ECF No. 36. DoD later filed a notice of non-opposition to class certification, in which the parties agreed to slight modifications in the class definition. *See* ECF No. 40-1.

On September 6, 2018, DoD filed its motion to dismiss. ECF No. 42. After briefing on the preliminary injunction and motion to dismiss were complete, DoD produced the administrative record on October 19, 2018, pursuant to Court order. ECF No. 57. The Court permitted the parties to file supplemental briefs regarding any relevant information in the administrative record. ECF Nos. 64, 65.

## II.     MOTION FOR CLASS CERTIFICATION

The Court first considers Plaintiffs' unopposed motion for class certification. ECF No. 31.

### A.     Legal Standard

Class certification under Rule 23 is a two-step process. First, a plaintiff must demonstrate

that the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) are met.

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542-43 (9th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).

Second, a plaintiff must also establish that one of the bases for certification in Rule 23(b) is met. Here, Plaintiffs invoke Rule 23(b)(1)(A) and (b)(2). ECF No. 31 at 15. DoD does not oppose the motion. ECF No. 40-1. A plaintiff invoking Rule 23(b)(1)(A) must establish that prosecuting separate actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." A plaintiff invoking Rule 23(b)(2) must establish that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a) and at least one of the three requirements under Rule 23(b) are met. *See Dukes*, 564 U.S. at 350-51.

## B. Discussion

As modified, Plaintiffs' proposed class consists of:

> [A]ll persons who (i) are lawful permanent residents of the United States; (ii) have signed an enlistment contract with the U.S. military; and (iii) pursuant to Defendants' October 13 memo, have not been permitted to begin initial entry training, commonly referred to as "boot camp," pending completion of their MSSDs and NSDs.

ECF No. 40-1 at 2 (footnote omitted).

### 1. Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." The record indicates that roughly 5,000 LPRs enlist each year. ECF No. 22-1 at 4. Plaintiffs estimate, and DoD does not dispute, that an estimated 3,500 of those LPRs fell within the class definition as of August 1, 2018. ECF No. 31 at 11.

The Court therefore concludes that this requirement is met.

### 2. Commonality

A Rule 23 class is certifiable only if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). For the purposes of Rule 23(a)(2), "even a single common question" is sufficient. *Wal-Mart*, 564 U.S. at 359 (citation and internal alterations omitted). The common contention, however, "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (alteration in original) (citation omitted).

Here, Plaintiffs' claims are primarily facial challenges to the validity of DoD's policy, which applies equally on a classwide basis. Whether DoD's policy is valid, and the scope of Plaintiffs' entitlement to relief, if any, are questions eminently capable of classwide resolution. *See Garcia v. Johnson*, No. 14-CV-01775-YGR, 2014 WL 6657591, at *14 (N.D. Cal. Nov. 21, 2014).

Accordingly, the Court holds this requirement is met.

### 3. Typicality

In certifying a class, courts must find that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality 'is whether other members have the same or similar injury, whether the action is

based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)).

The Court finds that proposed class representatives Jiahao Kuang and Deron Cooke are typical of the class they seek to represent. As discussed above, this action is based on a single course of conduct, i.e. DoD's adoption of the October 13 Memo. Moreover, as a result of this conduct, named Plaintiffs and putative class members have all suffered, and continue to suffer, the same general injury in the form of delayed shipment to basic training. *See Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014).

### 4. Adequacy

The Court must also find that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In considering the adequacy of the proposed class representatives, the Court addresses two questions: "(a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). This requirement "'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). Among other functions, these requirements serve as ways to determine "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n.13.

Here, named Plaintiffs have a similar alleged injury as the rest of the proposed class, and their claims are not based on any conduct that is unique to them. There are no apparent conflicts between named Plaintiffs, their counsel, and the proposed class, nor is there any reason to believe that they will not prosecute the action vigorously or adequately protect the absent class members' interests. *See id.*

Therefore, the Court finds that Plaintiffs have established that this requirement is satisfied.

### 5.     Rule 23(b)

In addition to meeting the four requirements of 23(a), the proposed class must satisfy one of the Rule 23(b) requirements.

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Wal–Mart*, 564 U.S. at 360. "These requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688 (citing *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2011)). "That inquiry does not require an examination of the viability or bases of the class members' claims for relief, does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries." *Id.* "The fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Rodriguez*, 591 F.3d at 1125.

Here, Plaintiffs seek unitary declaratory and injunctive relief related to the October 13 Memo. Compl. ¶¶ 120-121. The Court finds that this relief, if granted, would be appropriate to the class as a whole. Therefore, this requirement is met. *See Parsons*, 754 F.3d at 688.

Because the Court finds that the class is appropriately certified under Rule 23(b)(2), it need not address the requirements of Rule 23(b)(1)(A). *See Reyes v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, No. 14-CV-05596-JST, 2015 WL 5569462, at *3 (N.D. Cal. Sept. 22, 2015).

### 6.     Appointment of Class Counsel

Plaintiffs also seek appointment of their attorneys as class counsel. ECF No. 31 at 17-18. Under Rule 23(g), which governs the appointment of class counsel, the Court must

13

United States District Court
Northern District of California

consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing this class." Fed. R. Civ. P. 23(g)(1)(A). In addition, the Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

The Court concludes that Plaintiffs' counsel should be appointed class counsel. Counsel have substantial experience in class actions and other complex civil litigation. *See* ECF No. 32 ¶¶ 3, 5-6; ECF No. 33 ¶¶ 3-6, 8-9, 11-12. Counsel have vigorously prosecuted this case thus far, *see* ECF No. 32 ¶ 9; ECF No. 33 ¶ 14, and there is no evidence before the Court that they will not continue to do so. Nor is there any evidence that counsel has interests with conflict those of the class. *See Marsh v. First Bank of Delaware*, No. 11-cv-05226-WHO, 2014 WL 554553, at *15 (N.D. Cal. Feb. 7, 2014). Accordingly, the Court concludes that the Rule 23(g) factors are met.

### 7. Conclusion

For the foregoing reasons, the Court hereby certifies a class defined as follows:

All persons who

(i) are lawful permanent residents of the United States;

(ii) have signed an enlistment contract with the U.S. military; and

(iii) pursuant to Defendants' October 13 memo, have not been permitted to begin initial entry training, commonly referred to as "boot camp," pending completion of their MSSDs and NSDs.

Plaintiffs Jiahao Kuang and Deron Cooke are appointed Class Representatives.

Plaintiffs' counsel, Latham & Watkins LLP, the American Civil Liberties Union of Southern California, and the American Civil Liberties Union of Northern California, are appointed Class Counsel.

## III.  MOTION TO DISMISS

The Court next considers DoD's motion to dismiss. ECF No. 42.

14

### A.  Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  While a complaint need not contain detailed factual allegations, facts pleaded by a plaintiff must be "enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (internal quotation marks and citation omitted).  In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

### B.  Discussion

DoD first urges the Court to dismiss this action wholesale, arguing that the military considerations involved render the entire case nonjusticiable.  ECF No. 42 at 25-28.  Alternatively, DoD argues that Plaintiffs have failed to state a claim under equal protection or substantive due process.

DoD also contends that Plaintiffs' APA claims are unreviewable because they are committed to agency discretion by law, pursuant to 5 U.S.C. § 701(a)(2).  *Id.* at 39.  DoD further argues in the alternative that Plaintiffs have failed to state a claim under either § 706(1) or § 706(2), at least in part.

#### 1.  Nonjusticiability

The Constitution vests Congress and the President with "broad constitutional power" for establishing the U.S. armed forces and employing them for the protection of the United States's security.  *Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) (citing U.S. Const. art. I § 8 cls. 12-14,

15

art. II § 2 cl.1). Courts therefore give "a healthy deference to legislative and executive judgments in the area of military affairs." *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981). In so doing, however, the Supreme Court has cautioned that neither the President nor "Congress is free to disregard the Constitution when it acts in the area of military affairs." *Id.* at 67.

In evaluating such claims, a court must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)), or "the composition, training, equipping, and control of a military force," *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).

### a. *Mindes* Test

To determine whether a challenge to an internal military decision is justiciable, the Ninth Circuit has generally applied a version of the test first articulated in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971), and adopted in *Wallace v. Chappell*, 661 F.2d 729 (9th Cir. 1981), *rev'd on other grounds sub nom. Chappell v. Wallace*, 462 U.S. 296 (1983). Application of the *Mindes* test is not jurisdictional in nature; rather, it represents "a prudential judgment that the military's decision should not be reviewed in a judicial forum" and is equivalent to a failure to state a claim upon which relief can be granted. *Khalsa v. Weinberger*, 779 F.2d 1393, 1396 (9th Cir.), *reaff'd*, 787 F.2d 1288 (1985).

Under this test, "an internal military decision is unreviewable unless the plaintiff alleges (a) a violation of [a recognized constitutional right], a federal statute, or military regulations; and (b) exhaustion of available intraservice remedies." *Wenger v. Monroe*, 282 F.3d 1068, 1072 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Apr. 17, 2002) (alteration in original) (quoting *Khalsa*, 779 F.2d at 1398). If those prerequisites are met, a court then determines whether judicial review is appropriate by weighing four factors: "(1) The nature and strength of the plaintiff's claim; (2) The potential injury to the plaintiff if review is refused; (3) The extent of interference with military functions; and (4) The extent to which military discretion or expertise is involved." *Wenger*, 282 F.3d at 1072 (citation omitted). Courts generally consider the third and fourth factors together. *Id.* at 1075.

### b. Applicability of *Mindes* Test

As a threshold matter, the parties dispute whether the *Mindes* test applies.

In arguing that it does, Defendants place great weight on *Khalsa*. In that case, an applicant for military service, who was a member of the Sikh faith, brought constitutional and APA challenges to the Army's appearance regulations. 779 F.2d at 1394-95. The applicant argued that *Mindes* did not apply, reasoning that the Army's regulations were "not 'internal' in scope because they effectively prevent[ed] certain citizens from enlisting." *Id.* at 1396. The court rejected this argument, concluding that regulations governing soldiers' appearance were clearly internal, and opining that "[a]lmost any regulation may cause a particularly sensitive civilian to decide that he or she could not take the statutory enlistment oath to follow all orders." *Id.* at 1397. The court also cited with approval out-of-circuit cases applying the *Mindes* test to regulations prohibiting single parents with custody of minor children from enlisting. *Id.* at 1396.[7] *Khalsa* thus strongly suggests that a policy governing the processing of background investigations is an internal decision subject to *Mindes*. And contrary to Plaintiffs' assertion, ECF No. 46 at 14, the *Khalsa* court was clear that "the *Mindes* test also applies to statutory claims against the military," including the APA challenge at issue there. 779 F.2d at 1401.

Plaintiffs argue that "[i]n considering the reviewability of APA claims in the military context, courts typically have not considered the *Mindes* factors," citing *Garrett v. Lehman*, 751 F.2d 997, 1006 (9th Cir. 1985) and *Kirwa*, 285 F. Supp. 3d at 35. ECF No. 46 at 14. But neither *Garrett* nor *Kirwa* even mentions *Mindes*.[8] ECF No. 46 at 14. And while the Ninth Circuit[9] has sometimes declined to apply the *Mindes* test to the facial validity (constitutionally or otherwise) of

---

[7] DoD likewise relies on these same cases. *See* ECF No. 42 at 26 (citing *Lindenau v. Alexander*, 663 F.2d 68 (10th Cir. 1981); *West v. Brown*, 558 F.2d 757 (5th Cir. 1977); *Henson v. Alexander*, 478 F. Supp. 1055 (W.D. Ark. 1979)).

[8] Furthermore, *Kirwa* was decided by the District of the District of Columbia. Unlike the Ninth Circuit, "the D.C. Circuit has not expressly adopted the *Mindes* test" and there is some doubt as to whether it would ever do so. *Doe v. Rumsfeld*, 297 F. Supp. 2d 119, 127 (D.D.C. 2003); *see also Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C. Cir. 1990) ("[T]his court rejected the *Mindes* test in *Kreis v. Secretary of Air Force*, 866 F.2d 1508, 1512 (D.C. Cir. 1989).")

[9] The Supreme Court has never addressed the *Mindes* test.

a military regulation or policy,[10] it has never overruled *Khalsa*.

Not only is *Khalsa* still good law, but Plaintiffs have provided no good way to distinguish the reviewability of the regulations in *Khalsa* from the policy at issue here. Accordingly, the Court must apply the *Mindes* test. In applying that test, the Court takes into account the Ninth Circuit's observation that, notwithstanding its deference to the military, it has "consistently entertained servicemembers' constitutional challenges to military policies on the merits." *Wilkins v. United States*, 279 F.3d 782, 788 (9th Cir. 2002); *see also Pruitt v. Cheney*, 963 F.2d 1160, 1166 (9th Cir. 1991) (cautioning that "military decisions by the Army are not lightly to be overruled by the judiciary" but explaining that this deference is "best applied in the process of judging whether the reasons put forth on the record for the Army's discrimination against [plaintiff] are rationally related to any of the Army's permissible goals").

Because DoD agrees that the two threshold elements are met, ECF No. 42 at 27, the Court turns to the four *Mindes* factors.

### c.    Nature and Strength of Claims

Here, the nature of Plaintiffs' claims favors review. Claims of a constitutional nature are "normally more important than those having only a statutory or regulatory base" for purposes of this factor. *Khalsa*, 779 F.2d at 1399 (quoting *Mindes*, 453 F.2d at 201). Further, Plaintiffs claim that DoD has arbitrarily subjected them to substantial delays in their ability to begin their military careers. Unlike a "haircut regulation," this is not at "the least significant end of the constitutional scale." *Khalsa*, 779 F.2d at 1399. Rather, it significantly "impedes the ability of [LPRs] to serve in the military." *Serv. Women's Action Network v. Mattis ("SWAN")*, 320 F. Supp. 3d 1082, 1093 (N.D. Cal. 2018).

The strength of Plaintiffs' claims also supports review. As discussed in greater detail

---

[10] *See, e.g.*, *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1473 n.2, 1476 (9th Cir. 1994) (adjudicating merits of DoD policy requiring discharge for homosexual conduct without mentioning or applying *Mindes*); *Christoffersen v. Wash. State Air Nat'l Guard*, 855 F.2d 1437, 1445-46 (9th Cir. 1988) (concluding that *Mindes* test barred review of service members' constitutional challenges to individual non-retention decisions, but addressing on the merits constitutional and statutory challenges to the National Guard regulation authorizing those non-retention decisions without mentioning or applying *Mindes*).

18

below, this is not a case where the "claims are meritless." *Christofferson*, 855 F.2d at 1443; *see also Khalsa*, 779 F.2d at 1399 (claim failed under Ninth Circuit precedent denying similar claim under "highest possible level of scrutiny"); *Gilliam v. Miller*, 973 F.2d 760, 764 (9th Cir. 1992) (holding that *Mindes* test barred review of APA claim where defendants did not act in federal capacity, and plaintiffs therefore could not state a claim). "Where a facially sufficient claim of violation of the right [alleged] is involved, the first *Mindes* factor favors review." *Sandidge v. Washington*, 813 F.2d 1025, 1026 (9th Cir. 1987). Here, Plaintiffs have demonstrated not only facially sufficient claims, but at this stage, have shown a likelihood of success on the merits of those claims.

Accordingly, the first *Mindes* factor weighs in Plaintiffs' favor.

### d.    Potential Injury

Here, Plaintiffs are a class of LPRs who allege that, because of the challenged policy, they are subject to delays averaging at least 350 days before they can enter military service. *See* Compl. ¶¶ 25-28. As explained in greater detail below, the Court concludes that this potential injury supports review.

DoD contends that courts have traditionally given "little weight to the injury flowing from the denial of enlistment." ECF No. 42 at 27 (quoting *Khalsa*, 779 F.2d at 1399). Here, however, Plaintiffs are not denied the right to enlist, but have already signed enlistment contracts. Rather than simply "having to choose another career," *Khalsa*, 779 F.2d at 1400, Plaintiffs allege that they are stuck in limbo where both their military and interim career prospects are impaired. *See* Compl. ¶ 74; *cf. Sandidge*, 813 F.2d at 1027 (finding "claims of adverse impact on other job opportunities . . . speculative" where plaintiff had not applied for a single job); *Sebra*, 801 F.2d at 1142 (finding "inconvenience of moving [plaintiff's] household" for military transfer not significant where "he has not been demoted or discharged").

Moreover, the delay in Plaintiffs' ability to enter active service delays their ability to obtain the expedited naturalization available to service members who enter basic training. Compl. ¶ 75; 8 U.S.C. § 1440(a); *cf. Kirwa*, 285 F. Supp. 3d at 42 ("[D]elaying naturalization applications after applicants have been promised an expedited path to citizenship constitutes irreparable

1    harm.").  This goes beyond the mere economic injury that "the Ninth Circuit has recognized . . . is

2    enough to establish an injury for purposes of the second Mindes factor."  *SWAN*, 320 F. Supp. 3d

3    at 1094 (citing *Christoffersen*, 855 F.2d at 1444).

4         The Court's conclusion is bolstered by the size of the class represented by Plaintiffs.  As

5    noted above, Plaintiffs represent, and DoD does not dispute, that they represent a class of at least

6    3,500 LPRs who are subject to this injury.  ECF No. 31 at 11.  Here, the number of service

7    members affected multiplies the potential injury if the Court were to refuse review.  Common

8    sense dictates that the Court consider the number of persons affected in determining potential

9    injury.  In the event that Plaintiffs' underlying claims are meritorious, all of those LPRs, and all

10   future LPR enlistees will be unjustly subjected to the injuries identified above.  When faced with

11   situations where large groups of service members might be injured by potentially unconstitutional

12   policies, "[t]he Ninth Circuit has consistently entertained [their] constitutional challenges to

13   military policies on the merits."  *Wilkins*, 279 F.3d at 788.

14        The Court thus concludes that the second *Mindes* factor supports review.

### e.  Interference and Military Expertise

16        The *SWAN* court provided a helpful synthesis of the governing precedent relevant to the

17   third and fourth *Mindes* factors.  The court explained that "a proper assessment of the degree of

18   interference threatened by a lawsuit is informed by whether the Court will be required to scrutinize

19   particular personnel decisions (such as an assignment) by many decisionmakers (as in *Gonzalez*

20   [*v. Dep't of Army*, 718 F.2d 926 (9th Cir. 1983)]) or called upon to take on a comprehensive,

21   ongoing supervisory role, displacing military management over a broad range of policy decisions

22   (as in *Gilligan*[, 413 U.S. 1])."  *SWAN*, 320 F. Supp. 3d at 1095.  In *Gonzalez*, for instance, the

23   plaintiff argued that he had been subject to intentional race discrimination in promotion decisions,

24   and so plaintiff would have to be able to examine his superior officers over a ten-year period "to

25   determine the grounds and motives for their ratings" in performance reviews.  718 F.2d at 930; *see*

26   *also Sandidge*, 813 F.2d at 1027 ("The officers who evaluated Sandidge would have to be

27   examined to determine the grounds and motives for their ratings of him, and other evidence of his

28   performance would have to be gathered for the year in question.").  In *Gilligan*, plaintiffs

requested that the district court "establish standards for the training, kind of weapons and scope and kind of orders to control the action of the National Guard," as well as "assume and exercise a continuing judicial surveillance" to ensure compliance with those standards.  413 U.S. at 6.

The Court further agrees with the *SWAN* court that the concerns underlying those scenarios apply with far less force when plaintiffs request that "discrete policies be held unconstitutional and thereby enjoined."  320 F. Supp. 3d at 1095.  The Court acknowledges that, unlike in the gender integration issues in *SWAN*, *id.* at 1097, the military undoubtedly has particular expertise in conducting military background investigations and making national security determinations and is vested with a corresponding discretion in those endeavors.  ECF No. 52 at 11.

But DoD overstates the extent of interference judicial review would create here.  As will become clear below, Plaintiffs' main claim, although brought under multiple doctrines, is that DoD's policy lacks adequate justification.[11]  If the Court agrees, it will not mean that DoD must "ignore the national security concerns that gave rise to the October 13 Memo."  ECF No. 42 at 28.  Rather, DoD will have to adopt a policy that is justified by its purported concerns.  *See City & County. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) ("Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." (quoting *Hills v. Gautreaux*, 425 U.S. 284, 293-94 (1976)).  And "given the equitable nature of injunctive relief," courts routinely "tailor a remedy to ensure that it" does not unduly burden important interests.  *McCullen v. Coakley*, 134 S. Ct. 2518, 2538 (2014).

DoD is correct that reviewing Plaintiffs' challenge will inevitably involve some judicial evaluation of areas of military expertise, but that is why the Court's deference is "best applied in the process of judging whether the reasons put forth on the record for [DoD's] discrimination against [LPRs] are rationally related to any of [DoD's] permissible goals."  *Pruitt*, 963 F.2d at 1166.  DoD does not contend that such deferential review is logistically impracticable in this case,

_____

[11] To the extent that Plaintiffs claim that DoD's policy *violates* 10 U.S.C. § 504(b), invalidating the policy on that basis will not interfere with military discretion because it will mean that Congress did not vest DoD with the discretion or authority to adopt the policy.

just that it is unwarranted.  Moreover, DoD concedes that such review would be appropriate, notwithstanding the asserted degree of interference, were the challenged policy a sufficiently egregious constitutional violation.  ECF No. 52 at 12 (resting its argument for lack of reviewability on the asserted weakness of Plaintiffs' argument).  As explained above, the Court's initial evaluation of the merits and the potential injury to Plaintiffs differs markedly from DoD's analysis.

Considering all the *Mindes* factors, the Court finds it prudent to review Plaintiffs' claims.

### 2.    Equal Protection

The Court next addresses whether Plaintiffs have adequately stated a claim under equal protection.

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."  *Windsor*, 570 U.S. at 774 (citing *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954)); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." (citation omitted)).  While "[t]he first step in equal protection analysis is to identify the [government's] classification of groups," *Wilson v. Lynch*, 835 F.3d 1083, 1098 (9th Cir. 2016) (citation omitted), the parties do not dispute that the October 13 Memo draws a facial classification based on whether an enlisted service member is a U.S. citizen or an LPR, *see* ECF No. 22-2 at 2.  The Court therefore proceeds to decide the level of scrutiny that applies.  *See Wilson*, 835 F.3d at 1098.

### a.    Level of Scrutiny

The Supreme Court has long recognized aliens as a "prime example of a 'discrete and insular' minority for whom . . . heightened judicial solicitude is appropriate" in the equal protection analysis.  *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152-53 n.4 (1938)); *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 (1976) (observing that aliens "are already subject to disadvantages not shared by the remainder of the community," such as, among other things "not [being] entitled to vote").  Accordingly, "state classifications based on alienage are subject to strict scrutiny review."  *Korab*

*v. Fink*, 797 F.3d 572, 577 (9th Cir. 2014).

Strict scrutiny does not apply here, however, because "the Fourteenth Amendment's limits on state powers are substantially different from the constitutional provisions applicable to the federal power over immigration and naturalization." *Mathews v. Diaz*, 426 U.S. 67, 86-87 (1976). Where the federal government acts, "overriding national interests may provide a justification for a citizenship requirement in the federal service even though an identical requirement may not be enforced by a State" without violating equal protection. *Hampton*, 426 U.S. at 101. But the Supreme Court has rejected "the extreme position" that "the federal power over aliens is so plenary that any agent of the National Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens." *Id.* Instead, "federal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review." *Korab*, 797 F.3d at 577 (citing *Hampton*, 426 U.S. at 103).

Plaintiffs concede that strict scrutiny does not apply, but they argue that courts nonetheless "apply a more 'active' form of rational basis review 'when a classification adversely affects unpopular groups.'" ECF No. 46 at 17 (quoting *Diaz v. Brewer*, 656 F.3d 1008, 1012 (9th Cir. 2011)). The distinguishing feature of this type of "active" review is that courts examine "*whether the government ha[s] established on the record* a rational basis for the challenged discrimination." *Pruitt*, 963 F.2d at 1166 (citing *High Tech Gays*, 895 F.2d at 576-77).

Plaintiffs' cases do not establish that "active" rational basis review applies to federal *legislative* classifications based on citizenship. Because the federal government's authority in this arena is "substantially different," *Mathews*, 426 U.S. at 87, Plaintiffs' reliance on equal protection cases involving state action under the Fourteenth Amendment is misplaced. *See* ECF No. 46 at 17; *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1065-67 (9th Cir. 2014) (state law);[12] *Dandamudi v. Tisch*, 686 F.3d 66, 72 (2d Cir. 2012) (same); *Diaz*, 656 F.3d at 1010 (same).[13]

_____

[12] In *Arizona Dream Act Coalition*, the Ninth Circuit did not decide whether to apply the strict scrutiny necessary for "state action that discriminates against noncitizens authorized to be present in the United States" or the rational basis review that governs noncitizens present "in violation of federal law." 757 F.3d at 1065 n.4 (quoting *Plyler v. Doe*, 457 U.S. 202, 223 (1982)).

[13] Similarly, because this exception to strict scrutiny protection for suspect classes derives from

23

United States District Court
Northern District of California

If this case involved an equal protection challenge to a legislative act of Congress, the Court would be inclined to agree with DoD that the appropriate "question . . . is whether there is any conceivable rational basis justifying [the October 13 Memo's] distinction." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 309 (1993). Under this standard, the government "'has no obligation to produce evidence to sustain the rationality of a statutory classification'; '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993).

But it is not so clear that the government bears no evidentiary burden in the context of agency action. For instance, the *Beach Communications* Court explained that, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." 508 U.S. at 315. In contrast, it is a bedrock principle of administrative law that "an agency's action must be upheld, if at all, on the basis *articulated by the agency itself.*" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (emphasis added); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) ("Whatever potential reasons the Department might have given, the agency in fact gave almost no reasons at all. In light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision."); *SEC v. Chenery*, 332 U.S. 194, 196 (1947) (explaining the "simple but fundamental rule of administrative law" that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency"). Indeed, when the Ninth Circuit has applied rational basis scrutiny to equal protection challenges to

---

"the paramount federal power over immigration and naturalization," *Hampton*, 426 U.S. at 100, Plaintiffs' reliance on cases involving a Congressional classification based on homosexuality – where the federal government lacks any special constitutional power – is also inapposite. *See* ECF No. 46 at 17-18; *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 5 (1st Cir. 2012) (federal benefits to same-sex spouses); *cf. Witt v. Dep't of Air Force*, 527 F.3d 806, 819-21 (9th Cir. 2008) (applying heightened scrutiny to substantive due process challenge to "Don't Ask, Don't Tell" legislation).

military *regulations*, it has "required the government to establish on the record that its policy had a

rational basis." *Pruitt*, 963 F.2d at 1166.[14]

The Court need not directly resolve this issue here, because Plaintiffs claim both that

DoD's policy lacks a rational basis under equal protection principles and, for that same reason, is

also arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). *See* Compl. ¶¶ 90-92,

111-12. The Ninth Circuit has explained how to proceed when confronted with this situation:

"[T]he equal protection argument can be folded into the APA argument, since no suspect class is

involved and the only question is whether the defendants' treatment of [LPRs] was rational (i.e.,

not arbitrary and capricious)." *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949,

955 (9th Cir. 2011); *see also* 5 U.S.C. § 706(2)(B) (requiring a court to set aside agency action

"contrary to constitutional right, power, privilege, or immunity"). The Court then examines

whether "*[t]he record indicates* that [the government] had a rational basis" for its decision.

*Ursack*, 639 F.3d at 958 (emphasis added); *see also Grant Med. Ctr. v. Hargan*, 875 F.3d 701, 708

(D.C. Cir. 2017) ("Accordingly, we consider [the equal protection and APA] arguments together,

reversing only if the agency offers insufficient reasons for treating similar situations differently.");

*Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Human Servs.*, 747 F.3d 172, 180 (3d Cir. 2014)

(holding that "[r]eview of an equal protection claim in the context of agency action" requires the

court to "consider whether the Secretary set forth a satisfactory, rational explanation for her

actions here"); *Cooper Hosp. / Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 47 (D.D.C. 2016),

*aff'd sub nom. Cooper Hosp. Univ. Med. Ctr. v. Price*, 688 F. App'x 11 (D.C. Cir. 2017)

(explaining that "if the challenge is to an agency action, the equal-protection challenge is

_____

[14] This distinction between rational basis review of legislative versus administrative action finds
further support in the *Hampton* Court's analysis, which concerned a Civil Service Commission
regulation barring residential aliens from civil service employment. 426 U.S. at 98. The Supreme
Court explained that "[s]ince these residents were admitted as a result of decisions made by the
Congress and the President, implemented by the Immigration and Naturalization Service acting
under the Attorney General of the United States, due process requires that the decision to impose
that deprivation of an important liberty be made either at a comparable level of government or, if it
is to be permitted to be made by the Civil Service Commission, that it be justified by reasons
which are properly the concern of that agency." *Id.* at 116. The Supreme Court invalidated the
rule, reasoning that the agency had failed to comply with its "obligation to perform its
responsibilities with some degree of expertise, and to make known the reasons for its important
decisions" because "nothing in the record" evidenced proper support for the rule. *Id.* at 115.

subsumed within the APA challenge," but "[w]hen the disparate treatment is the result of congressional action . . . both the burden and the permissible kinds of argument shift in favor of the government").

### b.    Fit

DoD does not dispute that the October 13 Memo facially discriminates against LPRs. Rather, in support of its motion to dismiss, DoD argues exclusively that this discrimination is supported by a rational basis.  ECF No. 42 at 31-34.  As just explained, this argument requires the Court to consider whether DoD has set forth adequate support in the administrative record. Therefore, it is not appropriate to decide this issue in the context of DoD's motion.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) ("Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure."); *cf. Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011) ("If the district court intended to make a ruling on the merits of Pinnacle's APA claim, based on consideration of the full administrative record, it could have converted its decision into a Rule 56 summary judgment ruling.  But it did not do so."). [15]

The Court thus denies DoD's motion to dismiss Plaintiffs' equal protection claim.

### 3.    Substantive Due Process

The Court next examines whether Plaintiffs have adequately stated a claim based on substantive due process.

### a.    Legal Standard

"The substantive component of the Due Process Clause forbids the government from depriving a person of life, liberty, or property in such a way that . . . interferes with rights implicit in the concept of ordered liberty."  *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 996 (9th Cir. 2007), *aff'd*, 553 U.S. 591 (2008) (alteration in original) (citation omitted).  In order to state a substantive due process claim, a plaintiff must identify "a liberty or property interest protected by the Constitution."  *Id.* (quoting *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th

---

[15] At the hearing on these motions, the parties expressly asked the Court not to convert DoD's motion to dismiss to a motion for summary judgment.

Cir. 1994)).

Courts have found a liberty interest based on "some generalized due process right to choose one's field of private employment." *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999); *see also Dittman v. California*, 191 F.3d 1020, 1029 (9th Cir. 1999) ("[I]t is well-recognized that the pursuit of an occupation or profession is a protected liberty interest that extends across a broad range of lawful occupations." (quoting *Wedges/Ledges of Cal.*, 24 F.3d at 65 n.4)). However, courts have recognized an infringement that implicates this liberty interest only where the governmental action creates "a complete prohibition of the right to engage in a calling, and not [a] sort of brief interruption." *Engquist*, 478 F.3d at 997 (alteration in original) (quoting *Conn*, 526 U.S. at 292). This right protects against "government legislation or regulation," and also "extreme cases" where "government employer actions . . . foreclose access to a particular profession to the same degree as government regulation." *Id.* at 997-98.

Even where the restriction amounts to a complete prohibition, the right infringed is not fundamental, *see Dittman*, 191 F.3d at 1031, and is therefore "subject to reasonable governmental regulation," *Conn*, 526 U.S. at 292. Accordingly, "a plaintiff can make out a substantive due process claim if she is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis." *Engquist*, 478 F.3d at 997.

### b.   Discussion

Here, Plaintiffs claim that DoD's policy impermissibly burdens their right to pursue a military career by forcing them to wait until their background investigations have been completed. Compl. ¶ 99; ECF No. 46 at 22.

As an initial matter, the Court first addresses the nature of the substantive due process violation alleged. *See Chavez v. Martinez*, 538 U.S. 760, 775–76 (2003) ("[The Supreme Court] requires a careful description of the asserted fundamental liberty interest for the purposes of substantive due process analysis" (internal quotation marks and citation omitted)); *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1085 (9th Cir. 2015) ("Accordingly, we must formulate the asserted right by carefully consulting both the scope of the challenged regulation and the nature of Plaintiffs' allegations.").

United States District Court
Northern District of California

Plaintiffs argue that the October 13 Memo interferes with their liberty interest in pursuing a military career. The Court observes that the parties have cited no case concerning government restrictions on entry into a wholly public profession,[16] rather than a "field of private employment." *Conn*, 526 U.S. at 292; *see also Greene v. McElroy*, 360 U.S. 474, 492 (1959) ("[T]he right to hold specific *private* employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." (emphasis added)); *but see Schware v. Bd. of Bar Exam. of State of N.M.*, 353 U.S. 232, 238-39 (1957) ("A State cannot exclude a person from the practice of law or from *any other occupation* in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment." (emphasis added)). Given the dearth of authority, the Court assumes for purposes of this motion that the standard applicable to private professions governs: "[r]egulations on entry into a profession, as a general matter, are constitutional if they have a rational connection with the applicant's fitness or capacity to practice the profession." *Dittman*, 191 F.3d at 1030 (quoting *Lowe v. SEC*, 472 U.S. 181, 228 (1985) (White, J., concurring)).

DoD relies on *Engquist* to argue that Plaintiffs' claim is only available in "extreme cases." ECF No. 52 at 16 (quoting *Engquist*, 478 F.3d at 998). But *Engquist* concerned a state government's treatment of a single employee, 478 F.3d at 990-91, rather than a generally applicable rule governing all or a subset of public employees. The *Engquist* court therefore addressed when the government's treatment of a single employee operated as the equivalent of "legislative action that effectively banned a person from a profession." *Id.* at 998. In that context, the court explained that an employer action must be so "extreme" that it accomplishes the same result "as if the government had yanked the license of an individual in an occupation that requires licensure." *Id.* (citation omitted). Therefore, *Engquist* supports the Court's conclusion that licensing cases provide the appropriate framework for Plaintiffs' claim.[17]

---

[16] Because the parties have provided no information to the contrary, the Court assumes without deciding that there is no relevant and available private analogue to U.S. military service.

[17] The Court is not persuaded by DoD's assertion that "Plaintiffs must allege behavior that is 'so egregious' and 'outrageous' as to 'shock the contemporary conscience.'" ECF No. 42 at 34 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998)). *Lewis* involved "a

28

To the extent DoD argues that Plaintiffs fail to state a claim because the October 13 Memo does not impose a "complete prohibition," the Court disagrees. *Cf.* ECF No. 42 at 34 ("But the October 13 Memo does not prevent LPRs from serving in the military – it merely requires the completion of their background investigations before they enter service."). Supreme Court and Ninth Circuit precedent make clear that licensing requirements, which are *prerequisites* to entry into the profession, are subject to this type of rational basis scrutiny, even if they are not lifetime bans that could never be satisfied by the challengers. *See, e.g.*, *Conn*, 526 U.S. at 292 (citing as an example of reasonable regulation precedent "upholding a requirement of licensing before a person can practice medicine" (citing *Dent v. West Virginia*, 129 U.S. 114 (1889)); *Dittman*, 191 F.3d at 1032-33 (requirement to disclose social security number to obtain acupuncture license). Here, Plaintiffs cannot enter military service until DoD completes their investigations. Cooke, for instance, has been unable to begin basic training for more than a year, and Plaintiffs' complaint alleges that the type of investigations DoD is likely to conduct "take 350 days to complete on average." Compl. ¶ 27. This is "not the sort of brief interruption" the Supreme Court referenced in *Conn*, 526 U.S. at 292, where the plaintiff lawyer was prevented from attending a single grand jury hearing with his client, *id.* at 288-89.

The Court therefore turns to the justification underlying the October 13 Memo. Plaintiffs do not argue that DoD's background investigation and security determination requirements themselves lack "a rational connection with the applicant's fitness or capacity to" serve in the military. *Dittman*, 191 F.3d at 1030 (citation omitted). Nor do Plaintiffs appear to contend that requiring *all* service members to complete these requirements prior to beginning service would be irrational. Rather, Plaintiffs contend that the October 13 Memo is irrational because it "targets LPRs only" to achieve "its purported objective of facilitating efficient background investigations, which is not limited to LPRs." ECF No. 46 at 22. In other words, the policy "singles out one

---

high-speed automobile chase," *id.* at 836, and the Supreme Court explained that "criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue," 523 U.S. at 846 (emphasis added). Given that subsequent Ninth Circuit cases involving regulation of entry into a profession have not required allegations of conscience-shocking behavior, the Court concludes that this standard is inapposite. *See, e.g.*, *Franceschi v. Yee*, 887 F.3d 927, 938 (9th Cir. 2018); *Dittman*, 191 F.3d at 1032-33.

United States District Court
Northern District of California

subset of enlistees for disparate treatment – LPRs – and . . . this discrimination bears no rational relationship to the stated purpose of making DoD background investigations more 'efficient.'" *Id.* at 23.

The gravamen of Plaintiffs' substantive due process claim, then, is the same as their equal protection claim: irrationally unequal treatment. The parties concede that the same rational basis review standard applies and incorporate the same arguments from the equal protection context as to why the October 13 Memo is irrational. *See* ECF No. 42 at 35; ECF No. 46 at 22-23; ECF No. 52 at 17. Accordingly, the Court reaches the same conclusion, and denies DoD's motion to dismiss the substantive due process claim. *See Stormans*, 794 F.3d at 1088 (incorporating rationality analysis to resolve substantive due process claim without further discussion).

### 4. APA

DoD's motion to dismiss raises numerous arguments concerning various provisions of the APA. The Court thus begins by briefly reviewing the relevant framework.

#### a. Judicial Review under the APA

The APA provides a right of action for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

The Act empowers a reviewing court to grant two types of relief. First, a court may "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Under § 706(1), a claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All. ("SUWA")*, 542 U.S. 55, 64 (2004).

Second, a court may "hold unlawful and set aside agency action, findings, and conclusions, found to be," as relevant here, "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Rather, a court must determine whether "the agency has relied on

factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*  To enable this review, the agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars*, 136 S. Ct. at 2125 (quoting *State Farm*, 463 U.S. at 43).  Furthermore, "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2706 (2015) (citation omitted).

Where a plaintiff alleges that, as a result of an erroneous legal interpretation, the agency's action was "not in accordance with the law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), courts apply the framework for review first established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  *See Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008).

The APA also exempts from judicial review cases where "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  5 U.S.C. § 701(a).

### b. Committed to Agency Discretion by Law

DoD argues that § 701(a)(2) bars review of Plaintiffs' APA claims because decisions regarding the implementation of 10 U.S.C. § 504(b)(1) are "committed to agency discretion by law."  ECF No. 42 at 35-36.

### i. Legal Standard

Because "Congress rarely intends to prevent courts from enforcing its directives to federal agencies," courts apply "a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. E.E.O.C.*, 135 S. Ct. 1645, 1651 (2015) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)).  Thus, the Supreme Court has long "read the APA as embodying a 'basic presumption of judicial review.'" *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)).

Section 701(a)(2) provides "a very narrow exception" to this principle. *Citizens to Pres.*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). It governs "those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* (citation omitted); *see also Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (Section 701(a)(2) applies where a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."). But "[e]ven where statutory language grants an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which [a] court may review its exercise of discretion." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) (quoting *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003)).

The Supreme Court has also recognized "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" and which may fall within § 701(a)(2)'s ambit. *Lincoln*, 508 U.S. at 191. For instance, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler*, 470 U.S. at 831; *see also Lincoln*, 508 U.S. at 192 ("The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."); *I.C.C. v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987) ("[W]e perceive that a similar tradition of nonreviewability exists with regard to [agency] refusals to reconsider for material error.").

Accordingly, a court must examine "the language of the statute and whether the general purposes of the statute would be endangered by judicial review." *ASSE Int'l*, 803 F.3d at 1068 (quoting *Pinnacle Armor*, 648 F.3d at 719). "[T]he mere fact that a statute contains discretionary language" does not mean that Section 706(a)(2) prevents judicial review. *Pinnacle Armor*, 648 F.3d at 719 (quoting *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994)).

Even where § 701(a)(2) forecloses judicial review of APA claims, however, it does not necessarily bar constitutional claims. *See Webster v. Doe*, 486 U.S. 592, 601, 603 (1988). "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Id.* at 603.

### ii.     Discussion

Here, DoD argues that 10 U.S.C. § 504 contains no meaningful standards for the Court to apply to the October 13 Memo.  ECF No. 42 at 36-37.  Plaintiffs counter that because the statute does not impose any different restrictions on U.S. citizens and LPRs, Congress did not intend to grant DoD discretion to treat the two groups differently, let alone preclude judicial review.  ECF No. 46 at 25.  Both parties stress that Congress recently amended § 504 to impose precisely the requirements of the October 13 Memo on a different class of aliens who are not LPRs, and both parties argue that this decision left their respective interpretations of the status quo intact.  *See* John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, 132 Stat. 1636 (2018), *codified at* 10 U.S.C. § 504(b)(3)(A) (requiring that the Secretary must "complete[] all required background investigations and security and suitability screening" before that person "may report to initial training").  DoD contends that Congress deliberately left in place DoD's discretion to implement the October 13 Memo; Plaintiffs argue that Congress did not amend its prior implied instruction to treat U.S. citizens and LPRs equally for enlistment purposes.[18]

Section 504, by itself, does not supply a meaningful standard for the Court to apply to this case.  The Court cannot infer from the mere fact that § 504(b)(1) permits both groups to enlist, without additional distinction, that the statute prohibits DoD from imposing *different terms* on their enlistment.  *City of Santa Clara v. Andrus*, 572 F.2d 660 (9th Cir. 1978), is on point.  There, the statute required the agency to give preference to a class of electric power customers.  *Id.* at 667 (citing 43 U.S.C. § 585h(c)).  The Ninth Circuit explained that this provision did "not require that all preference customers be treated equally or that all potential preference customers receive an allotment."  *Id.*  Accordingly, the court concluded, when "one preference entity challenges the Secretary's decision to discriminate against it in favor of other preference entities, the reclamation laws provide no law to apply to the dispute."  *Id.*

---

[18] The Court finds unpersuasive DoD's reliance on the fact that Congress unambiguously prohibited the enlistment of the "insane" or "intoxicated."  10 U.S.C. § 504(a).  Whether Congress removed discretion to enlist certain groups of people is not responsive to the question whether Congress vested the agency with discretion to impose different standards on groups permitted to enlist.

33

1    But the Court need not rely on section 504 alone, because DoD has promulgated

2 regulations and guidance regarding enlistments. *See ASSE Int'l*, 803 F.3d at 1069. Through

3 regulation, DoD has established a policy to "[u]se common entrance qualification standards for

4 enlistment, appointment, and induction into the Military Services." 32 C.F.R. § 66.4(a). Pursuant

5 to this policy, DoD regulations set forth in great detail the requirements by which "[e]ligibility

6 will be determined." *Id.* § 66.6(a)(2). Of particular relevance here, the regulations explain that

7 "[t]he underlying purpose of these enlistment, appointment, and induction standards is to

8 minimize entrance of persons who are likely to become disciplinary cases, security risks, or who

9 are likely to disrupt good order, morale, and discipline." *Id.* § 66.6(b)(8). As part of this

10 evaluation, the regulations disqualify anyone who "[r]eceives an unfavorable final determination

11 by the DoD Consolidated Adjudication Facility on a completed National Agency Check with Law

12 and Credit (NACLC) or higher-level investigation, which is adjudicated to the National Security

13 Standards in accordance with Executive Order 12968, during the accession process." *Id.*

14 § 66.6(b)(8)(vi). Nonetheless, under the regulations, DoD may permit an applicant to "[b]e

15 accessed (including shipping him or her to training or a first duty assignment) provided that a

16 NACLC or higher-level investigation was submitted and accepted by the investigative service

17 provider (Office of Personnel Management (OPM)) and an advanced fingerprint was conducted,

18 and OPM did not identify any disqualifying background information." *Id.* § 66.6(b)(8)(vi)(A).

19    Here, DoD has made a categorical determination that an entire group of enlisted service

20 members are not eligible to access under the conditions provided for in § 66.6(b)(8)(vi)(A). The

21 Court can assess – with the requisite deference – whether this determination is rationally related to

22 DoD's stated goal "to minimize entrance of persons who are likely to become disciplinary cases,

23 security risks, or who are likely to disrupt good order, morale, and discipline." *Id.* § 66.6(b)(8).

24 The Court can further evaluate whether that rationale adequately justifies DoD's deviation from its

25 policy to "[u]se common entrance qualification standards." *Id.* § 66.4(a).

26    The Court rejects DoD's argument that the regulations must expressly forbid DoD's action

27 or affirmatively require the precise course that Plaintiffs urge. *See* ECF No. 52 at 21 (arguing that

28 "the regulation does not state that it is DoD's policy to ship all enlistees to basic training at the

34

same time"). DoD's position is squarely at odds with well-established Ninth Circuit precedent holding that a general standard against which to measure the agency's action is sufficient. *See, e.g.*, *Pac. Nw. Generating Co-op. v. Bonneville Power Admin.*, 596 F.3d 1065, 1077 (9th Cir. 2010) (collecting Ninth Circuit cases finding law to apply based on "whether a decision was 'in the public's interest' or whether a particular act was 'feasible' or 'just and reasonable,' . . . [or] 'consistent with sound business principles'" (citations omitted)).

DoD also contends that the October 13 Memo falls within one of the "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191. As an initial matter, although whether agency decisions "traditionally have been reviewable . . . are relevant considerations in a section 701(a)(2) analysis, it's well settled that the touchstone of reviewability under section 701(a)(2) is whether there's law to apply." *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) (citation omitted). Further, while courts grant great deference to the military, the Court cannot say that this area is one that has historically been regarded as committed to the military's absolute discretion. Certainly, the outcome of individual security clearance adjudications, *see Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988), or the Director of the Central Intelligence Agency's assessment whether a particular employee presents a security threat, *see Webster*, 486 U.S. at 601, may traditionally be viewed as beyond the reach of the courts. But, as discussed in detail above, the same is not true for claims that generally applicable requirements or procedures to which military members are subject are arbitrarily discriminatory. *See, e.g.*, *Pruitt*, 963 F.2d 1160 (reviewing on the merits constitutional challenges to the Army's regulations prohibiting homosexuality); *High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563, 565, 576-77 (9th Cir. 1990) (same for regulations "subjecting all homosexual applicants for Secret and Top Secret clearances to expanded investigations and mandatory adjudications"), *abrogated on other grounds by United States v. Windsor*, 570 U.S. 744 (2013).

Accordingly, the Court concludes that Plaintiffs' APA claims are reviewable.

### c. Failure to State a Claim

#### i. Section 706(1)

The Court next considers whether Plaintiffs have failed to state a claim to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

In their complaint, Plaintiffs allege that DoD has unreasonably delayed their "shipment to basic training, and thus their military service." Compl. ¶ 103. In opposing DoD's motion to dismiss, however, Plaintiffs argue that the required action is "*a determination* whether Plaintiffs can access into the military and ship to basic training." ECF No. 46 at 33 n.12 (emphasis added). In response, DoD contends that Plaintiffs' "complaint may not be amended by briefs in opposition to a motion to dismiss." ECF No. 52 at 21 (quoting *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1145 (N.D. Cal. 2010)). DoD's argument misses the mark.

The rule on which DoD relies applies to "*facts raised for the first time in [a] plaintiff's opposition papers.*" *Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) (emphasis added); *see also Tietsworth*, 720 F. Supp. 2d at 1145 (explaining that the complaint "still does not contain any factual allegations that would support th[e] claimed violation" advanced for the first time in the opposition). The Court applies a different analysis to new "legal conclusions" as to precisely which agency action was unlawfully withheld, because unlike Plaintiffs' plausible factual allegations, the Court is not required to accept them as true. *Ashcroft*, 556 U.S. at 678. If the facts alleged support a § 706(1) claim on a different legal theory, Plaintiffs' claim may proceed. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014) (per curiam) ("The federal rules effectively abolish the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief." (quoting 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1219 (3d ed. 2005)); *Coos Cty. Bd. of Cty. Comm'rs v. Kempthorne*, 531 F.3d 792, 812 n.16 (9th Cir. 2008) ("Notice pleading requires the plaintiff to set forth in his complaint *claims for relief*, not causes of action, statutes or legal theories." (citation omitted)). "The complaint should not be dismissed merely because plaintiff's allegations do not support the legal theory he intends to proceed on, since the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory." *Pruitt*, 963 F.2d at 1164. The Court therefore considers whether an adjudication of Plaintiffs' background investigations is a discrete and mandatory duty. *See SUWA*, 542 U.S. at 64.

DoD argues that this decision does not constitute "agency action," ECF No. 52 at 21, which the APA defines as "*includ[ing]* the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(12) (emphasis added). This definition, however, "is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). Indeed, the APA further defines "order" in capacious terms: "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). Accordingly, the Court has "little trouble concluding" that DoD's disposition of Plaintiffs' background investigations constitutes agency action. *Whitman*, 531 U.S. at 478; *see also Mamigonian v. Biggs*, 710 F.3d 936, 945 (9th Cir. 2013) ("[T]here is no question that USCIS's denial of Ms. Mamigonian's adjustment-of-status applications is "final agency action" for purposes of the APA.").

Further, the adjudication of an individual investigation is a "discrete" action, rather than a "broad programmatic" issue. *SUWA*, 542 U.S. at 64. The remaining question is whether a decision on Plaintiffs' applications is mandatory within a certain timeframe. *See id.*

The APA "instructs agencies to complete their work 'within a reasonable time,' and grants courts of appeal the authority to 'compel agency action unlawfully withheld or unreasonably delayed.'" *In re Pesticide Action Network N. Am., Nat. Res. Def. Council, Inc.*, 798 F.3d 809, 813 (9th Cir. 2015) (first quoting 5 U.S.C. § 555(b); then quoting *id.* § 706(1)); *see also Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003) (explaining that the APA "imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time,'" (quoting § 555(b)).[19]

In this circuit, courts determine whether an agency's delay is unreasonable based on six factors:

---

[19] Section 555(b) provides, in relevant part: "With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."

(1) the time agencies take to make decisions must be governed by a rule of reason;
(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
(5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
(6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re Pesticide Action Network*, 798 F.3d at 813 (quoting *Telecomms. Research & Action Ctr. v. F.C.C. ("TRAC")*, 750 F.2d 70, 79-80 (D.C. Cir. 1984)).

This general duty to conclude matters within a reasonable time applies even when there is no requirement that the agency undertake the action in the first instance. *See In re A Cmty. Voice*, 878 F.3d 779, 785 (9th Cir. 2017) ("Once an agency decides to take a particular action, a duty to do so within a reasonable time is created." (citation omitted)). "An agency 'cannot simply refuse to exercise [its] discretion' to conclude a matter." *Id.* (quoting *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 507 n.6 (9th Cir. 1997)). Because this general duty applies even in the absence of a statutory or regulatory deadline for the specific agency action at issue, DoD's reliance on the lack of such a requirement, ECF No. 52 at 21-22, is unavailing. Rather, the absence of a specific timetable is simply the second of six factors the Court must consider. *See In re Pesticide Action Network*, 798 F.3d at 813.[20]

The Court notes that cases finding unreasonable delay have generally involved lengthier delays than the ones at issue here. *See In re A Cmty. Voice*, 878 F.3d at 787 (finding an eight-year delay unreasonable and suggesting that "a '14-month time period' without more is not

[20] DoD mischaracterizes *Nio v. DHS*, 270 F. Supp. 3d 49, 66-67 (D.D.C. 2017). *Nio* in fact supports the Court's conclusion. There, the court noted that "no statute or regulation mandates a timetable for completing the investigation and examination" of certain naturalization applications and therefore the second *TRAC* factor tipped in the government's favor. *Id.* at 67. But rather than dismissing plaintiffs' § 706(1) claim – as DoD represents – the *Nio* court explained that the application of the *TRAC* factors "is a fact intensive inquiry." *Id.* at 66. Because "the current record [wa]s inadequate at th[at] time to reach any conclusions" on the remaining *TRAC* factors, the court *declined to issue a preliminary injunction*. *Id.* at 67.

38

unreasonable" (quoting *United Steelworkers of Am., AFL-CIO-CLC v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986)). But "[r]esolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003); *see also Fu v. Gonzales*, No. C 07-0207 EDL, 2007 WL 1742376, at *4 (N.D. Cal. May 22, 2007) ("What constitutes an unreasonable delay in the context of immigration applications depends to a great extent on the facts of the particular case." (citation omitted)). Because "the current record is inadequate at this time to reach any conclusions" on the relevant factors, the Court cannot determine whether the time DoD has taken to process Plaintiffs' investigations was unreasonable as a matter of law. *Nio v. U.S. Dep't of Homeland Sec.*, 270 F. Supp. 3d 49, 62 (D.D.C. 2017).

Accordingly, the Court denies the motion to dismiss Plaintiffs' § 706(1) claim.

### ii.        Section 706(2)

In their complaint, Plaintiffs raise numerous arguments that the October 13 Memo is invalid under § 706(2), but these arguments can be distilled into essentially two claims. First, Plaintiffs allege that the October 13 Memo is "not in accordance with the law," 5 U.S.C. § 706(2)(A), and "in excess of [DoD's] statutory jurisdiction," *id.* § 706(2)(C), because 10 U.S.C. § 504(b) does not permit DoD to differentiate between U.S. citizens and LPRs on a classwide basis. Compl. ¶¶ 115-116. These are essentially the same claim, because "there is *no difference*, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has." *City of Arlington v. F.C.C.*, 569 U.S. 290, 299 (2013). In either case, Plaintiffs claim is that the October 13 Memo "violates a federal statute." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 220 (2012) (citing 5 U.S.C. § 706(2)(A), (C)). If, as Plaintiffs contend, 10 U.S.C. § 504(b) prohibits DoD's policy, then the Court must set the policy aside, regardless of DoD's reasons for adopting it.

Second, Plaintiffs allege that, even if DoD's policy is permitted by statute, its decision to adopt this otherwise permissible policy was "arbitrary and capricious" or "an abuse of discretion,"

5 U.S.C. § 706(2)(A), because DoD "failed to provide any legitimate explanation." Compl. ¶ 111.

While Plaintiffs' first claim raises a question of statutory interpretation, their second claim

requires the Court to assess whether DOD "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action 'including a rational connection between the facts found and

the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).

DoD argues that Plaintiffs have failed to state a claim under either theory. ECF No. 42 at

41-43.

The Court first addresses Plaintiffs' statutory interpretation argument. Plaintiffs'

complaint alleges that "[t]he October 13 Memo is not in accordance with the law and . . . exceeds

the authority granted to the DoD by the Enlistment Statute, which mandates that LPRs be

permitted to enlist and serve in the military." Compl. ¶ 115. The complaint further explains that

the memo "has indefinitely barred LPRs, including Plaintiffs, from serving in the military by

prohibiting them from doing so until their MSSD and NSD adjudications are complete," thereby

"violat[ing] Congress's clear intent and the plain language of the Enlistment Statute." *Id.* ¶ 116.

In their opposition, Plaintiffs phrase their argument in different terms, contending that 10 U.S.C.

§ 504 requires that "LPRs not only may enlist, but once enlisted, may access into the Armed

Forces on the same terms as U.S. nationals." ECF No. 46 at 31. Though DoD faults Plaintiffs'

opposition for straying from the terms of their complaint, ECF No. 52 at 22, Plaintiffs are

permitted to refine their legal arguments, as opposed to advancing new factual allegations, as

explained above.[21]

---

[21] Moreover, the Court may use Plaintiffs' "brief to clarify allegations in [their] complaint whose meaning is unclear." *Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000); *see also Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017) (explaining that the Ninth Circuit has "relied on the briefs on appeal to clarify the complaint, in compliance with our obligation to construe the complaint favorably to the plaintiff"). Plaintiffs' argument, as formulated in their opposition, clarifies the complaint's allegation that the statutory framework requires DoD "to allow LPRs to enlist along with U.S. citizens," Compl. ¶ 116, rather than advancing an entirely new theory. Plaintiffs' "equal treatment" reading of the statute should come as no surprise to DoD, *see id.* ¶ 56 ("The October 13 Memo fails to articulate any legitimate justification for its departure from this country's long tradition of enlisting LPRs and U.S. citizens on equal terms."); *see also United States v. Idaho*, 210 F.3d 1067, 1080 (9th Cir. 2000) (courts must consider how "[t]he complaint, taken as a whole, is most naturally read").

The Court thus turns to the merits of Plaintiffs' argument. Plaintiffs agree that the *Chevron* framework applies. ECF No. 46 at 31-33.[22] Under *Chevron*, the Court considers "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Campos-Hernandez v. Sessions*, 889 F.3d 564, 568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842). In other words, the Court asks "whether, 'applying the normal tools of statutory construction,' the statute is ambiguous." *Sung Kil Jang v. Lynch*, 812 F.3d 1187, 1190 (9th Cir. 2015) (quoting *INS v. St. Cyr*, 533 U.S. 289, 321 n.4 (2001)). Second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Campos-Hernandez*, 889 F.3d at 568 (quoting *Chevron*, 467 U.S. at 843).

Congress has not "directly spoken to the precise question" whether DoD can require enlisted LPRs, but not U.S. citizens, to complete background investigations prior to accessing. *Id.* (citation omitted). Nor, as explained above, has Congress directly specified that DoD cannot apply different accession rules to LPRs. *Cf. Andrus*, 572 F.2d at 667. On its face, § 504(b)(1) simply provides a prerequisite for the citizenship or residency of enlisted service members. It does not unambiguously express any intent to restrict DoD from adopting different requirements for how those enlisted service members are processed into service.

Plaintiffs also stress that Congress specifically required that non-LPR aliens enlisted under the MAVNI program could not "report to initial training until after" the completion of "all required background investigations and security and suitability screening." 10 U.S.C. § 504(b)(3)(A). Relying on the canon of *expressio unius*,[23] Plaintiffs reason that Congress's

---

[22] A court applies *Chevron*'s framework where (1) "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law," and (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Marmolejo-Campos v. Holder*, 558 F.3d 903, 908 (9th Cir. 2009) (en banc) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).

[23] The canon of statutory construction *expressio unius est exclusio alterius* means "expressing one item of [an] associated group or series excludes another left unmentioned." *N.L.R.B. v. SW Gen., Inc.*, ___ U.S. ___, 137 S. Ct. 929, 940 (2017) (quoting *Chevron U.S.A. Inc. v. Echazabal,* 536 U.S. 73, 80 (2002)). The Supreme Court gives the example of a sign at the entrance to a zoo that says "come see the elephant, lion, hippo, and giraffe" next to a temporary sign saying "the giraffe

failure to expressly impose this same requirement on LPRs enlisted pursuant to § 504(b)(1)(B) means that the DoD may not impose that requirement either. ECF No. 46 at 25-26 (citing *Silvers v. Sony Pictures Entm't Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc)). The difficulty with Plaintiffs' argument is that this canon of statutory construction "does not apply unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (internal quotation marks and citation omitted). Given that Congress added § 504(b)(3)(A) after the October 13 Memo was already in effect, *see* 132 Stat. at 1636, the Court cannot infer that Congress meant by its silence to foreclose the policy change enacted through the October 13 Memo.

Accordingly, Plaintiffs' allegations, even if true, do not state a claim that the October 13 Memo exceeded DoD's jurisdiction or was otherwise prohibited by statute.

The Court next addresses Plaintiffs' arbitrary-and-capricious argument. DoD asserts that Plaintiffs have failed to state a claim by taking issue with two points in Plaintiffs' complaint: (1) that the memo "contains vague and unworkable requirements," Compl. ¶ 112; and (2) that DoD is "impermissibly applying the October 13 Memo retroactively," *id.* ¶ 114. DoD contends that these specific arguments are meritless, but it does not attempt to rebut Plaintiffs' larger claim that the October 13 Memo is fatally arbitrary because the agency "failed to provide any legitimate explanation." Compl. ¶ 111; *cf. United States v. Williams*, 846 F.3d 303, 311 (9th Cir. 2016) (distinguishing between claims and arguments for purposes of waiver). In other words, even if the Court agreed with DoD on these particular points, it would not mean that Plaintiffs "fail[ed] to state a [5 U.S.C. § 706(2)] claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). DoD's motion to dismiss Plaintiffs' Section 706(2) claim on this theory is therefore denied.[24]

is sick." Under those circumstances, one "would reasonably assume that the other [animals] are in good health." *Id.*

[24] DoD also argues that Plaintiffs have failed to state a claim for failure to comply with the APA's notice-and-comment rulemaking requirements, which are set forth in 5 U.S.C. § 553. ECF No. 42 at 42; *see also* Compl. ¶ 113 ("Nor did Defendants circulate the October 13 Memo for public review and comment prior to issuing the Memo."). DoD points out that 5 U.S.C. § 553(a)(1) exempts from those requirements actions involving "a military or foreign affairs function of the United States." It does not appear that Plaintiffs have raised or are pursuing an independent 5

## IV.    MOTION FOR PRELIMINARY INJUNCTION

Having concluded that Plaintiffs' claims survive a motion to dismiss, the Court turns to Plaintiffs' motion for a preliminary injunction.  Plaintiffs seek a preliminary injunction solely on the basis of their § 706(2) claim, ECF No. 21 at 9 n.9, requesting that the Court order relief "(1) prohibiting Defendants' continued implementation of the October 13 Memo; (2) ordering Defendants to return to the pre-October 13, 2017 practices for the accession of LPRs into the military; and (3) ordering Defendants to permit Plaintiffs to ship basic training while their background investigations are pending, as U.S. nationals are able to do," *id.* at 10.

### A.    Legal Standard

Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.  To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest.  *Id.* at 20.  "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).

### B.    The Record

The Court first addresses threshold questions regarding the scope of the record for this motion.

The APA instructs that, in reviewing § 706 challenges, "the court shall review the whole

---

U.S.C. § 553 claim, as they do not designate one in their complaint, *cf.* Compl. ¶ 113, nor do they respond to DoD's argument on this point.  The Court therefore concludes that, to the extent Plaintiffs' intended to raise such a claim, they have conceded it.  *See So Young Kang v. Wells Fargo Bank, N.A.*, No. 16-CV-04309-DMR, 2018 WL 1586237, at *6 (N.D. Cal. Apr. 2, 2018) ("Plaintiff fails to respond to this argument and therefore concedes it through silence." (quoting *Ardente, Inc. v. Shanley*, No. C 07-4479 MHP, 2010 WL 546485, at *6 (N.D. Cal. Feb. 10, 2010)).

record or those parts of it cited by a party." 5 U.S.C. § 706. Therefore, to the extent practicable, a court should determine a plaintiff's likelihood of success on the merits of such a challenge based on the administrative record. *See Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) (holding that the district court abused its discretion in denying a preliminary injunction by using "the parties' written or oral representations to discern the basis on which the [agency] acted" instead of "calling for the administrative record"). Because "'[t]he whole record' includes everything that was before the agency pertaining to the merits of its decision," the Ninth Circuit has explained that "[a]n incomplete record must be viewed as a 'fictional account of the actual decisionmaking process.'" *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993) (first quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555-56 (9th Cir. 1989); then quoting *Home Box Office, Inc. v. Fed. Commc'ns Comm'n*, 567 F.2d 9, 54 (D.C. Cir. 1977)). "The 'whole' administrative record, therefore, consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson*, 885 F.2d at 555.

The Ninth Circuit permits consideration of "material outside of the administrative record in four narrow circumstances:"

> 1) where the extra-record evidence is "necessary to determine whether the agency has considered all relevant factors and has explained its decision";
> 2) where "the agency has relied on documents not in the record";
> 3) where "supplementing the record is necessary to explain technical terms or complex subject matter"; or
> 4) where "plaintiffs make a showing of agency bad faith."

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 600 (9th Cir. 2018) (quoting *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1451 (9th Cir. 1996)). Even where the Court allows such supplementary evidence, "[c]onsideration of the evidence to determine the correctness or wisdom of the agency's decision is not permitted, even if the court has also examined the administrative record." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980).

Here, DoD produced a 162-page administrative record, pursuant to the Court's order. ECF No. 57. It is not unduly burdensome to summarize the record's contents. It contains the 2-page

October 13 Memo, *id.* at 5-6, 137 pages of DoD regulations and guidance documents concerning

its general procedures for enlistment, accession, and security determinations, *id.* at 7-143, an

additional 14 pages of memos that pertain solely to the MAVNI program, *id.* at 146-48, 153-54,

158-66, and a 4-page memo increasing the requirements for LPR and MAVNI service members to

obtain the "honorable service" certifications necessary to begin the naturalization process, *id.* at

149-52.

The only portions of the record that appear to relate to security screening for LPRs are (1)

a 2-page "background" document summarizing findings of a 2017 study on "Gaps in Vetting of

Legal Permanent Residents (LPRs) who Obtain Citizenship via Joining the U.S. Military" ("2017

Study"), *id.* at 144-45; and (2) and a single statement in another memo regarding MAVNI

accessions that states: "[B]ecause we believe [LPRs] share[] many of the same risk factors with

the MAVNI population, we believe current policy is insufficient to mitigate risk," *id.* at 157.

Notably, DoD's supplemental brief also cites only those latter two documents as the basis for its

decision that change the timing of LPR background investigations was warranted.  ECF No. 65 at

2-3.

### 1.    Classified Information

DoD admits that the record is not complete.  In its certification of the administrative

record, DoD explained that the record contained only "all unclassified information" that Under

Secretary Kurta considered.  ECF No. 57 at 2.  DoD urged the Court to resolve this case on "the

basis of the unclassified record," but "reserve[d] the right to seek relief from the Court in order to

protect this classified record."  *Id.* at 2 n.1.  DoD cites no authority for its ability to unilaterally

withhold classified information from the administrative record.

The Court is sensitive to the need to protect the confidentiality of information that bears on

national security, including classified information.  But there are established routes for addressing

those concerns.  Most obviously, DoD "may provide the Court with classified information."

*Washington v. Trump*, 847 F.3d 1151, 1168 n.8 (9th Cir.), *reconsideration en banc denied*, 853

F.3d 933 (9th Cir. 2017), *and reconsideration en banc denied*, 858 F.3d 1168 (9th Cir. 2017), *and

cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017) ("Courts regularly receive

United States District Court
Northern District of California

classified information under seal and maintain its confidentiality. Regulations and rules have long been in place for that." (citing 28 C.F.R. § 17.17(c) (describing Department of Justice procedures to protect classified materials in civil cases); 28 C.F.R. § 17.46(c) ("Members of Congress, Justices of the United States Supreme Court, and Judges of the United States Courts of Appeal and District Courts do not require a determination of their eligibility for access to classified information . . . .")); *De Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 104 (D.D.C. 2012) (concluding that a court "has the discretion to order disclosure of classified information to the Court in a civil case where the information is material to the resolution of disputed legal issues and where alternatives to reliance upon classified information are inadequate to satisfy the interests of justice"); *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 45 (D.D.C. 2005) (upholding agency action under § 706(2) based on "both the classified and unclassified administrative record" provided to the court), *aff'd in part and remanded sub nom. Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007). At today's hearing, DoD acknowledged that it could have used these avenues to provide further data to the Court, but chose not to do so.

Alternatively, DoD can assert "the state secrets doctrine," which "encompasses a 'privilege against revealing military [or state] secrets.'" *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1079 (9th Cir. 2010) (alteration in original) (quoting *United States v. Reynolds*, 345 U.S. 1, 6-7 (1953)). Because this privilege "is not to be lightly invoked," it requires "a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *Id.* at 1081 (quoting *Reynolds*, 345 U.S. at 7-8). The Court must then must independently determine that "from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged." *Id.* (alteration in original) (quoting *Reynolds*, 345 U.S. at 10)). If the government satisfies these first two steps, then "the evidence is completely removed from the case." *Id.* at 1082 (citation omitted).

DoD has done none of those things here. The Court will therefore proceed to assess Plaintiffs' likelihood of success on the merits based on the record before the Court.

### 2. Smith Declaration

First, the Court must determine whether the record properly includes the declaration of Roger Smith, which DoD submitted in support of its opposition to this motion. *See* ECF No. 42-1. Plaintiffs initially sought to strike Smith's declaration, and the Court deferred ruling on the request until production of the administrative record, ECF No. 54, so that the Court could evaluate whether the declaration was "necessary to explain technical terms or complex subject matter," *Cachil Dehe Band of Wintum Indians*, 889 F.3d at 600.

Having reviewed the administrative record and the Smith declaration, the Court finds that it cannot consider the Smith declaration as support for DoD's decision. As an initial matter, the Smith declaration is not "necessary to explain technical terms or complex subject matter." *Id.* DoD argues that the declaration offers further explanation of the classified information that it has withheld from the record. ECF No. 65 at 6. As explained above, DoD has not sufficiently supported its withholding of that information or shown that the proper course is to provide a post-hoc summary rather than providing the underlying information itself, in its entirety, with tailored redactions[25] or for *in camera* review. Moreover, purportedly explanatory extra-record evidence cannot supply the basis for the Court "to determine the correctness or wisdom of the agency's decision." *Asarco*, 616 F.2d at 1160.

Even were the Court to accept the post-hoc Smith declaration as a substitute for a complete administrative record, the current record does not contain, even in summary form, any corresponding information with which to anchor the Smith declaration's "additional" explanation. The "Most Significant Findings" of the 2017 Study, as presented in the record, relate to information-sharing between different agency components and whether certain procedures are used. ECF No. 57 at 144-45. Regarding the key question in this motion – whether there is a

---

[25] If additional evidence exists that might support the October 13 Memo, the Court is not convinced that none of it is unclassified. For example, one asserted justification for the October 13 memo is contained in Under Secretary Kurta's September 22, 2017 memorandum where he states that LPRs "share[] many of the same risk factors with the MAVNI population." ECF No. 57 at 157. But DoD disclosed the percentage of MAVNI investigations that resulted in negative suitability determinations. *See* ECF No. 57 at 156-57. So it is difficult to understand why the production of similar data regarding LPRs, if it exists, would implicate national security.

rational connection between the evidence before DOD and its conclusion that LPRs as a class must complete all investigations and screening prior to accessing – the record contains only DoD's unadorned conclusion that "current policy is insufficient to mitigate risk" posed by LPRs. *Id.* at 157. That single sentence does not permit DoD to bootstrap by vague assertion, in effectively unrebuttable form, that LPRs provide a greater classwide risk and that "particular LPR enlistees have posed a grave threat to national security." ECF No. 42-1 at 7-8. Either there is no evidence to support the assertion or DoD has intentionally chosen not to provide it. Either way, the existing record gives the Court no assurance that the Smith declaration is "explanatory in nature, rather than a new rationalization of the agency's decision." *Kunaknana v. Clark*, 742 F.2d 1145, 1149 (9th Cir. 1984). So, even if the Court accepted DoD's invitation to create a fifth exception for extra-record evidence that explains classified information, *cf. Cachil Dehe Band of Wintum Indians*, 889 F.3d at 600, it would not aid DoD here, because the record gives no contemporaneous indication that this type of evidence was considered by the decisionmaker, *see Kunaknana*, 742 F.2d at 1149 (claim that extra-record evidence is explanatory "must be sustained by the record"). The Court cannot simply take the assertion on faith.

Nonetheless, though not addressed by the parties, the Court must also consider whether the Smith declaration has any legitimate purpose in deciding this motion. While the Court's consideration of extra-record evidence is carefully circumscribed in evaluating the merits of Plaintiffs' APA claim, "the Court is not limited to the administrative record" when "assessing how the issuance of an injunction may harm the public interest." *Nat. Res. Def. Council, Inc. v. Evans*, No. C-02-3805-EDL, 2003 WL 22025005, at *1 (N.D. Cal. Aug. 26, 2003) (citation omitted); *see also Winter*, 555 U.S. at 24 (relying on "declarations from some of the Navy's most senior officers" as to how a preliminary injunction would impact the Navy's training exercises for the public interest prong). Accordingly, the Court declines to strike the Smith declaration at this time but will not consider its assertions as support for the merits of DoD's policy.

## C. Nature of Injunctive Relief

DoD argues that Plaintiffs are subject to a heightened standard because they seek a mandatory rather than a prohibitory injunction. ECF No. 42 at 43-44. The argument is not

48

persuasive.

"A mandatory injunction orders a responsible party to take action," while "[a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Ariz. Dream Act Coal.*, 757 F.3d at 1060 (citation omitted). The relevant status quo consists of "the last, uncontested status which preceded the pending controversy." *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 n.13 (9th Cir. 1999) (citation omitted).

Here, Plaintiffs seek a prohibitory injunction to "prohibit enforcement of a new law or policy." *Ariz. Dream Act Coal.*, 757 F.3d at 1061. That DoD will have to perform other, affirmative acts based on the old policy does not transform this "classic form of prohibitory injunction" into a mandatory one. *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017).

### D.     Likelihood of Success on the Merits

As described above, the Court reviews with great deference whether DoD has "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars*, 136 S. Ct. at 2125 (quoting *State Farm*, 463 U.S. at 43).

DoD cannot articulate such a connection, and its explanation therefore fails at the outset, because it has simply withheld all of the relevant facts. *See State Farm*, 463 U.S. at 43 (requiring a court to consider whether the agency has "offered an explanation for its decision that runs counter to the evidence before the agency"); *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1078 (N.D. Cal. 2005) ("Without the ability to examine the studies cited by defendants in order to determine whether they support the [challenged] policy change, this court is unable to conclude that the policy change had any rational basis.").

The only quasi-factual elements of the record related to LPRs are set forth in the background summary of the 2017 Study. As relevant here, the 2017 Study concluded that the government was not doing certain things that rendered its background investigations of LPRs ineffective. First, because LPRs are never eligible to receive classified information, *see* ECF No. 57 at 89 § 6.1, the DOD Consolidated Adjudication Facility did "not review or adjudicate Tier 3

49

investigations," instead issuing "a No Determination Made." *Id.* at 144. Accordingly, this created a risk that "derogatory information discovered in the investigation" would not be "acted upon accordingly." *Id.* Second, DOD's "central biometric repository for terrorist data from a range of combatant commands and military services" was "not being systematically queried as part of the fingerprint check being conducted for military accessions." *Id.* "[R]elying only on name-based [counterterrorism] checks," impaired "DoD's ability to positively identify terrorists and other national security threats." *Id.* at 144-45. Finally, DoD did not have access to LPRs' green card or visa applications. *Id.* at 145. Likewise, DHS was not provided access to derogatory information identified by DoD. *Id.*[26]

Even considering the Study's bare conclusions, none of these findings rationally support the October 13 Memo's policy change. Because nothing in the administrative record suggests that these information-sharing defects were *caused* by permitting LPRs to ship to basic training prior to the completion of background checks, there is no rational basis to believe that preventing LPRs from shipping to basic training will *fix* these problems. *Cf. Santillan*, 388 F. Supp. 2d at 1079. Nor does the record indicate that DoD could not fix those problems without requiring completed investigations prior to LPRs shipping to basic training. For instance, the record does not state, and DoD does not now argue, that the timing change enacted by the October 13 Memo in any way impacted its ability to systematically query its biometric database or share information with DHS. *See* ECF No. 57 at 144-45.

DoD argues that its decision is supported by the finding that it was not adjudicating Tier 3 investigations for LPRs or acting on derogatory information that could have been revealed. ECF No. 65 at 2. That suggests, logically enough, that DoD should in fact adjudicate those investigations for LPRs and act on derogatory information. Though the October 13 Memo requires DoD to do so, ECF No. 57 at 5-6, Plaintiffs do not challenge that aspect of the policy, *see* Compl. ¶¶ 109-116. But the record does not suggest that DoD was unable to adjudicate those

_____

[26] The 2017 Study additionally conclude that LPRs comprised roughly 79 percent of the Tier 3 and NACLC investigations conducted for non-U.S. citizens during fiscal year 2016, and that further research was needed to determine whether a National Intelligence Agency Check should be adopted across all military components. ECF No. 57 at 144.

1   investigations because LPRs shipped to basic training.  Rather, all military personnel must

2   undergo those investigations, *see* ECF No. 57 at 74 § 4.2, and U.S. citizens continue to ship to

3   basic training prior to the completion of those investigations.

4        In interpreting the 2017 Study, the Court does not purport to "to substitute its judgment for

5   that of the agency."  *Fox*, 556 U.S. at 513 (citation omitted).  Rather, DoD has simply provided no

6   explanation for how the 2017 Study's findings support its policy choice, and "where the agency

7   has failed to provide even that minimal level of analysis, its action is arbitrary and capricious."

8   *See Encino Motorcars*, 136 S. Ct. at 2125.

9        DoD's remaining argument hinges on its conclusion that the class of LPRs "shares many

10  of the same risk factors with the MAVNI population."  ECF No. 57 at 157.  DoD's post-hoc

11  explanation of these factors is that, like MAVNI recruits, LPRs have more extensive relationships

12  with foreign countries than do U.S. citizens.  ECF No. 65 at 2-3.  But DoD has given no reason to

13  think that this was not the case during the prior policy.  And where an agency's "new policy rests

14  upon factual findings that contradict those which underlay its prior policy," it must provide "a

15  reasoned explanation . . . for disregarding facts and circumstances that underlay or were

16  engendered by the prior policy."  *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956,

17  966 (9th Cir. 2015) (en banc) (quoting *Fox*, 556 U.S. at 515-16).

18       Moreover, the record provides no indication of the risk that LPRs pose compared to U.S.

19  citizens.  Curiously, DoD contends that it need not have made such a comparison.  ECF No. 65 at

20  4.  But the precise policy change at issue is that DoD began to treat LPRs as presumptive security

21  risks, while presuming that U.S citizens did not pose such a risk.  If there was no evidence that

22  LPRs posed a greater security risk, this policy change is by definition arbitrary and capricious.

23  *See Organized Vill. of Kake*, 795 F.3d at 969.

24       In sum, DoD has simply provided no evidence to support a rational connection between the

25  facts and its choice, nor any indication that "the process by which it reache[d] that result [was]

26  logical and rational."  *Michigan*, 135 S. Ct. 2706 (citation omitted).  Therefore, the Court

27  concludes that Plaintiffs are likely to succeed on the merits of their § 706(2) claim.

28

### E.     Irreparable Harm

The Court next considers whether Plaintiffs have adequately demonstrated that they are likely to suffer irreparable harm in the absence of a preliminary injunction.

Plaintiffs cite three forms of harm: (1) damage to their career prospects, ECF No. 21 at 24-28; (2) economic harm in the form of lost service pay and other benefits, *id.* at 29-30; and (3) a delay in obtaining U.S. citizenship through the expedited naturalization process available to military members, *id.* at 30.

The Court first addresses Plaintiffs' career prospects. The Ninth Circuit has held that "diminished . . . opportunity to pursue [plaintiffs'] chosen professions" constitutes an irreparable injury, one which is particularly acute "early in their careers." *Ariz. Dream Act Coal.*, 757 F.3d at 1068 (citing *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165-66 (9th Cir. 2011)). More particularly, courts have recognized irreparable harm stemming from delayed accession into active military service. *See Tiwari v. Mattis*, No. C17-242 TSZ, 2018 WL 1737783, at *7 (W.D. Wash. Apr. 11, 2018) ("Among other setbacks, this limitation has precluded MAVNI soldiers from performing in the roles they were recruited for, prevented them from advancing in their careers, spoiled the currency of their qualifications and training, and reduced the amount of pay they are eligible to receive."); *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 216 (D.D.C. 2017) (ban on accession of transgender recruits "stunts the growth of their careers, and threatens to derail their chosen calling or access to unique educational opportunities"), *stay denied*, 2017 WL 6553389, at *3 (D.C. Cir. Dec. 22, 2017) (finding that "the enjoined accession ban would directly impair and injure the ongoing educational and professional plans of transgender individuals").

It is undisputed that DoD projected that LPRs' time in delayed entry programs would "likely exceed one year while awaiting completion of the screening requirements," ECF No. 57 at 157, and Kuang's and Cooke's own experiences further support that projection. Whether Kuang may ship out soon, ECF No. 42 at 45, is immaterial to whether Plaintiffs as a class will continue to experience year-long delays. Similarly, whether Plaintiffs' enlistment contracts provided that they could be ordered to active duty at any time, *id.*, is irrelevant to whether the October 13 Memo

causes such delays. Plaintiffs have provided evidence that these delays impact the long-term trajectories of military and post-military careers. ECF No. 26 ¶¶ 17-25. DoD argues that cases like *Doe 1* and *Tiwari* involved additional harms, ECF No. 42 at 47-49, but do not rebut the evidence that a one-year delay does cause harm to career prospects. In light of Ninth Circuit precedent recognizing irreparable injury flowing from general delay of the ability to pursue a career, *see, e.g.*, *Enyart*, 630 F.3d at 1165, Plaintiffs need not show that *Doe 1* and *Tiwari* are indistinguishable.

Moreover, there is a second form of irreparable injury present here that was not implicated in *Doe 1*, because the October 13 Memo delays Plaintiffs' ability to obtain citizenship through their military service. *See Kirwa*, 285 F. Supp. 3d at 42 ("[D]elaying naturalization applications after applicants have been promised an expedited path to citizenship constitutes irreparable harm." (citing *Nio*, 270 F. Supp. 3d at 62). It is true, as DoD points out, that its newly adopted policy requires LPRs to have completed background investigations prior to naturalization under 8 U.S.C. § 1440. ECF No. 57 at 149-50. But it is equally true that, under this same policy, LPRs must also have a total of 180 days of active service, including basic training, before they can be certified for honorable service, another prerequisite to the expedited naturalization process. *Id.* at 150. Plaintiffs' inability to begin basic training until after their complete investigations plainly delays this process. The Court further rejects DoD's suggestion that Plaintiffs suffer no injury from the loss of this opportunity. ECF No. 42 at 50. Statutory eligibility for naturalization is an important benefit of military service, and Kuang's and Cooke's declarations make clear that the military was in the practice of using that benefit as a recruiting tool. ECF No. 24 ¶ 8; ECF No. 25 ¶ 10. While Plaintiffs have no "right to naturalization," they can still suffer irreparable harm from unjustified delays in the process.

Finally, while DoD repeatedly asserts that various injuries were not "caused" by the October 13 Memo, the test is whether "irreparable injury is *likely* in the absence of an injunction." *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012). A plaintiff "need not further show that the action sought to be enjoined is the exclusive cause of the injury." *Id.*

53

Accordingly, the Court concludes that Plaintiffs have demonstrated irreparable harm.[27]

### F.        Balance of Equities and Public Interest

The Court turns to the final two *Winter* factors.  "When the government is a party, these last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

DoD argues that it has valid national security concerns regarding the accession of LPRs prior to the completion of background investigations.  ECF No. 42 at 54.  The country's national security is obviously of the utmost importance, and the Court will give due deference to that consideration, when present, as it analyzes the balance of harms.  Before it can do so, however, there must be evidence that the concern actually *is* present.  Defendants have not given the Court anything from which it could reach that threshold conclusion.  Simply put, "[a] bare invocation of 'national defense' simply cannot defeat every motion for preliminary injunction that touches on the military."  *Doe 1*, 275 F. Supp. 3d at 217.

By contrast, there is substantial, uncontradicted evidence before the Court – including evidence from the military itself – that the policy set forth in the October 13 Memo actually impairs the military's recruitment goals and undermines military readiness.  *See* ECF No. 57 at 157 (Under Secretary Kurta's statement that the policy "will impact the ability of some Military Service components to make recruiting mission in FY 2018"); *see also* ECF No. 23 ¶¶ 19-24 (former Secretary of Army's declaration that policy impacts military objectives).  Former Secretary of the Army Eric K. Fanning opines without rebuttal that "the recently announced policy change is causing significant harm to both LPRs serving in the military and the efficacy of the military itself," ECF No. 23 ¶ 17, and "will likely dissuade many qualified LPRs from enlisting in the military due to the lengthy delays in accession and uncertainty surrounding shipment dates," making it difficult for the military to meet its recruiting goals, *id.* ¶ 22.  Thus, a policy with the stated goal of improving the country's national security is likely to actually undermine that goal by impairing military readiness.  That does not serve the public interest.

There are additional equities on Plaintiffs' side.  Kuang and Cooke, and likely many other

---

[27] The Court therefore does not reach Plaintiffs' asserted stigmatic and economic injuries.

LPR class members as well, enlisted prior to the October 13 Memo, only to face an entirely different policy after enlistment. Their ability to apply for citizenship after a fixed period of military service has been frustrated by a delay of unknown length in beginning that service. Finally, "in the balancing of equities, it must be remembered that all Plaintiffs seek during this litigation is to serve their Nation with honor and dignity, volunteering to face extreme hardships, to endure lengthy deployments and separation from family and friends, and to willingly make the ultimate sacrifice of their lives if necessary to protect the Nation, the people of the United States, and the Constitution against all who would attack them." *See Doe 1 v. Trump*, 2017 WL 6553389, at *3.

For these reasons, the Court concludes that the balance of equities and the public interest favor granting an injunction and Plaintiffs' motion for a preliminary injunction is granted.

**CONCLUSION**

For the foregoing reasons, the Court (1) GRANTS Plaintiffs' motion for class certification; (2) DENIES DoD's motion to dismiss; and (3) GRANTS Plaintiffs' motion for preliminary injunction. The Court hereby ENJOINS Defendants and their officers, agents, servants, employees, and attorneys, and any other person or entity subject to their control or acting directly or indirectly in concert or participation with Defendants from taking any action continuing to implement the October 13 Memo and ORDERS Defendants to return to the pre-October 13, 2017 practices for the accession of Lawful Permanent Residents into the military.[28]

This Preliminary Injunction shall take effect immediately and shall remain in effect pending resolution of this action on the merits or further order of this Court.

**IT IS SO ORDERED.**

Dated: November 16, 2018

_____
JON S. TIGAR
United States District Judge

---

[28] In their moving papers, Plaintiffs request the Court also order "Defendants [to] permit Plaintiffs to ship out to basic training while their background investigations are pending, as U.S. nationals are able to do." ECF No. 21-1 at 2. Because Plaintiffs request the same relief as that granted to the class as a whole, the Court has not added a provision specific only to them.